UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA        )
                                )
        v.                      )    Docket No. 5:22-cr-00366-OLG-4
                                )
FELIPE ORDUÑA-TORRES,           )    San Antonio, Texas
                                )    September 30, 2024
        Defendant.              )
_____ )

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE HENRY J. BEMPORAD
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

FOR THE GOVERNMENT:
Sarah Ella Spears
Eric Fuchs
U.S. Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, TX 78216

FOR THE DEFENDANT:
Edgardo Rafael Baez
Attorney at Law
700 North Saint Mary's Street, Suite 1400
San Antonio, TX 78205

COURT RECORDER:  FTR Gold

Proceedings reported by electronic sound recording.  Transcript produced by computer-aided transcription.

INDEX

PAGE

MANUEL MENDOZA

Direct Examination by Ms. Spears .........................14

Cross-Examination by Mr. Baez ............................35

Redirect Examination by Ms. Spears .......................65

Recross-Examination by Mr. Baez ..........................67

FELIPE ORDUÑA-TORRES

Direct Examination by Mr. Baez ...........................74

Cross-Examination by Ms. Spears ..........................76

Redirect Examination by Mr. Baez ........................93

*(10:11 a.m.)*

THE COURT:  Good morning.  Please be seated.

Calling case number SA:22-CR-366, defendant number four, United States of America v. Felipe Orduña-Torres.

Let me get announcement of counsel, starting with counsel for the government, please.

MS. SPEARS:  Good morning, Your Honor.  Sarah Spears and Eric Fuchs on behalf of the United States.

THE COURT:  All right.  Good morning.

MR. BAEZ:  Dr. Baez on behalf of the defendant, Your Honor, Felipe Orduña.

THE COURT:  All right.  Good morning to you as well.

We set this case for a hearing because Judge Garcia had referred the defendant's motion to suppress a confession to me. I received a response from the government with a good number of attachments, and then this morning a -- what's called a brief in support of motion to suppress confession.  I'm assuming it's more of like a reply brief, from the defense.

I wanted to -- before I start hearing evidence on this issue, I wanted to see if we could clarify a little bit exactly what the issues are before the Court at this time.  So that's something to go to the defendants -- defense counsel for because it's their motion.

The opening part of the motion to suppress seemed -- and part of the original motion to suppress appeared to seek

suppression of statements made by Christian Martinez, who is a codefendant in the case.  I don't know what the -- I don't understand if that's an issue that the -- that the defense is presenting.  And if so, you'll need to tell me the legal theory upon which that can be made.

MR. BAEZ:  No, Your Honor.  We acquiesce to that.  The government's absolutely correct --

THE COURT:  Okay.

MR. BAEZ:  -- in which my client does not have standing in challenging that.  So --

THE COURT:  I mean, certainly subject to cross-examination --

MR. BAEZ:  That's correct.

THE COURT:  -- at trial.  And there are Sixth Amendment issues but not a Fifth Amendment issue.

Secondly, I know that the -- that the arguments in the motion and now this brief in support of suppression suggest two different arguments that the defense is presenting.  One is that there was improper Miranda warnings given before a statement was made and then, second, that even if *Miranda* warnings were given, or irrespective of that, that any statement was involuntary, as I understood it.

Now, are those two separate arguments the defense is making?

MR. BAEZ:  That is correct, Your Honor.  We included

the coercion aspect of it. And this is why -- just for purposes of this hearing, my client will (inaudible) testify in relation to what happened prior to the recordings. If you notice, there's a total of 14. And I misspoke when I submitted the brief. I said eight. It's actually a total of 14 exhibit that the government has introduced. And for the record, I'm not objecting for purposes of this hearing only.

But the main thing is there are six videos recording. And those recordings were stop and start, stop and start. This is something that the agents did periodically. And as -- I presented that in the argument in relation to the coercion by the government. And so the Court will hear evidence in relation to that aspect particularly.

But, more importantly, yes, I believe that the agent that was giving the *Miranda* rights did not do so properly.

THE COURT: All right.

MR. BAEZ: So that -- my argument is it was improperly given, Your Honor.

THE COURT: All right. Very well.

Couple of things there I may need to turn to Ms. Spears about. One is, it sounds like there's no -- there's no objection for the purposes of this hearing to the admission of the -- of the exhibits the government has presented. So I have those exhibits in paper form. They were filed under seal. I'll admit all of those exhibits. If there's anything specific

that needs to be admitted -- I know there's some videos that have already been sent to the Court as well, if I understand.

MS. SPEARS:  That is correct, Your Honor.  I filed a government exhibit list.  Exhibits 1 --

THE COURT:  I may not have that in front of me.

MS. SPEARS:  Okay.  Yes.  So essentially it is the six videos, along with their corresponding transcriptions.  And then the last two documents are the written *Miranda* warnings that the defendant signed --

THE COURT:  Okay.

MS. SPEARS:  -- along with a written consent for HSI to search the defendant's phone.

THE COURT:  All right.

MS. SPEARS:  And like defense had mentioned, we're both in agreement that they have all been admitted.

THE COURT:  Okay.  All right.  So on that then, Exhibits 1 through 8, inclusive of the sub -- the translations and so forth, will be admitted.

*(Government's Exhibit Nos. 1 through 8 admitted)*

THE COURT:  I'm wondering -- the other thing I was going to ask the government because as the -- the government has the burden of showing that a particular statement is admissible, is it clear exactly which statements we're talking about that you're seeking to admit at trial that the government -- the defense is seeking to suppress?  Because this

is ongoing.  There's all these videos.  Is there like a -- do we have a written version of the statement or some -- the actual statement that I -- or is it in one of the transcripts? I'm just wondering what exactly y'all are planning on seeking to admit or may be seeking to admit, that the defense would want to suppress.

MS. SPEARS:  Right, Your Honor.  You're correct.  It is a long interview.  It's approximately four hours, the interview is, the reason being the defendant -- in the first couple minutes the defendant denies, denies, denies.  Primarily his admission is in the fourth and fifth portion of the interview.

If we were to admit it during trial -- we're still making those pretrial decisions.  If we were to admit it during trial, we would admit the entire thing, the entire video, but primarily play those admissions that he made.

THE COURT:  All right.  Getting -- I've got all these preliminary questions, I'm sorry, for both parties.  This is another issue that the defense just raised, is it's broken up in pieces.  You said the whole video.  Is there one complete video?

MS. SPEARS:  No, Your Honor.  So the reason --

THE COURT:  Okay.

MS. SPEARS:  -- being is that the case agent, or the agent that interviewed the defendant --

THE COURT: Uh-huh.

MS. SPEARS: -- Special Agent Manny Mendoza with HSI, he recorded the interview on his cell phone at the HSI office. So this was a large takedown. Mr. Orduña-Torres was not the only defendant that was taken down that day. There were several defendants taken down around the same time across the state of Texas.

So Mr. Mendoza was handling the interview of the defendant. And so sometimes he would get a text message from other agents. He'd have to stop the interview and look at it or -- look at the text message and then proceed again with the interview of the defendant.

Also, there were times where the defendant would deny. So Agent Mendoza would step out to speak to his other co-case agents and then come back in to speak to the defendant.

So that's why it was broken into six parts, just because a lot was going on at that time. Several defendants were being arrested at the same time.

THE COURT: All right. But -- so from your perspective, when you say you'd admit the whole thing, you'd admit all six parts then?

MS. SPEARS: Correct, Your Honor.

THE COURT: Okay. All right. I gotcha.

Two more questions. One is, there's an issue -- the burden of persuasion or burden of proof isn't exactly clear as to how

this works.  The government cited a very old case, which -- *Delafuente* case, which I'm familiar with, that the defense has to proffer or have some production.

For ease of this particular hearing, without either party waiving any burden issues, it's a lot simpler for the government to present their case, allow Mr. -- allow the defense to cross-examine, then present any additional case and make a decision, unless the parties have an objection to handling it that way.  And I'll start with the government.

MS. SPEARS:  No, Your Honor.  Understood.  And I agree.  The best evidence in this case are the exhibits, being the interviews --

THE COURT:  Yeah.

MS. SPEARS:  -- along with the translations and the written and signed *Miranda* form.

THE COURT:  Yeah.

MS. SPEARS:  I submit that we don't necessarily need to put the agent on the stand because it really is just the transcriptions and the interview itself.

THE COURT:  All right.  Let me -- okay.  Let me stop right there and -- well, I would need a sponsor for those documents.  Even though they've been admitted, I'd have to know these are -- the reliability is going to be an issue.  Even admitting them, the Court would want to know that he was there, he did the recording and, very importantly, I think, from the

defense's argument, why he stopped and why he started again, things like that, stuff going around the recordings themselves. The recordings would speak for themselves to the extent they're intelligible.

MS. SPEARS:  Understood, Your Honor.

THE COURT:  I gather they were all in -- all the conversations are in Spanish?

MS. SPEARS:  That's correct.  That's the -- that's the defendant's native language.

THE COURT:  All right.  Very well.  Thank you.

I saw you were going to stand up, sir.  Let me hear from you.

MR. BAEZ:  Yes, Your Honor.  I just learned that these were taken with -- by the agent's own phone number.

THE COURT:  Yeah.

MR. BAEZ:  So those raise some issues in relation to, you know, was this an accurate thing or -- but anyways.

I just wanted the -- I mean, the Court to notice that on document 292, the government proffered that they were going to bring Manny Mendoza, which is the agent.  That's why I didn't subpoena him, because he was supposed to be here.  So I think it's appropriate.

And I guess I misspoke when I said I have no objections. I'm thinking that they're going to bring Mendoza so I can cross-examine him in relation to the accuracy and all these

things and why stop.  But I just hear that's not the case.  So I don't think I can agree to introduce these exhibits without the agent that is in question here, Your Honor.

THE COURT:  I see that you have a case agent.  Is it the sponsoring -- the agent who took the recordings or --

MS. SPEARS:  He's here, Your Honor.  We can call him.

THE COURT:  Okay.  All right.  So yeah, he's here.

All right.  One last question.  It sounds like -- I don't know the benefit of playing all the interviews in Spanish unless -- now, when you say it's recorded, are these only audio recorded, or they're also video recorded?

MS. SPEARS:  It's also video, Your Honor.  I agree with the Court.  There's no need to play the entirety of the video.  My only intention was to play the first four minutes when the *Miranda* is read to the defendant.

THE COURT:  All right.  All right.  Thank you.

Now, the defense may want to raise certain -- raise certain things.  But let me just ask -- I'm trying to get through the preliminary issues here.  Was there some questions as to the translation, that the defense was raising?

MR. BAEZ:  Yes, there were, Your Honor.  You can tell, based on -- I speak the language.  You can tell that not only Agent Mendoza had issues with the language, also, the person that translated.  There's a lot of omissions.  There's a lot of words that were misquoted.  And so I needed to question that

person.  And it's our -- Cordova, I believe that's the person who translated.  This person --

And I just went on Number 1.  Evidence number -- there's six of them.  I just went on one, the whole weekend.  And there's numerous errors in relation to the translation.  We have presented this in front of the Court for another time. But I didn't want to waste the time.  I just want to ask specific.

And I posted it on my brief, the times at which I'm going to ask Mendoza where I notice the mistakes.  And they're very specific.  And it talks about which exhibit and the time.  And so I put that for the Court for their perusal.

THE COURT:  Well, you indicate only Exhibit Number 1. Is it your view that Exhibit Number 1 is where the action is with regard to the motion to suppress --

MR. BAEZ:  In the *Miranda*.

THE COURT:  -- and the appropriateness of the *Miranda* statements --

MR. BAEZ:  That is correct.

THE COURT:  -- and whether it was really a voluntary statement?

MR. BAEZ:  That is correct.

THE COURT:  The rest of it then would be -- questions of translation are issues that would be presented to the -- to the jury --

MR. BAEZ:  That is correct, Your Honor.

THE COURT:  -- and to the Court at a later time.

All right.  All right.  I see where I am.  I had to do some -- a little bit of work to get this squared away, but I understand.

So it sounds like we're going to hear that -- it's probably good to play some portion of the first video.  It looks like -- the government said four minutes, and the defense in their more recent brief was about the same.  I saw a reference to a six minutes and seven minutes, we can watch -- that would be eight minutes of video.  I'm happy to watch that.  So government can show what they want to.  As long as it's all in the same system, the defense can show what they want to.

If there are questions of translation, we have a court interpreter here, and I'm going to be asking the court interpreter what the translations are.  And the Court -- I will tell the parties, the Court's probably going to be listening to what the court interpreter says is the translation since we rely upon our translation services here in court to make very important decisions I'm going to rely on here, unless there's some objection.  And I'll let y'all object at the appropriate time.

All right.  Very well.  Thank you.  I appreciate all the info.  That got me a little bit read into where we are.

And I'll hear from the government at this time.

MS. SPEARS:  Thank you, Your Honor.  I'll go get my witness now.

THE COURT:  Okay.  Very well.

*(Discussion off the record)*

THE COURT:  Court notes we have two court interpreters in the courtroom today, which is a rare benefit.  And so, if necessary, I can put one court interpreter on the stand and have the other one interpreting for Mr. Orduña so he can hear everything that's going on.

All right.  I ask the witness come forward and be sworn in with my courtroom deputy.

THE CLERK:  Okay.  You can please raise your right hand.

*(The oath was administered)*

MS. SPEARS:  Your Honor, may I proceed?

THE COURT:  You may proceed.

MANUEL MENDOZA, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. SPEARS:

Q.  Can you please state your name for the record.

A.  Manuel Mendoza.

Q.  And how do you spell your last name?

A.  M-E-N-D-O-Z-A.

Q.  And where are you currently employed, Mr. Mendoza?

A.  San Antonio, Texas, with Homeland Security Investigations.

Q.   And how long have you been working for HSI?

A.   Eighteen years.

Q.   And how long have you been in San Antonio?

A.   Been in San Antonio 11 years.

Q.   And what, in your capacity, do you do for HSI?

A.   I'm a criminal investigator.  Investigations can include alien smuggling, drug smuggling, money laundering, guns exportation, different things.

Q.   And you said you handle alien smuggling cases; is that correct?

A.   Yes.

Q.   Okay.  What did you do prior to being an HSI special agent in San Antonio?

A.   I was a Customs and Border Protection officer in El Paso, Texas.

Q.   Okay.  And how long were you a Customs and Border Protection agent in El Paso?

A.   Approximately three years.

Q.   And what did you do as a CBP officer?

A.   Inspected individuals entering the United States.  I worked at the port of entry.

Q.   And during that time, did you speak Spanish?

A.   Yes.

Q.   And do you speak Spanish in your job here in San Antonio?

A.   Yes.

Q.   What did you do prior to being a CBP officer in El Paso?

A.   I was a teacher, actually, for four years.

Q.   And what did you teach?

A.   I taught elementary.  I was a bilingual teacher at the elementary level from first through fifth grade throughout those four years.

Q.   And was that in El Paso?

A.   Yes.

Q.   And what did you do as a bilingual elementary schoolteacher?

A.   The purpose of the bilingual teaching was to start introducing the students into English and transitioning them from Spanish instruction into English, to prepare them to go to middle school where the instruction was going to be mainly in English.

Q.   And were your students primarily Spanish-speaking?

A.   Yes.

Q.   And did you speak to them in their native tongue?

A.   Yes.

Q.   Did you also help them with reading in their native language?

A.   Yes.

Q.   And that native language was Spanish; is that correct?

A.   Correct.

Q.   When have you -- how long have you been speaking Spanish?

A.   Since I was a little kid.  I would speak to my grandparents in Spanish.

Q.   And you spoke as a teacher; is that correct?

A.   As a teacher, yes.

Q.   And you spoke Spanish as a CBP officer?

A.   Yes.

Q.   And you speak Spanish now as a HSI special agent, correct?

A.   Yes.

Q.   Okay.  And in the course of your duties as an HSI special agent, how many interviews would you say you've done with target suspects or defendants?

A.   Throughout the 18 years?

Q.   Yes, sir.

A.   It would be hundreds, couple hundred.

Q.   And over those -- over the hundred interviews you've done, what percentage of those were in Spanish?

A.   Probably 80 percent.

Q.   Do you also speak to witnesses that speak Spanish?

A.   Yes.

Q.   Now, were you involved with the arrest of the defendant, Felipe Orduña-Torres?

A.   Yes.

Q.   And what day did that occur?

A.   That occurred June 26, 2023.

Q.   And what was the defendant arrested for?

A.   Alien smuggling.

Q.   And was that in relation to the incident of the 53 people that died on June 27th of 2022?

A.   Yes.

Q.   What time approximately was the defendant arrested?

A.   Approximately 6:20 to 6:30 a.m.

Q.   And where was he arrested at?

A.   At his home at 5551 Knoll Krest.

Q.   And where were you during the time of that arrest?

A.   I was perimeter security.  I was on location but just on the street.

Q.   And do you recall who arrested the defendant?

A.   Homeland Security Investigations.

Q.   Just not you, right?

A.   Right.

Q.   Okay.  And what happened once the defendant was arrested at his home at approximately 6:20 in the morning?

A.   He was then transported to our office at 1015 Jackson Keller.

Q.   And what's the distance between the defendant's home and the HSI office?

A.   Approximately 30 minutes.

Q.   Do you recall if you were with him when he was transported? And if you don't, that's okay.

A.   I do not recall.

Q.  Okay.  What did you do once the defendant was transported to HSI?

A.  Once the individual arrives to HSI, we usually set them up in a interview room.  So we would have to gain access to our office, gain access to the processing room and make sure the interview's clear.  And then we would bring the subject into the interview room.

Q.  And why do you interview a subject in an interview room versus at his house or somewhere else?

MR. BAEZ:  Objection, leading.

THE COURT:  Overruled.

You may -- you can answer the question.

THE WITNESS:  Well, he was under arrest, so we were going to transport him to our office, regardless.

BY MS. SPEARS:

Q.  And who all was in the interview with you?

A.  Special Agent Joe Santos.

Q.  And was the defendant there?

A.  Yes.

Q.  Okay.  And was the defendant handcuffed?

A.  He was cuffed to the bench.  There's a bench located in the room, that you cannot move.  Neither the table nor the bench can be moved.  They're fixed.  And he was handcuffed to the bench.

Q.  And is that fairly typical?

A.   Yes.

Q.   And why is that?

A.   We don't know how they're going to react to being under arrest, and it's one way to prevent them from doing any violent acts towards us.

Q.   Once you're in the interview room with the defendant, was that interview recorded?

A.   Yes.

Q.   And how long was the interview?

A.   Approximately four hours.

Q.   And the recordings of this interview are broke up into six parts.  Why is that?

A.   We would take breaks.  I know for one part I received a text message.  And when I checked it, it stopped the recording. So that was one.

     And on others, when we -- this was a very complicated case. So I would need to take breaks to gather my thoughts and discuss items with other individuals.  So I would take breaks and stop the recording at that point.

Q.   And during the parts that you stopped the recording, did you ever speak to the defendant off record, with the recording not happening?

A.   No.

Q.   What was the defendant's demeanor throughout that four-hour interview?

Manuel Mendoza - Direct

A.   He was calm, seemed cooperative.

Q.   Did he appear educated?

A.   He did.

Q.   And why do you say that?

A.   I've spoken to a lot of individuals throughout my career, and I get a good feel for -- I'm not an expert in education, but I get a good feel for their level of education.

Q.   Was this interview transcribed?

A.   Yes.

        THE CLERK:  Your Honor, just a second.  It stopped recording.

        THE COURT:  Okay.  Speaking of recordings, hold on one second.  Let's get the system running.

     (Pause)

        THE CLERK:  Okay, Your Honor.

        THE COURT:  Okay.  You may proceed.

        MS. SPEARS:  Thank you, Judge.

BY MS. SPEARS:

Q.   This interview was transcribed; is that correct?

A.   Yes.

Q.   Are you the one that did the transcriptions?

A.   No.

Q.   Do you know who did the transcriptions?

A.   It's a transcriber hired by Homeland Security Investigations.

Q.   And is that often how your agency handles transcriptions?

A.   Yes.

Q.   They'll outsource?

A.   Outsourced.

Q.   In preparation for this hearing, did you have an opportunity to review that entire interview with the defendant?

A.   Yes.

Q.   Did you also have an opportunity to review the transcriptions of that interview?

A.   Yes.

Q.   And would you agree that those transcriptions are a fair and accurate depiction of the interview?

A.   Yes.

        MS. SPEARS:  All right.  If we may play Exhibit 1, to approximately 60 seconds.

        THE COURT:  Okay.  Let me see if I can get -- hold on one second.  Okay.  I got it in front of me now.  Go ahead.

     (Playing video, Government's Exhibit Number 1)

        THE COURT:  Can we pause it for a second?

     (Video stopped)

        THE COURT:  I have a question for counsel before -- is there -- do you have a copy of the written document that he read and --

        MS. SPEARS:  Yes, Your Honor.  My apologies.  I thought -- it's Exhibit 1A.

THE COURT:  I thought -- 1A I have is the transcription.

MS. SPEARS:  That is correct.  Sorry.  What --

THE COURT:  Is there -- there's -- like, he read a form.  That's what he's asking.  "Did you read it?  Are you able" -- did he -- did he have a form?

MS. SPEARS:  Yes, Your Honor.  And I was about to ask him about the form.

THE COURT:  But I'm just wondering, is it admitted as an exhibit?

MS. SPEARS:  Oh, yes, Your Honor.  It is --

THE COURT:  That's my question.  Yeah.  I'm sorry.

MS. SPEARS:  It's Exhibit 7.

THE COURT:  7.

All right.  You may proceed.  That's all I needed to know.  I just wanted to know where it was.

MS. SPEARS:  Thank you.

THE COURT:  Thank you.

*(Playing video, Government's Exhibit Number 1)*

BY MS. SPEARS:

Q.  Okay.  Stopping the video at minute 1:00.

Agent Mendoza, prior to speaking to the defendant, did you have any substantive conversations with him?

A.  No.

Q.  So any conversations of substance occurred on this video;

is that correct?

A.   That's correct.

Q.   Okay.  And I notice the video is sort of set up on the side.  Why is that?

A.   I believe I propped up my phone with something, and that's where I put it.

Q.   Okay.  And as the Court noted, you handed the defendant a document; is that correct?

A.   Correct.

Q.   And we can't see the document on the recording, though, can we?

A.   No.

Q.   Okay.  What was that document that you handed him?

A.   It was the rights waiver form.

Q.   And is that something you usually show individuals that you interview?

A.   Yes.

Q.   And watching that video, it appears that he is also reading along; is that right?

A.   Correct.

Q.   Did you watch him read along?

A.   Yes.

Q.   And, in fact, what did you tell him?

Well, let me ask you this.  Did you ask him if he could read?

Manuel Mendoza - Direct

A.   I did.

Q.   And what did he say?

A.   That he could.

Q.   Did you ask him to follow along?

A.   I did.

Q.   And did he, in fact, follow along?

A.   He did.

Q.   Did you watch him follow along?

A.   I mean, I was reading.  But right now on the video, I can see his lips moving as I'm reading.

        MS. SPEARS:  Okay.  If you can please play from -- to 1:11.  Or play from minute 1:00 to minute 1:11 of Exhibit 1A.

    *(Playing video, Government's Exhibit Number 1)*

    *(Video stopped)*

BY MS. SPEARS:

Q.   Okay.  Stopping.  Playing that from 1:00 to minute 1:11.
    Did you tell him that he had the right to remain silent?

A.   Yes.

Q.   And did he also read that on the paper, that he had the right to remain silent?

A.   Yes.

        MS. SPEARS:  Okay.  Can you play -- please play Exhibit 1A from minute 1:11 to minute 1:22.

    *(Playing video, Government's Exhibit Number 1)*

    *(Video stopped)*

BY MS. SPEARS:

Q. Stopping at 1:22.

Did you also tell him that anything he said could be used against him?

A. Yes.

Q. And did it appear that he was reading along as you said that?

A. Yes.

Q. Okay.

MS. SPEARS: If you can please pull up Government Exhibit 7.

THE COURT: I have 7 in front of me.

MS. SPEARS: Do you? Okay. Thank you, Judge.

THE COURT: But the agent may need a copy.

MS. SPEARS: Yes, Your Honor.

THE COURT: Oh, is there a screen -- it's going to go from the screen. That's fine. All right. Very well.

MS. SPEARS: Yeah.

BY MS. SPEARS:

Q. Is this the form that the defendant was looking at?

A. Yes.

Q. Okay. And it's in the Spanish language; is that correct?

A. That's correct.

Q. Can you please explain to us what this document says?

A. This document states his rights to answer questions

before -- he understands his rights, whether he wants to answer them or not with an attorney present.  This form explains all that.

Q.   Okay.  And those are his *Miranda* warnings; is that correct?

A.   Yes, *Miranda* warnings.

Q.   And are those his initials beside each sentence?

A.   Yes.

Q.   And what do -- what does it mean by him initialing at the end of each sentence?

A.   What I explain to them is, as I read each sentence, I want to make sure they understand that sentence.  That doesn't mean they have to talk to me or not, but do they understand that sentence.  And I have them initial if they do, in fact, understand it.

Q.   And what does his signature mean down there below?

A.   The signature below states that he will talk to us without an attorney present.

Q.   And what time is that signature stamped?

A.   I stamped it as 7:26 a.m.

Q.   Okay.  So the defendant was arrested at approximately around 6:20 a.m.; is that correct?

A.   Correct.

Q.   And his *Miranda* warnings were signed at approximately 6:26 a.m.?

A.   Correct.

Q.   Okay.

THE COURT:  7:26 a.m.

MS. SPEARS:  Or 7:26 a.m.  My apologies.

THE COURT:  Right.  It couldn't have been six minutes. That would have been very quick.  Yeah.

BY MS. SPEARS:

Q.  For the record, he signed the document at approximately 7:26 a.m.; is that right?

A.  Correct.  Sorry.  I was looking at the form.  But yeah.

MS. SPEARS:  Okay.  Can you please pull up Exhibit 1A and play minute 1:37 to 3:59 -- or Exhibit 1, and play 1:37 to 3:59.

*(Playing video, Government's Exhibit Number 1)*

BY MS. SPEARS:

Q.  And is he reading his rights right there?

A.  It appears so, from this video.  But I was there.  And yes, he was reading them.

Q.  And is he initialing?

A.  Yes.

*(Video stopped)*

BY MS. SPEARS:

Q.  Okay.  So going to the translating -- or the corresponding translation, Exhibit 1A, Page 3.  And do you see that in front of you, Agent Mendoza?

A.  Yes.

Manuel Mendoza - Direct

Q.   Okay.  You had told him he had the right to remain silent, correct?

A.   Correct.

Q.   And that was the same as what that statement of rights said, that he initialed, correct?

A.   Correct.

Q.   On Page 3, line 10, you also said that anything he used -- he said could be used against him; is that correct?

A.   Correct.

MR. BAEZ:  Judge, I'm going to object to this --

THE COURT:  About to say, the transcript -- the document speaks for itself.  If there's a particular thing about the document you need to present, that's all right.  I mean, I have it in front of me.

MS. SPEARS:  Yes, Your Honor.

THE COURT:  There may be some issues that the defense wants to say there's a problem with the translation, something like that, and I will allow you to come back on those, Ms. Spears, and say, "No, this is correct."  So --

MS. SPEARS:  Yes, Your Honor.

THE COURT:  But you -- but it's okay.  Go ahead.

BY MS. SPEARS:

Q.   So during that entire interview, you read him his *Miranda* rights, correct?

A.   Correct.

Q. And at any time did he ask you for an attorney?

A. No.

Q. At any time did he appear confused about his rights?

A. No.

Q. Did he show any signs of fear and intimidation?

A. No.

Q. Did he show any signs of hesitancy in signing those rights?

A. No.

Q. And, in fact, you gave him the opportunity to read Exhibit 7 on his own, correct?

A. Correct.

Q. After you had read it to him?

A. That's correct.

Q. And he told you he was willing to speak to you without an attorney?

A. Correct.

Q. Did he give you permission to search his phone?

A. Yes.

Q. Did he, in fact, sign something to also give you permission to search his phone?

        MR. BAEZ:  Objection, leading.

        THE WITNESS:  Yes.

        THE COURT:  Overruled.

BY MS. SPEARS:

Q. Okay.  I'm showing you what's been marked as Government

Exhibit 8.  Is that what the defendant signed?

A.  Yes.

Q.  Okay.  So would you say he was cooperative?

A.  Yes.

Q.  Lastly, I want to ask you about when you talked to him about his wife.  Do you know his wife's name?

A.  Yes.

Q.  What's her name?

A.  Fernanda.

Q.  Okay.  At some point in that four-hour interview did you ask the defendant whether his wife was involved?

A.  Yes.

Q.  And that was involved in smuggling, right, you asked?

A.  Yes, if she was involved in alien smuggling.

Q.  Okay.  Approximately when did you ask him that?

A.  From when I reviewed the videos, it was approximately video three, if I'm not mistaken.

Q.  Let me refresh your recollection.  Would it help to look at the transcript of -- would it help to look at the transcript of the interview --

A.  Yes.

Q.  -- for you to know when?

A.  Yes.

Q.  Okay.  I know it's a lengthy interview.

        MS. SPEARS:  If you could please pull up Exhibit 5A.

TECHNOLOGY SPECIALIST:  Yes, ma'am.

MS. SPEARS:  Page 48, line 8.

BY MS. SPEARS:

Q.   Can you please read that page, Agent Mendoza, and see if it refreshes your recollection?

A.   (Witness complies.)

Okay.

Q.   Reading it, does it refresh your recollection as to when you asked the defendant about whether or not his wife was involved in alien smuggling?

A.   Yes.

Q.   Okay.  And you had mentioned her before; is that right?

A.   Correct.

Q.   Well, in what context had you mentioned her before?

A.   Just if she was his wife or girlfriend, or who lived with him at the house, something along those lines.

Q.   And why did you ask those questions?

A.   They're standard questions of who's in the house.

Q.   Those questions -- were those questions starting an investigation into her?

A.   No.

Q.   Prior to you asking the defendant this question on Page 48, regarding his wife's involvement in alien smuggling, what information had he provided you before then?

A.   He had already told me that he was illegally smuggled into

the United States by someone named Jainer, that lives in the Laredo/Nuevo Laredo area.  And that same person, Jainer, asked him if he wanted to work for him, do some work.

And Felipe stated:  I can't.  You know, something's wrong with my leg.  I won't be able to run if we're being chased or what have you.

And that Jainer said:  It's not that type of work that you would do.  So --

Q.  And when you say "work," what do you mean by "work"?

A.  Alien smuggling.

Q.  Okay.

A.  That he would assist in alien smuggling.

So he told me about that part.

He had already, by this point, identified Christian Martinez, not by name but as El Gordo, that drives a Chrysler 300, I believe.

Q.  And why did the name Christian Martinez -- why was that of significance to you?

A.  He was a target of our investigation as well.

And he had already identified Riley, also a target, and mentioned a man named Juan, who was, again, a target of our investigation.  And he had mentioned several things that he had done, as far as picking up Juan, taking him to the trailers that were going to be used for alien smuggling.

He had already discussed all those things before I asked

him if Fernanda was involved in alien smuggling.

Q.  And so throughout this four-hour interview, did he ever once ask for an attorney?

A.  No.

Q.  Did he ever once try to stop the interview?

A.  No.

Q.  Was he ever not cooperative during this interview?

A.  No.

Q.  Were any promises ever made to the defendant during the interview?

A.  No.

Q.  Were any threats ever made to the defendant?

A.  No.

Q.  Did he ever appear confused to you?

A.  No.

         MS. SPEARS:  Your Honor, if I may have one moment.

         THE COURT:  Sure.

     (Pause)

         MS. SPEARS:  Your Honor, that's it for direct.  I may pass the witness.

         THE COURT:  Okay.  I had one question for you about an exhibit, and then I'll hear from the defense.

     Exhibit 1A, on the front page it says -- indicates a time, and it's some sort of timestamp, 15:49:47.  I'm wondering -- that can't be the actual time, military time.  That'd be 3:00

in the afternoon.  But it sounds to me like, from the document, with the rights being signed -- was signed at 7:26 in the morning.  I just don't know what that time is.  It wasn't a 15-hour interview, so I just didn't know what that was.

MS. SPEARS:  No, Your Honor.

BY MS. SPEARS:

Q.  Do you -- Agent Mendoza, do you happen to know what that time is?

A.  I believe that's the time it was transcribed, at 3:49.

THE COURT:  So it was -- if I may ask a question.  It was transcribed the same day?

THE WITNESS:  Yes.  I believe so.

THE COURT:  Ah.  Very well.  Thank you.  That's pretty quick transcription, but okay.  Very well.  That was my question.

You're free to inquire, sir.

MR. BAEZ:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BAEZ:

Q.  Agent Mendoza --

A.  Yes.

Q.  -- the recording device that recorded this interview was your phone?

A.  Yes.

Q.  Is that typical practice of the agency?

Manuel Mendoza - Cross

A.   It could be.  If that's the only device you have at that moment, yes.

Q.   So you're telling the Court that there's no recording device in this interrogation room?

A.   That's correct.

Q.   Except your phone?

A.   My phone can record.

Q.   No.  But the agency, supported by the U.S. government, doesn't have a recording device capable of making accurate depictions of the interview?

A.   At that time there was no recording device in that room.

Q.   Only your phone?

A.   Yes.

Q.   And that's why there are six videos instead of one current or continuous interview; is that correct?

A.   Yes.

Q.   Okay.  And you stated that you never spoken to my client in relation to his wife prior to you reading the *Miranda* rights; is that correct?

A.   I don't think I stated that.

Q.   You don't think?

     So did you talk to my client in relation to his wife prior to you reading his *Miranda* rights?

A.   It's possible.

Q.   Okay.  But that is not what you indicated earlier, right?

A.   I need clarification.  I don't know what you're asking me.

Q.   When the U.S. government attorney asked you, you said, no, only at that particular time, video 5A at some time.  That's the only time.

A.   Well, it depends.  I mean, it's difficult question to answer, sir.

Q.   I understand.

Now, do you believe that you read my client's *Miranda* rights properly?

A.   Yes.

Q.   In fact, if I told you that you never told my client that anything that you say will be used against you, would you be surprised?

A.   Shocked.

Q.   Shocked, right?

Because according to you, he signed a document, correct?

A.   Yes.

        MR. BAEZ:  In fact, if I can pull that -- I'm sorry.  I'm going to have to use you as well.  Hope you guys don't mind.

        TECHNOLOGY SPECIALIST:  Yes, sir.

        MR. BAEZ:  That, where he signed --

        THE COURT:  Exhibit 7?

        MR. BAEZ:  Exhibit 7.  That's correct.

BY MR. BAEZ:

Q.  I want you to look at line number three.  And please read it.

A.  Okay.  "*Cualquier cosa que diga puede ser usada en su contra en un tribunal u otros procedimientos* legales."

Q.  "*Otros*" what?

A.  *"Procedimientos."*

Q.  That's not what you said.

A.  Right now?

Q.  You said *"procesimientos,"* did you not?

A.  When, sir?

Q.  Just now.

A.  I don't know.  You tell me what you heard.

Q.  Okay.  Now, if we can play that video.  And I believe it's around 1:17.

THE COURT:  And you can start a little bit before, just to be safe.  There you go.  Uh-huh.

*(Playing video, Government's Exhibit Number 1)*

MR. BAEZ:  Pause it.

*(Video stopped)*

BY MR. BAEZ:

Q.  What did you say?

A.  What he just played?

Q.  What you just read.  You just read it.

A.  Sir, are you asking me what I read or what I said?

Manuel Mendoza - Cross

Q.   I don't know if you've read it.  I don't know if you said it.  What just came out of that speaker was not what you read earlier, was it?

A.   Earlier today or earlier that day?

Q.   Sir, don't -- right now, on line number 3, that I asked you to read it.

A.   Right now, today?

Q.   Yes.  Right now.

A.   Okay.

Q.   Do I need to -- you need to read it again?

A.   Yes.

Q.   Would you please?

TECHNOLOGY SPECIALIST:  Yes, sir.

THE COURT:  Can you just give him a copy of the document?  Why don't I just give him a copy.  Let him have a copy of the document in front of him --

MR. BAEZ:  Okay.

THE COURT:  -- and a copy of the transcription so we can look at what we're talking about.  This is going to go on forever to see who can hear what they can hear in a conversation in Spanish, recorded on the phone.

MR. BAEZ:  May I approach, Your Honor?

THE COURT:  Just give him that.  If there's a question about the transcript, you can give him the transcript, too.  It doesn't say *"su*."  The papers say (inaudible).  I think I see

where you're going, but let's just get it done.

MR. BAEZ:  That's correct.  All right, Your Honor.

THE COURT:  I know, I think, where you're going.  But it's right here in the translation.

MR. BAEZ:  Correct, Your Honor.

THE COURT:  You can give him --

MR. BAEZ:  But he's --

THE COURT:  Just give him that document as well.

MR. BAEZ:  He just testified that he did tell him.

THE COURT:  That's fine.  No.  I understand.

MR. BAEZ:  Okay.

THE COURT:  But we'll be going in circles on the recording forever on that issue.  Yeah.

MR. BAEZ:  Well, Judge, that's the issue that I have. He was not properly given the *Miranda* rights.

THE COURT:  It's written in this transcript I'm holding up to show you, sir.  You can hand him this transcript. It's a piece of paper, and he can see it.  It doesn't say *"su."* It says *"ser usada en contra en un tribunal."*  So, I mean, it says it right there.  Doesn't have *"su"* on there.  So that would make a difference, I think is your point.

So, I mean, to this extent, that you're going to show distinctions between what the rights are and what the transcript is, show him the transcript.  If it's something where the transcript is wrong, then we'll need to listen to the

tape.

Do you see what I'm saying?

MR. BAEZ:  Yes, Your Honor.

THE COURT:  All right.  Otherwise, we're going to be here for a very long time.

BY MR. BAEZ:

Q.  So after you heard that, you agree you never told him against him --

THE COURT:  Yeah.  Show him the -- you can cross-examine, sir.  You have the right to cross-examine.  I do not --

MR. BAEZ:  May I approach, Your Honor?

THE COURT:  -- mean in any way to limit your rights, sir.

MR. BAEZ:  May I approach, Your Honor?

THE COURT:  Uh-huh.  You may.

BY MR. BAEZ:

Q.  Right here and right here.  Could you read this particular part?

A.  This one on my left?

Q.  Yes.

A.  "*Cualquier cosa que diga, puede ser usada en contra en un tribunal o otros procedimientos legales.*"

Q.  Did you see that you're missing the part that is against him?

A.   Yes.  I'm missing the word *"su,"* just like the judge stated.

Q.   Do you think that's important to a person to know that the rights that he's waiving are his rights, his rights?  But you never told him that, did you?

A.   That particular word *"su,"* I missed it.  But taken as a whole -- I don't understand what you're saying.

        MR. BAEZ:  Objection, nonresponsive.

    Just answer my question, please.

        THE COURT:  Ask the question again so he can hear you.

BY MR. BAEZ:

Q.   You did not tell him that he's waiving his rights, did you?  They were going to be used against him.

A.   That sentence doesn't indicate about waiving his rights.  It says the statements made, right.

Q.   Will be used against you, correct?

A.   So that sentence specifically --

Q.   But you didn't tell him that, did you?

A.   I didn't say *"su."*  You're correct.

Q.   Okay.  But yet, here we have a signature on that exhibit that apparently he did say against him.  You see that?

A.   Yes.

Q.   Okay.  On Page 2 of Exhibit A1 you actually admit that you have been spoken to my client prior.  In fact, if we go to 07 on Exhibit 1A -- and I'll show you the transcript.  If you can

read that right there.

A.  "*Ya sé que usted tiene muchas preguntas, ¿okey? Y queremos hablar con usted sobre algunas cosas.*"

Q.  And the translation?

A.  "I know you have a lot of questions.  Okay.  And we want to talk to you about some things."

Q.  Okay.  So how do you know that he had a lot of questions? And you said "a lot of questions," did you not?

A.  Yes.

Q.  How did you know that he had a lot of questions if you hadn't talken to him prior?

A.  Because when we arrest someone, they have a lot of questions before we read them their rights, and we don't answer them until after we read them their rights.

Q.  Wasn't it because you spoke to him before?

A.  Literally, yes.

Q.  So you spoke to him before?

A.  Literally, sir.

Q.  Okay.

A.  We're not going to not speak to him.

Q.  During this time, did you promise him that he was -- that his wife was not going to get arrested if you -- if he cooperated?

A.  No.

Q.  You didn't tell him that?

Manuel Mendoza - Cross

A.   No.

Q.   Okay.  And you didn't promise him that if he turn over the phone and allow you to use it, then you would not go after his wife?

A.   No.

Q.   You didn't say that?

A.   I did not.

Q.   Okay.  I'm going to show you, in Exhibit 1A you talked to my client about the phone prior to his *Miranda* rights being read.  Isn't it true?

A.   Literally?

Q.   Yes.

A.   Yes.

Q.   So you spoke about the phone without reading his *Miranda* rights?

A.   Literally, yes.

Q.   The phone that had a lot of incriminated evidence against him?

A.   Yes.

Q.   Without reading his *Miranda* rights?

A.   We spoke about the phone, the thing in his hand, not about what was in it.

Q.   But it's not part of the interview, is it?

A.   I'm sorry?

Q.   It's not part of the interview, is it?  What you talked to

him about the phone.

A. No. When they're arrested and they give us their property and we ask them, "Is this your phone," and he'll say, "Yes," that's the talking about the phone that happened.

Q. All right. So let me show you -- right here. Could you read that and the English part, please?

A. In Spanish first?

Q. The Spanish first.

A. "*Okey. Ahora, yo sé que yo hablé con usted sobre su teléfono ¿okey?*"

Okay. English. "Okay. Now, I know I talked to you about your phone. Okay?"

Q. Now, in Spanish, do you see those little marks? What are those?

A. What marks, sir?

Q. These little marks right here?

A. The accents?

Q. Accents. What do they do?

MS. SPEARS: Your Honor, my apologies. What page are --

THE COURT: Yeah. Can you --

MR. BAEZ: We are on page number 6, line -- one, two, three, four, five, six, seven, eight, nine, ten, 11 -- 12. Line 12.

Manuel Mendoza - Cross

BY MR. BAEZ:

Q.  So what is -- what do they do, accents?

A.  They give the --

Q.  Sir, you teach Spanish, correct?

A.  No, I don't.

Q.  You teach --

Okay.  So if I say that word, as you read it, was incorrect, it says *"hablé,"* would you agree with me?

A.  *"Hablé,"* yes.

Q.  So I talked to you prior.  Emphasis on that I did this prior.  But it's not recorded, is it?

A.  This sentence is recorded.

Q.  This right here.  You talking -- are you telling him that you talked to him prior about his phone?

A.  Yes.

Q.  But there's no recordings of it, is there?

A.  No.

Q.  Why not?

A.  Because we literally spoke, "Is this your phone?"

"Yes."

I'm answering your question literally.  We didn't speak about anything inside the phone.

Q.  That's what you're saying?

A.  That's what I'm saying.

Q.  Okay.

A.   Because we bring property -- they bring property with them, and we need to know whose it is.

Q.   What is the difference between a prayer in Spanish and a section?  Do you know?

A.   A "section"?

Q.   Uh-huh?

A.   And a "prayer"?

Q.   Yes, sir.

A.   A prayer is religion.

Q.   What is the word that we use in Spanish to say "prayer"? "Are you praying?"

A.   Like we?  You and me?

Q.   Yes.

A.   Are you of Mexican --

Q.   Is it *"oracion"*?

A.   -- Mexican heritage as well?

Q.   I guess.  I don't know if there's a difference.

A.   Well, Puerto Rican and Mexican is different.

         THE COURT:  What word do you use in Spanish to say the word "prayer"?  Otherwise, we're going to be here forever. This goes in too many circles.  What word do you use in Spanish for "prayer"?

         THE WITNESS:  *"Ora."*

         MR. BAEZ:  *"Oracion,"* correct?

         THE WITNESS:  *"Oracion."*

THE COURT: *"Oracion*."

BY MR. BAEZ:

Q.  And isn't that that what you told my client in relation to -- "do you understand this prayer"?

A.  No.  Because the "sentence" is translated into *"oracion"* as well.

Q.  "Sentence"?

A.  Right.  The word "sentence," translation *"oracion*."

I learned that when I was a teacher.

Q.  Did you ascertain whether my client understood that, or could he have taken it as a prayer?

MS. SPEARS:  Objection, speculation, Your Honor.

MR. BAEZ:  If he --

THE COURT:  Well, I think that part would be overruled.  But you have to get us to the correct page, if we're talking about -- if that's --

MR. BAEZ:  Yes.  This is Exhibit 1A, Page 6.

THE COURT:  All right.  So --

MR. BAEZ:  I'm sorry.  Sorry.  Sorry.

THE COURT:  So let the agent have it in front of him, too, so --

MR. BAEZ:  Page 5.  Sorry.  Page 5.

THE COURT:  Page 5?  All right.  Thank you.

MR. BAEZ:  Yes.

THE WITNESS:  I have it.

THE COURT:  And to the objection, the agent has testified whether he believed, for example, that the defendant understood his rights and things like that.  So to the extent that that is somehow speculative, I believe that the door's been opened.  I think the interpretation or his view of what the defendant understood is admissible at this time.

So you can ask those questions, too, Mr. Baez.

THE WITNESS:  I have it in front of me.

THE COURT:  Yeah.

BY MR. BAEZ:

Q.  Do you see your question?  "*¿Esta oración es verdad?*"

A.  Yes.  Yes.

Q.  Could that be -- could that be -- could that have been understood as, "This prayer is correct"?

A.  "Is this prayer correct"?

Q.  Yes.

A.  Yes.

Q.  All right.  Now, is that part of what my client supposedly signed anywhere?

A.  When you use the word "supposedly," what do you mean, sir?  He did sign it.

Q.  Well, it's rather difficult to see what he signed when it's out of the camera.  Would you not agree?

A.  Yes.

Q.  I mean, you could have moved the angle a little bit more to

see what he was signing, correct?

A.   I could have.

Q.   But you didn't?

A.   Right.

Q.   Why?

A.   I couldn't see what was on the screen, sir.  I assumed it was on there.

Q.   But then we wouldn't be having this argument, sir, in relation to what did he sign, correct?

A.   I believe so.

Q.   Isn't it true, sir, that you told my client many times *"procesimientos"*?

A.   I don't recall.

Q.   In fact, you just said it earlier, and you and I had a little discussion about that when I asked you to reread it?  Do you agree or no?

A.   No.

Q.   All right.  So in Exhibit 1, at 1:21, and Page 3 of Exhibit 1A, line -- one, two, three, four, five, six, seven, eight, nine -- line number ten, right here, you see that that's -- appears to show *"procedimientos"*?

A.   Okay.

Q.   In fact, it's translated the same way, "proceedings."  But I want the Court to hear what you said.

          MR. BAEZ:  Can we play it?

TECHNOLOGY SPECIALIST:  Yes, sir.

*(Playing video, Government's Exhibit Number 1)*

THE COURT:  You might want to rewind a little bit so I can hear it in context, if that's all right.

TECHNOLOGY SPECIALIST:  Yes, sir.

*(Playing video, Government's Exhibit Number 1)*

*(Video stopped)*

BY MR. BAEZ:

Q.  You hear that you tell him *"procesimientos"*?

A.  It sounds like it in that recording.

Q.  Is there a word in Spanish for whatever *"procesimientos"* are?

A.  Is *"procesimientos"* a word?

Q.  Yes.

A.  I'm not sure.

Q.  So why would you tell that to my client?

A.  I believe I read that word.  I wasn't changing words knowingly.  If I mentioned that word as *"procesimientos,"* then that's what it is.

Q.  So you mean to tell me that you believe that my client understood "proceedings" when you told him a word that doesn't exist in the Spanish language?

MS. SPEARS:  Objection, Your Honor.

THE WITNESS:  I'm confident -- I'm confident he --

THE COURT:  Hold on.  Hold on one second.

Yes, ma'am.

MS. SPEARS:  Argumentative, Your Honor.

THE COURT:  It's overruled.

Yeah.  So yes, did --

THE WITNESS:  Okay.

THE COURT:  You can answer the question, whether you believe he understood "proceedings" when you said -- misspoke, whatever that word was.

THE WITNESS:  I'm very confident he understood what I was -- because the paper's upside down.  I'm reading upside down at this point so he can read along with me.

BY MR. BAEZ:

Q.  So is that the reason why so many mistakes?

A.  I didn't count them.

Q.  I mean, there are plenty.  Would you not agree?

A.  No.

Q.  Okay.  On Exhibit 1 at 2:10, and this is Page 4, item number 3, right here, does that appear to say "*interrogación*"?  Right there.

A.  It doesn't appear to say.  It says "*interrogación*."

Q.  Okay.  And it says "questioning," as it was transcribed, correct?

A.  Correct.

Q.  Let's play to see -- what did you tell my client?

A.  Well, let's play to see.

(Playing video, Government's Exhibit Number 1)

(Video stopped)

BY MR. BAEZ:

Q.  You said "*integración*"?

A.  Play it again.

(Playing video, Government's Exhibit Number 1)

(Video stopped)

THE WITNESS:  "*Interrogación*."

BY MR. BAEZ:

Q.  You didn't say "*interro*."  You said "*integración*."

A.  I disagree.  I heard "*interro*."

Q.  Are you telling the Court that you believe that my client understood?

A.  Yes.

Q.  Do you see the discrepancy?

A.  In what, sir?

Q.  In the way that you say that it said it and the way it sound, "*integración*" versus "*interrogación*."

A.  Okay.

MS. SPEARS:  Asked and answered, Your Honor.

THE COURT:  Yeah.  That's sustained.

Go ahead.

BY MR. BAEZ:

Q.  What is "*autoración*"?

A.  Authority?

Manuel Mendoza - Cross

Q.  "*Autoración*" is authority?

A.  "*Autoración*"?

Q.  Uh-huh.

A.  Authorization.

Q.  Isn't it "*autorización*"?

A.  "*Autorización*"?

Q.  Uh-huh.

A.  Is that what, sir?

Q.  Isn't that the proper way to say it?

A.  Sure.

Q.  But you said "*autoración*."  Do you remember that?

A.  No.

Q.  Okay.  So this is Exhibit Number 1, at 6:02, page number 7 on Exhibit 1A, item number -- one, two, three -- four.  Right here.

In fact, read that for the Court, the whole thing.

A.  Right here?

Q.  Right there, yes.

A.  "*Felipe Orduña.  Por la presente autorización a… y va a poner mi nombre.*"

Q.  What do you think that means to you?

A.  That he's -- authorization.

Q.  In fact, isn't it true that they couldn't even transcribe? Look at this.  Where is that at?

A.  What do you mean, where is it at, sir?

Manuel Mendoza - Cross

Q.  Is it missing, the translation?

A.  I didn't -- I didn't translate it.

Q.  I know that but -- because it makes no sense.

A.  If something's not there, doesn't mean it's missing.

Q.  Well, it's not there, is it?

A.  It's not missing.

Q.  So *"por la presente,"* and you say you said *"autorización,"* right?

A.  That's what it says there, yes.

Q.  But I'm asking, is that what you said?

A.  If that's what it says there, yes.

        MR. BAEZ:  All right.  So let's -- can we play that?

        TECHNOLOGY SPECIALIST:  Yes, sir.  You said 6:02?

        MR. BAEZ:  It's on 6:02.  That's correct.

    *(Playing video, Government's Exhibit Number 1)*

    *(Video stopped)*

BY MR. BAEZ:

Q.  Do you see what you said?

A.  Okay.  I mis- --

Q.  *"Por la presente"* --

A.  -- -pronounced the word, yes.

Q.  So again --

A.  That's clear.

Q.  Okay.  And just for the record, what is *"autoración,"* if you know?

A. I don't.

Q. And do you believe that my client knew?

A. He was -- luckily for me, he was reading along with me.

Q. He was agreeing, according to you?

A. "Reading" along with me, I said.

Q. Okay. But we don't know that because you don't have it on camera, do you?

A. You have my word.

Q. Oh, okay. How do you say "coercion" in Spanish?

A. I'd have to look it up to be sure.

Q. I'm going to page number 8 on Exhibit 8 -- I mean, 1A. Can you read that word?

A. *"Coerción."*

Q. I'm sorry?

A. *"Coerción"*?

Q. Sir, that says *"corcesión"*?

A. *"Corcesión."*

Q. Is that correct?

A. *"Coerción."*

Q. You read *"coerción,"* but it says *"corcesión."* Can you really read Spanish?

A. Yes.

Q. So what is *"corcesión"*?

A. I don't know what it is, sir.

Q. But that's what you told my client.

THE COURT:  I lost you, sir.  It looks like Mr. Orduña said "*corcesión*."  He says "*coerción*," and then it's -- "*corcesión*" is from Orduña --

MR. BAEZ:  Can we play it?

THE COURT:  -- and then "coercion."

MR. BAEZ:  It's on --

THE COURT:  So I didn't understand what you meant. I'm trying to follow along with the transcript.

MR. BAEZ:  Correct.

THE COURT:  But if there's something different from the transcript, let me know.

MR. BAEZ:  No, no, no.  It's on 7:41.

*(Playing video, Government's Exhibit Number 1)*

*(Video stopped)*

BY MR. BAEZ:

Q.  So you're having a conversation in Spanish with my client, and you're trying to indicate to my client, isn't it true, coercion, correct?  Is that not what is happening right here?

A.  I need to see it, sir.  What are you --

Q.  Okay.  I'm sorry.

A.  Let me see.

Q.  Page number 8.

A.  Okay.  It's up.  So --

THE COURT:  He's got in it front of him.

THE WITNESS:  So what I heard in the recording there

Manuel Mendoza - Cross

is I mispronounced the word.  And luckily, he's following along with me, so he corrected me.

BY MR. BAEZ:

Q.  My question is, sir --

A.  Is that what you're saying?

Q.  -- you're having a conversation, but neither you, nor my client, understand what you're talking about.  Is that not what's happening?

A.  I was reading him his rights.

Q.  Well, obviously he didn't understand because he's talking about some *"corcesión."*

A.  Okay.

Q.  Which is not "coercion" in Spanish, right?

A.  Right.

Q.  So can you say that he understood what you were reading?

A.  Yes.

Q.  You can say that?

And after he's reading after you, he still says the word wrong?

A.  This wasn't his first time to be arrested.  He's been arrested before.

Q.  You're not answering my question.

You're telling the Court that you're sure that he understood.  Yet, he is reading a word, which is super common, *"coerción,"* and he says *"corcesión"*?

A.   Yes.

Q.   That's what you're telling the Court?

A.   That's what you asked me, and I said yes.

Q.   Okay.  You had my client in handcuff for over four hours; is that correct?

A.   One handcuff, one wrist, yes.

Q.   Is that comfortable?

        MS. SPEARS:  Objection, Your Honor.

        MR. BAEZ:  I withdraw the question.

        THE COURT:  Well, all right.  Very well.

        MR. BAEZ:  I withdraw the question.

        THE COURT:  Very well.

BY MR. BAEZ:

Q.   You expect the Court to believe that he was not in any way, shape or form coerced, right?

A.   What's that word, sir?

Q.   Coerced.

A.   Coerced?  Right.

Q.   That he was not harassed?

A.   He was not harassed.

Q.   That he was treated fairly?

A.   Yes.

Q.   Isn't it difficult to read and sign and understand if you're handcuffed to a chair for four hours?

A.   He was --

MS. SPEARS:  Objection, argumentative, Your Honor.

THE COURT:  Well, you have to restate the question. It might be -- signing seems different than understanding or answering.  Is it the signing that you were talking about?

MR. BAEZ:  I'm actually referring to the act of being --

THE COURT:  All right.

MR. BAEZ:  -- in handcuff for four hours.

BY MR. BAEZ:

Q.  Would that impede your ability to perhaps understand?

A.  No.

Q.  And it makes it worse when the person reading to you the rights reads it wrong.  Would that make it almost impossible?

A.  It didn't take me four hours to read his rights, sir.

Q.  Okay.

A.  By 7:26 a.m. we were done.  At that point he had been handcuffed for maybe 15 minutes.

Q.  In fact, one of the times that you were reading -- in fact, no.  Many times that you were reading his rights -- during the time that you were reading his rights, one time, the other officer was removing his handcuff and changing it; isn't that correct?

A.  At one point, yes.

Q.  As you're reading his rights?

A.  Yes.

Q.  Why didn't you stop?

A.  Because I didn't want to.

Q.  Whether he understood the rights, that's irrelevant, because you didn't want to?

A.  He understood them.  That's a different question.

Q.  My question, sir, is you could have stopped, repositioned him and then continue?

A.  But I didn't.

Q.  Correct.  You did not.

A.  So that's what it is.

Q.  We don't have recordings that properly record, correct?

A.  Incorrect.

Q.  Your phone, that's what you use, right?

A.  That's right.

Q.  We have a person that barely speaks Spanish, reading the rights.

        MS. SPEARS:  Objection, argumentative, Your Honor.

        THE COURT:  Yeah.  That's sustained.

BY MR. BAEZ:

Q.  You tell the Court that this conversation, all this four hours were transcribed that afternoon?

A.  I'm not a hundred percent sure on that.  We'd have to research.  Is that the time that they did it?  We're not sure how they set it up.  We're not transcribers.  I'm not sure.

Q.  Could this be the time in which my client was under

Manuel Mendoza - Cross

interrogation?

A.   For 15 hours?

Q.   Yeah.

A.   Absolutely not.

Q.   Okay.  But why -- stopping and start, we don't have time frames in between those interrogations, do we?

A.   "Time frames"?  What do you mean, sir?

Q.   Yeah.  Typically on an investigation you will put recording.  That way you know the defendant was under custody for many hours.  Not here, right?  Because the phone stopped, nobody knows when it restarted, and then it started again, and then all the sudden here we have 15:49:47.

Is it possible that my client was on that interrogation for over 15 hours?

A.   No.

Q.   But, again, you cannot say that because the phones were stop and start, stop and start, stop and start, correct?

A.   I can say that.  But yes, the phones were stop and start, stop and start.  But they're two separate things that you're asking me.

Q.   Just want to make sure that -- did you ask my client if he could read English?

A.   No.

Q.   How do we keep a chain of custody from your phone so that it can be admissible into evidence in federal court?

Manuel Mendoza - Cross

A.   How do we keep the chain of custody?

Q.   Typically when you have evidence, you keep a chain of custody, did you not?  How did you ensure the chain of custody was done with this phone?

A.   It was uploaded to a external hard drive.

Q.   Is there a sheet that says, this is when it was uploaded and all that?

A.   I'm sure they have timestamps, but I'd have to doublecheck. I'm not a hundred percent sure.

Q.   Was a Cellebrite used?

THE COURT:  "Was a" what?  I'm sorry.

MR. BAEZ:  Cellebrite.

THE COURT:  Cellebrite?

MR. BAEZ:  Cellebrite.

THE WITNESS:  For what, sir?

BY MR. BAEZ:

Q.   To download the data.

A.   From whose phone?

Q.   From your phone.

A.   No.

Q.   Anywhere in that video does it show that it is capable of accurately recording?

A.   Ask me again, please.

Q.   Anywhere on that video does it show whether that -- your phone is capable of accurately recording?

MS. SPEARS:  Your Honor --

THE WITNESS:  I'm not sure what you're asking me.

MS. SPEARS:  -- I'm not sure I --

THE COURT:  Yeah.  On the video?

MR. BAEZ:  On the phone, yes.  On the video.

THE COURT:  How would the -- I don't understand.  How would the video show that the video's accurate?  Something else might show it.  But why would the video show that the video is --

MR. BAEZ:  I don't know, Judge.  This is his phone.

BY MR. BAEZ:

Q.  So do you have something to show the accuracy of this particular device?

A.  No.

Q.  So we don't know whether the phone -- the time frame was changed, do we?

A.  We do know.

Q.  How?

A.  Because I didn't change it.

Q.  But there's no -- nothing that says that this is accurate?

A.  I say it's accurate.

Q.  And it has not been changed?

A.  I don't do that kind of stuff, sir.

Q.  How many defendants in this particular case?

A.  I want to say -- may not be accurate.  I'm not the case

agent.  But maybe, off the top of my head, seven.  I'm not a hundred percent sure.

Q.  How is it then, sir, that some of the recordings are actually done at the police station with a recording device but not this defendant?

A.  We took him to our office.  I'm not sure what you're referring to.

Q.  So you said that there's multiple defendants.  Are you familiar with the case, with the recordings of other defendants?

A.  No.

Q.  Oh, you're not?

A.  No.

MR. BAEZ:  Okay.  I have no further questions, Your Honor.

THE COURT:  All right.  Very well.

You might have some followup questions, Ms. Spears.

MS. SPEARS:  Yes, Your Honor, just briefly.

THE COURT:  Uh-huh.

REDIRECT EXAMINATION

BY MS. SPEARS:

Q.  Agent Mendoza, on cross-examination with the defense you used the word "literally."  You literally spoke to Orduña-Torres before recording his interview.  What did you mean by that?

A.   I mean that I exchanged words with him.  So a conversation did, in fact, happen.  He asked me, you know:  What am I being arrested for?  Where are we going?

I said:  We'll talk about that in a little while.

That, to me, is a conversation.  So I have to answer him truthfully.  Did I have a conversation with him before?  Yes, I did.  But nothing involving the case.  He was asking me about --

Q.   And is it fairly typical that defendants are going to ask you about what's happening?

A.   Yes.

Q.   And do you often exchange conversation with them?

A.   Yes.

Q.   But was it of any substance in regards to this case?

A.   No.

Q.   Did you ever speak to the defendant off camera about his wife?

A.   Yes.

Q.   And what did you speak off camera about his wife?

A.   Who he lived with.  We also spoke about his wife's daughter.

Q.   Were they also at the house?

A.   Yes.

Q.   So they were present during the search?

A.   Yes.

Q.   Did you ask the defendant any substantive questions about his wife?

A.   No.

Q.   And is that, in fact, why you got a recording?

A.   Yes.

Q.   And why did you get the recording?

A.   Because I know the importance of this case, and I wanted there to be a video recording of his interview.

Q.   You read the defendant his *Miranda* rights, correct?

A.   Correct.

Q.   And he also followed along with you, right?

A.   Correct.

Q.   Now, I know that it's not necessarily on video, that document.  But what did you observe him -- during that interview in regards to reading along?

A.   He was following along with me and indicating he comprehended what I was saying.

        MS. SPEARS:  Your Honor, I have no further questions.

        THE COURT:  All right.  Very well.

        MR. BAEZ:  One last followup, Your Honor.

                    RECROSS-EXAMINATION

BY MR. BAEZ:

Q.   After we watched the video, parts of it, and all this, could it have been a better recording?

A.   Yes.

Manuel Mendoza - Recross

Q.   Would you agree with me?

     I'm sorry?

A.   Yes.

          MR. BAEZ:  Okay.  No further questions.

          THE COURT:  I just have one.

          MS. SPEARS:  Of course.

          THE COURT:  The very first statement you make to Mr. Orduña, Agent, the very first thing you say is, "*Okey. Ya vamos a comenzar pues como le explique.*"

     It sounds to me like -- you said, "Like I told you before, we're going to start."  What did you tell him before?

          THE WITNESS:  That I can't answer any of his questions until I read him his rights.  And he kept asking me, what are the charges, what is he being arrested for.  I said, you can't get into any of that.

          THE COURT:  All right.  And so when -- that was the thing that you explained to him --

          THE WITNESS:  Yes, sir.

          THE COURT:  -- until you start the recording.

          THE WITNESS:  So when I start recording -- yes, sir.

          THE COURT:  That's the only thing -- that's the very first question.  Y'all hadn't talked about it.

     Anything further from the government?  Any followup question on that?

          MS. SPEARS:  Not for the witness, Your Honor.

THE COURT:  Anything followup on the defense on that, sir?

MR. BAEZ:  Not on this witness, Your Honor.

THE COURT:  All right.  Thank you, sir.  You're excused from the witness stand.

THE WITNESS:  Thank you.

THE COURT:  Appreciate your testimony.

THE WITNESS:  Thank you.  Appreciate you.

THE COURT:  Uh-huh.

Did you, Ms. Spears, have additional witnesses that you wanted to present, or was that the substance of the government's presentation at this time?

MS. SPEARS:  That was the substance, Your Honor.  I just have argument.

THE COURT:  All right.  I had one followup question for you.  On the transcript -- it's been admitted, and I see what the issues are.  But there aren't particularly timestamps on this.  I'm wondering, on the recording -- and I didn't see the -- I mean, I didn't look for it.  Did the video have a running timestamp and/or even if it didn't, when they were downloaded, do they show the times?  You know, usually when those things -- lots of those recordings will show those times. I don't know if it did or not.

MS. SPEARS:  Your Honor, we can pull it back up, Exhibit 1.

THE COURT:  I think it had a -- like, one minute, two minute.  But did it show what time it was, as well?  I just don't remember.

MS. SPEARS:  No, I don't --

MR. BAEZ:  It did not, Your Honor.

MS. SPEARS:  -- believe so.

MR. BAEZ:  That's what my question in relation to --

THE COURT:  Yeah.  No.  That's why I was asking.  But I'm wondering, the files, do they show what time they are?  They're files that were sent to the computer or something.

MS. SPEARS:  No, Your Honor.  They don't.

THE COURT:  Okay.

MS. SPEARS:  We just show --

THE COURT:  That's all I was asking.

MS. SPEARS:  On the first page of the translations it just says the duration --

THE COURT:  Okay.  Got it.  That's all.  I just was wondering if there was additional evidence that I -- that there was on that.  But that's all right.  Very well.  Thank you.

Let me turn to the defense.  Any -- you mentioned you perhaps were going to call your client, sir.

MR. BAEZ:  That is correct.

THE COURT:  I don't know if -- all right.  Very well.  You may.

MR. BAEZ:  Judge, I just want to --

THE COURT:  You may have other evidence that you want to present.

MR. BAEZ:  I just want a limited instruction in relation to that -- to the particular conversation prior to the recordings, with Agent Mendoza, not into the substantive of the case or the -- anything that has to do with the case whatsoever.

THE COURT:  I agree on the substance of the case.  But going over the transcript or going over the declaration of rights, I think if he -- if he starts talking about what happened before, they get to talk to him about this declaration of rights.  I can't see how there's a -- those are directly related.  So, I mean, I would assume --

MR. BAEZ:  May I have a moment with my client?

THE COURT:  But -- yeah.  Why don't you talk to him.  But let me -- before do you, let me just check with Ms. Spears.

Ms. Spears, I don't think -- any admissions as to what he said about the actual case, that's not before the Court at this time.

MS. SPEARS:  Your Honor, I would argue that it is.  The defense did bring up a voluntariness issue and said that this was an involuntary interview because Agent Mendoza allegedly asked about his wife, and that's the only reason the defendant confessed.

So I would argue that it is a voluntary issue.  And because it being a voluntariness issue and not just *Miranda*, it does bring in the entire four-hour interview.

THE COURT:  Yeah.  I disagree.  But I will allow you to inquire about this question about his wife.  That's the only basis upon which involuntariness has been presented to the Court, except for some maybe miscommunication and/or prior statements.

MS. SPEARS:  Understood.

THE COURT:  The rest of it -- they don't have a -- they have to -- they're going to have to show something on that to get it suppressed before trial.

MS. SPEARS:  Correct.

THE COURT:  So --

MS. SPEARS:  And, Your Honor, I'd submit to the Court that Agent Mendoza only asked about the defendant's wife because he had already confessed.

THE COURT:  The parts that were discussed about his wife, which included some of the things that he said he did, it's all in the same page.  Y'all can inquire about that --

MS. SPEARS:  Okay.

THE COURT:  -- on both sides.  But that's if -- first, defense counsel has to talk to his client about it.  I'll take a short recess to allow him to do that.

MR. BAEZ:  Thank you, Your Honor.

THE COURT:  We'll take a recess.

*(Recess at 11:34 a.m. until 11:48 a.m.)*

THE COURT:  Please be seated.

All right.  I was going to hear from the defense as to whether they were going to call the defendant to the stand, and there was a question a little bit about the scope of cross-examination.

I'll ask the parties to -- I ask defense to object to any statements they believe -- or questions they believe that would be outside the scope of cross-examination.  As the Court indicated, as a general proposition, the questions as to the reading of the rights and the statement of the rights I think are open.  The questions as to other matters, I think I'm going to have to look at case by case.

Happy to hear from the defense at this time.

MR. BAEZ:  Thank you, Your Honor.  The defense going to call the defendant --

THE COURT:  All right.

MR. BAEZ:  -- Felipe Orduña.

THE COURT:  All right.  Mr. Orduña-Torres, if you'll come forward, the courtroom deputy will swear you in.

THE CLERK:  If you'll please raise your right hand to the best --

*(Discussion off the record)*

THE CLERK:  Okay.  If you can please raise your right

hand to the best of your ability.

(The oath was administered in Spanish through the official court interpreter)

THE CLERK:  Thank you.

You can take a seat.

And get him closer to the --

THE COURT:  That's great.  Thank you both.  Appreciate it.

You may proceed.

MR. BAEZ:  Thank you Your Honor.

FELIPE ORDUÑA-TORRES, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BAEZ:

Q.  Did you talk to Agent Mendoza prior to him reading your Miranda rights?

A.  Yes.

Q.  Oh, I'm sorry.  What was the content of that conversation?

A.  The conversation started when I was arrested.  I asked him for the arrest warrant that he had against me, and he never showed it to me.

And after that, I was transferred to their office.  When we arrived there, he told me that I was in a big trouble.  And I told him, what is that trouble?

And he asked me if I didn't know why was being arrested.

And I said if it was because I'm illegal.

And he said no.  He said, you are being accused, and they are placing you as the leader of those who organized the transportation in where more than 53 people died.

And I told him I didn't know what he was talking about.

He said, I have many videos.  I have videos where you appear.  I have videos where there are many illegals entering the house where you are living.  I have been investigating you for over two years.  I have many witnesses that can give statements against you.

And I told him, I don't know what you're talking about.  I don't have the slightest idea about why you're saying all that.

And he said, you are in a serious trouble.  It is best for you to cooperate.  It is not just you in these problems.  You are taking along with you the woman that lives with you.  I don't know if she's your partner.  The saddest thing and the obvious thing is that the underaged kid is going to be given up in adoption.  And Ms. Fernanda, right at this time, she's arrested with my other coworkers, the other agents.  Right now she's saying everything.  She's testifying against you.  Just now, in about 40, 50 minutes, she will be brought here, and she will be testifying here at the office.  The underaged person is going to be given to other staff members to be given up in adoption.

After that, I said, I don't know anyone.

He showed me some pictures, and I said, I don't know

anyone.

Q.  I'm sorry.  Let me stop you right there.

Mendoza showed you some pictures prior to reading your *Miranda* rights?

A.  Yes.

Q.  Did he make you any promises in order for you to testify?

A.  Yes.

Q.  Did he tell you that he was going to arrest your wife and your daughter unless you testify?

A.  Yes.  That she had already been arrested.

Q.  And this is prior to the recording starting?

A.  Yes.

Q.  This is prior to Mr. Mendoza, Agent Mendoza reading your *Miranda* rights?

A.  Yes.

MR. BAEZ:  No further questions, Your Honor.

THE COURT:  Oh, all right.  Very well.

CROSS-EXAMINATION

BY MS. SPEARS:

Q.  Mr. Orduña-Torres --

A.  Yes.

Q.  -- you love your wife, don't you?

A.  Of course.

Q.  And you love your daughter, right?

A.  Yes.

Felipe Orduña-Torres - Cross

Q.   And you want the best thing to happen to them, correct?

A.   Yes.

Q.   Okay.   And I'm assuming that, prior to this interview, you reviewed your four-hour interview with Agent Mendoza; is that correct?

        MR. BAEZ:   Objection, Your Honor, beyond the scope of this direct.

        THE COURT:   That question is overruled.   You can ask whether he did go over that.

        THE WITNESS:   No.

BY MS. SPEARS:

Q.   Oh, you've never watched your interview?

A.   No.

Q.   Your attorney's never showed you the interview with you?

        MR. BAEZ:   Objection, Your Honor, asked and answered.

        THE COURT:   No.   You can answer the question.

        THE WITNESS:   We're talking about the day of the arrest, not about the process that's been happening since I have my attorney.

BY MS. SPEARS:

Q.   Correct.   The day of the arrest, have you watched the interview that you did?

A.   Yes.

Q.   Did you read the transcripts of your interview?

A.   Yes.

Q.  Okay.  Tell me -- show me where you mention the -- show me where you mention your daughter and your wife.

MR. BAEZ:  Objection, Your Honor, beyond the scope of discovery.  This is our contention in which --

THE COURT:  Wait.  Hold up.  Hold up one sec.  Okay. Let me get it all in order.  Okay.  Go ahead.  So that she can translate.  Because we got them translating two different places.  Go ahead, sir.

MR. BAEZ:  It's beyond the scope, Your Honor.  This is our contention, that all this happened prior to the recordings been taking place.  So he couldn't have any personal knowledge of that.

THE COURT:  Okay.  So let's rephrase the question so he can make clear.  And let's go slow so that all the interpreting can happen.  Okay?  Go ahead.

BY MS. SPEARS:

Q.  Mr. Orduña-Torres, is it -- are you saying that Mr. Mendoza made promises to you prior to you being recorded?

A.  Yes.  I don't -- yes.  I don't know why he cut out the recording.

Q.  And what promises did he make to you?

A.  That they were not going to arrest Fernanda and that the underage kid was going to remain with her.  He was going to speak to the government attorney so that I would get little time or that I could get out right here, here in the

United States.

Q.  Okay.  Let's go one by one.  So Agent Mendoza allegedly said that he wasn't going to arrest your wife, correct?

A.  That he was going to let her go, that she was already arrested.

Q.  Okay.  So you're saying that -- okay.  So now you're saying that Agent Mendoza said that he would let your wife go; is that correct?

        MR. BAEZ:  Objection, Your Honor, argumentative.

        THE COURT:  Denied.  Overruled.

    Go ahead.  You can answer the question, sir.

        THE WITNESS:  Like I have been saying right from the beginning, Ms. Government Attorney, he said that Fernanda had been already arrested, that the kid would be given up in adoption, that it was best for me to cooperate so that she could go free and that the kid could remain with her.

BY MS. SPEARS:

Q.  Okay.  But wouldn't you agree with me that in the four-hour interview that you did with Agent Mendoza, that was recorded, you never asked about your child going free and not being adopted; is that correct?

        MR. BAEZ:  Objection, Your Honor, argumentative and above the scope --

        THE COURT:  That's overruled.

    You can answer, sir, if you ever talked about that when you

were being recorded.

THE WITNESS:  (Speaking in Spanish and not translated.)

BY MS. SPEARS:

Q.  Mr. Orduña-Torres, let me stop you.  It's a yes or no question.

During the four-hour interview that you did with Agent Mendoza, you never asked whether or not your daughter would be put up for adoption; is that correct?  Yes or no?

A.  Yes.

Q.  Okay.  Isn't it also correct that in that four-hour interview with Agent Mendoza you never asked whether or not your wife would be released from custody?

MR. BAEZ:  Judge, I'm going to object to this type of questioning.  She's going way above the scope of this --

THE COURT:  No.  It's overruled.

MR. BAEZ:  Judge, we never spoken about other than the fact -- Exhibit 1.  She's introducing Exhibit 2, 3, 4, 5, 6.

THE COURT:  They've all been admitted.  It's overruled.  She can ask these questions.  You have your objection.

Go ahead.

THE WITNESS:  I think, in that, I'm in agreement with my defense attorney.  I think those are questions that I don't have to comment about or that I don't have to answer.

Felipe Orduña-Torres - Cross

THE COURT:  I'll --

THE WITNESS:  If government -- if Mr. Mendoza cut out this video, that is something that is up to him.

THE COURT:  No.  Let me just instruct the witness. All that is being asked is, during that -- whether or not -- you don't have to point to a point in the video.  Just later in the conversations with the agent, did you ever discuss your daughter being put up for adoption or your wife being let go? Do you -- did you have those conversations with him at a later time?

THE WITNESS:  Yes.

THE COURT:  All right.

BY MS. SPEARS:

Q.  Okay.  And are you saying -- your testimony is that you asked Mr. Mendoza during your interview about your daughter being put up for adoption?

THE COURT:  No.  It's fine.  Go ahead.  You can --

THE INTERPRETER:  The interpreter will repeat the question.

THE COURT:  Yeah.  Thank you.  Better to do it that way anyway.

Why don't you repeat the question again in English and make it easier for the interpreter.

MS. SPEARS:  Yes, Your Honor.

THE COURT:  Better for the interpreter sitting next to

Felipe Orduña-Torres - Cross

Mr. Orduña to do the interpreting for Mr. Orduña.  It's going to be confusing for him otherwise.  Thank you very much.

BY MS. SPEARS:

Q.  I just want to make it clear.  During that four-hour interview you did with Agent Mendoza, that was recorded, you never once asked about your daughter being put up for adoption, correct?

MR. BAEZ:  Judge, I'm going to object again.  This is leading, because the time that he's spoken about this --

THE COURT:  It's overruled.  This is cross-examination.  You can lead the witness.  The exhibits have been admitted.  You have your objection.  It's a running objection.

You may answer the -- you may answer the question, sir.

THE WITNESS:  I did ask him a couple times.  He did say that if I talked about how the organization was made, how everything was organized, she was going to be able to remain with her mother and that they were not going to do anything to the mother.

BY MS. SPEARS:

Q.  And -- hold on.  Let me stop you, Mr. Orduña-Torres.

This was all off camera, right?

A.  I don't know if that happened in camera or outside the camera because I didn't know.  Ever since we got there, he placed his phone on a glass of water or a bottle of water.  I

don't remember.  And I thought that everything was being recorded.

Q.  Okay.  And you also said that Agent Mendoza promised you that you would have citizenship if you talked to him about the organization; is that right?

MR. BAEZ:  Objection, Your Honor.  He never mentioned citizenship.

THE COURT:  That's sustained.  I don't think that's -- I think he said something about being allowed to remain in the country.

MS. SPEARS:  Okay.  My apologies.  Let me reask.

THE COURT:  Defense is correct on that.

BY MS. SPEARS:

Q.  Mr. Orduña-Torres, you said that Agent Mendoza promised you that you'd be allowed to remain in the country legally if you spoke to him; is that right?

MR. BAEZ:  Judge, I'm going to make another objection. He never said "legally."  There was no legality mentioned.

THE COURT:  That's -- he can answer the question.

THE WITNESS:  If I were to tell him how everything was organized.  And I told him I had nothing to do with that organization.

BY MS. SPEARS:

Q.  But you would agree with me that that was not on video, correct?  It's a yes or no, Mr. Orduña-Torres.

A.  You can ask that to the agent.

Q.  Well, I'm asking you.  You've reviewed the video, correct?

A.  The way I saw the video, it is incomplete.

Q.  Okay.  So on the video, that's never mentioned, correct?

A.  Well, no.  Well, he deleted.  I don't know if he deleted it.  I don't know what happened to the hard --

Q.  And you also never mention your daughter going up for adoption in the video, correct?

        MR. BAEZ:  Objection, asked and answered.

        THE COURT:  Overruled.

    You may answer it.

        MS. SPEARS:  It's a yes or no, Mr. Orduña-Torres.

        THE WITNESS:  Yes, yes, yes.  I did mention if she was going to be in adoption, and he said no.

BY MS. SPEARS:

Q.  Okay.  And that's in the recording?

A.  Well, I don't have the video.  I didn't make the recording (inaudible).

Q.  Okay.  I'm showing you what's been marked as Government Exhibit 8.  Or Exhibit 7.  My apologies.

        THE COURT:  Do you want to put it on the screen, or you want to hand him a paper copy or --

        MS. SPEARS:  If we can put it on the screen, Your Honor.

        THE COURT:  Okay.  All right.

BY MS. SPEARS:

Q.  Mr. Orduña-Torres, this is the document that Agent Mendoza showed you; is that correct?

A.  I don't even remember it because he just showed it to me, and I was handcuffed.  He just -- he was reading from it, and he just showed it to me, and he just told me that I could sign there.

Q.  Okay.  So he showed you this document, correct?

A.  (Speaking in Spanish and not translated.)

Q.  No, no.  It's a yes or no, Mr. Orduña-Torres.  You don't need to have excuses for everything.  It's just a yes or no.

A.  Yes, yes, yes, yes.  Okay.  Okay.

Q.  Okay.  And is that your initial next to the first line on Government's Exhibit Number 7?

A.  Yes.

Q.  And is that your initial on -- next to line 2?

A.  Yes.

Q.  Is that your initial next to line 3?

A.  Yes.

Q.  What about lines 4, 5, 6 and 7?

A.  Yes.

Q.  And is that your signature at the bottom, Mr. Orduña-Torres?

A.  Yes.

Q.  Agent Mendoza didn't force you to write your signature, did

Felipe Orduña-Torres - Cross

he?

A.   (Speaking in Spanish and not translated.)

Q.   It's a yes or no, Mr. Orduña-Torres.

A.   He forced me.  Yes, he did force me.

Q.   Did Agent Mendoza force your hand to sign that document, Mr. Orduña-Torres?

A.   No.

Q.   Okay.  You signed that document, correct?

A.   Yes.

Q.   And you signed that document knowing; is that right?

A.   Yes.

Q.   And voluntarily?

A.   The way in which I signed it is that I was psychologically threatened.  He didn't force my hand.  But by the way of threats he forced me psychologically.

Q.   And you were psychologically threatened off camera; is that right?

A.   Yes.

Q.   But you never mention those psychological threats on camera, correct?  It's yes or no.

A.   Well, yes.  Why -- he didn't show them.

Q.   So you're saying that Agent Mendoza -- that you did express these psychological threats, but that we don't have the video for that?  Is that what you're saying?

A.   Yes.

Felipe Orduña-Torres - Cross

Q.  Okay.  And the fact that you act normal in six videos that last four hours, that means nothing?

A.  (Speaking in Spanish and not translated.)

Q.  Let me ask you this, Mr. Orduña-Torres.

THE COURT:  Let him answer the question.  Unless you want to withdraw the question.

MS. SPEARS:  No, Your Honor.

THE COURT:  All right.

THE WITNESS:  Can you please repeat?

THE COURT:  There you go.  That might fix it.

Go ahead.

BY MS. SPEARS:

Q.  Mr. Orduña-Torres, you would agree that you appear calm in the videos that we have played today, correct?

A.  Well, no, I was not calm.

Q.  Okay.

A.  I was under arrest, and I was being accused of something that I have no relationship to.

Q.  Were you yelling during the videos?

A.  No.  Well, I'm not crazy to be yelling.

Q.  Were you crying during the videos?

A.  No.

Q.  Were you forced to say anything during the videos?

A.  I was forced -- of course I was forced.

Q.  Okay.

A.  Not with blows, but just by the fact of telling me that I was being accused of something and by the fact of telling me that Ms. Fernanda was under arrest and that they were going to give the minor in adoption.

Q.  So Agent Mendoza forced you to tell him about Christian Martinez, your coconspirator?

A.  I didn't even know the name of Christian Martinez.  It was Agent Mendoza who told me the name of Christian Martinez.

Q.  But you pointed out Christian Martinez?

A.  He is the one that told me if I knew him and that if I had seen him on TV.  And I had seen him on TV.

Q.  You also pointed out Riley.

MR. BAEZ:  Objection, Your Honor.  The government's moving into the case-in-chief at this point.  I'm going to object to this line of questioning as above the scope of this direct.

THE COURT:  Let me just ask.  Ms. Spears, how is his pointing out of Riley pertinent to the question of whether it was a voluntary statement?

MS. SPEARS:  Yes, Your Honor.  It's not Agent Mendoza that brings up Riley.  It's the defendant that brings up Riley, which goes to his voluntariness, because it's the defendant that voluntarily offers that information.  Agent Mendoza never forces him -- that information upon him, Your Honor.

THE COURT:  I think the objection is sustained.  I'm

Felipe Orduña-Torres - Cross

not going to allow that one.

BY MS. SPEARS:

Q.  So just so I understand, Mr. Orduña-Torres, the promises that were you were made by Agent Mendoza, those are off camera, right?

A.  I wouldn't be able to tell you that because the phone was in his possession.  I thought that the phone was recording, and also because he told me that I didn't need an attorney at that time, that I was going to need an attorney, but for when I was going to appear in court.  And unfortunately I didn't understand either what was court.  I have been arrested several times but just for immigration.

Q.  You can read.  Is that correct, Mr. Orduña-Torres?

A.  Yes, a little, not a hundred percent.  I don't know how to read colons and interrogation points.  I only reached sixth grade of elementary school in Mexico.

        MR. BAEZ:  I'm sorry, Your Honor.  I believe that my client said "comma," not a "colon."  Just --

        THE COURT:  Oh, read like a comma?

        MR. BAEZ:  Correct.

        THE COURT:  I thought it was comment.  Okay.  All right.  Very well.

        MR. BAEZ:  Comma.

        THE COURT:  Okay.  All right.  Very well.

        THE INTERPRETER:  The interpreter corrects.  Yes, Your

Honor.

THE COURT:  All right.  Very well.  Thank you both.

THE INTERPRETER:  Defendant says "comma."

BY MS. SPEARS:

Q.  So are you wanting us to believe that you can't read this document?  Is that what you're saying?

A.  I can read it.  I can read it.

Q.  Okay.  So you do understand --

A.  Some things I don't understand because of the way they're written.  But I can read it.  I don't know if I'll understand it or not.

Q.  Okay.  But you told Mr. Agent Mendoza that you did understand it, correct?

A.  Yes, yes.  He told me about the questions that he was asking me, if I was understanding.  And I said, yes, I understand you.

Q.  Okay.  And you signed the document because you understood the document, correct?

A.  Yes.

MS. SPEARS:  Your Honor, if I may have a moment?

THE COURT:  Sure.

THE WITNESS:  (Speaking in Spanish and not translated.)

THE COURT:  Wait one second.  *Un momento*.  Wait one second.  There may be another question.  Wait one minute.

Okay.  Go ahead.  Any other questions?  You said you had a moment to go check --

MS. SPEARS:  Thank you, Judge.

THE COURT:  Uh-huh.

*(Pause)*

MR. BAEZ:  Judge, as they are conferring, can I talk to another U.S. Attorney real quick?

THE COURT:  Sure.

*(Discussion off the record)*

THE COURT:  Anything further, Ms. Spears?

MS. SPEARS:  Yes, Your Honor.  Just briefly.

BY MS. SPEARS:

Q.  Mr. Orduña-Torres, you said that Agent Mendoza made you several promises; is that correct?

A.  Yes.

Q.  When were these promises made?

A.  When we were -- when he arrested me, when we were at his office.

Q.  Okay.

A.  When he told me that I was in big trouble, that they had videos of me.

Q.  Mr. Orduña-Torres, let me stop you.  So you said that he made promises to you when you were arrested.  Do you mean by -- he made promises to you when you're arrested at your house?

A.  No, no, no, no.  I started talking to him when we were

Felipe Orduña-Torres - Cross

already at his office.  When I was arrested, there, I only asked him if he could show me the arrest warrant, the arrest order that he had against me.  He didn't show it to me.  He said he had it at his office.

Q.  Did he -- let me specify.  Did Agent Mendoza make the promises to you in that room that you were sitting in, or was it prior to you entering the room?

A.  No, no, no.  When we were inside that room.

Q.  Okay.  And was there anyone else present?

A.  I don't remember.  I think there were three or two officers more and Mr. Mendoza.

Q.  And they were also in the room; is that right?

A.  Yes.

Q.  Do you recall if they were HSI agents?

        MR. BAEZ:  Objection, Your Honor, relevance.

        THE COURT:  Overruled.

        THE WITNESS:  No.

BY MS. SPEARS:

Q.  And they overheard those promises made?

A.  I don't know if they heard because they were talking amongst them.

Q.  But that room's very small, wouldn't you agree?

A.  Yes.  They were also talking on the phone, them.

Q.  And were those promises just made in the beginning, or did he make any other promises, allegedly, to you throughout the

interview?

A.   Only at the beginning.

Q.   Okay.   But you never mention those promises during the interview, correct?

        MR. BAEZ:   Objection, asked and answered.

        THE COURT:   It's overruled.   There's some confusion.

        THE WITNESS:   Well, no, because I thought they were already recorded since he had his phone there.

        MS. SPEARS:   No further questions, Your Honor.

        THE COURT:   All right.   Very well.   Thank you.

        MR. BAEZ:   Couple more, Your Honor.

        THE COURT:   Sure.

                    REDIRECT EXAMINATION

BY MR. BAEZ:

Q.   So you understood that everything was going to be recorded?

A.   Yes.

Q.   But now you see that everything was not recorded?

A.   Well, not even half is recorded.

Q.   So how long were you in that station, in the interview taking place?

A.   More or less until 6:00 p.m., 6:00 p.m. more or less.

Q.   So over 12 hours?

A.   Under arrest, yes.   Since the moment of my arrest to that, yes, 12 hours.

Q.   But we only have four hours of recordings?

A.   I don't know why.  I don't know why they are cut up.  And I would also like that at some point Mr. Mendoza would show the videos that he supposedly has against me.  I want to see also supposedly where I --

MR. BAEZ:  I have no further questions, Your Honor.

THE COURT:  Okay.

THE WITNESS:  -- (inaudible) illegals.

THE COURT:  Okay.  All right.  Very well.  Thank you.

Was there any questions -- more questions, Ms. Spears, that you had?

MS. SPEARS:  No, Your Honor.

THE COURT:  All right.  Thank you, sir.  You may be excused from the witness stand.

Any additional evidence that you wanted to present for the defense, sir?

MR. BAEZ:  No, Your Honor.

THE COURT:  All right.  Very well.

Any additional evidence the government wants to put in by way of rebuttal?

MS. SPEARS:  No, Your Honor.

THE COURT:  All right.  Very well.

I will tell you, the parties know my -- probably know my procedures in handling these matters.  I have a transcript created, allow -- if the parties wish to present additional argument or briefing after the transcript because I have to

give the whole thing by way of report and recommendation to Judge Garcia in the case.

And so -- but I am happy to hear oral argument if the parties wish to present oral argument.  I'm also quite happy to have argument in writing.  I really leave that up to the parties as to how they want to proceed.

Obviously I'll start with the defense since it's the defense's motion.  Either way is fine with me, sir.

MR. BAEZ:  Your Honor, at this time I would like to submit a brief in support in writing.

THE COURT:  That's totally fine.

Ms. Spears, do you have any objection to us go forward in writing by way of the arguments that you'd like to present? Either way is fine.

MS. SPEARS:  Your Honor, I would just like to present it orally if that's fine.  But I can also present it in writing.  I mean, it's whatever the Court's preference is.

THE COURT:  Well, and if the defense presents a brief, I'd give you the opportunity to respond, you know, to the brief, certainly.

MS. SPEARS:  Your Honor, trial is set for October 21st.  We have our pretrial conference in front of Judge Garcia Thursday.  It is a precise timeline.

THE COURT:  Look, I'll tell you, it's going to be a problem.  Let's be -- let's talk this -- let's talk that part

through, because the fact of the matter is, I have to do this by report and recommendation.  I don't have the authority to rule on this motion.

That means there's a 14-day objection window with a 14-day response window.  Starting from today, you're basically out of time.  Even if I were to transcribe my ruling from the -- orally, there'd be almost no way to get this done.  So I set this as quickly as I possibly could.  I'm not sure exactly what to do about this particular issue.  So this is something the parties need to confer about, to see how they want to approach it.

I'm happy to hear argument at this time.  I still would have to get a transcript, still would have to rule on it.  And you still have the full -- there's 28 days of objections, approximately, that's going to happen.  So I'm concerned.

I'm not sure if the parties want to consult about this matter.  Let me ask you this, Ms. Spears.  How many defendants are going to trial on the 21st, to your understanding?

MS. SPEARS:  Three, Your Honor.

THE COURT:  All right.  Very well.

Yeah.  I'm not sure what the solution is to that problem.  I mean, I can -- I can -- you can -- I guess Judge Garcia could shorten the time for objection and shorten the time for response.  But even if that's done, it's going to be difficult for me to get a written order on a motion to suppress, you

know, based on multiple issues.  It's just -- it's difficult to do.

I'm not sure what y'all -- I mean, look, I'm looking for y'all's guidance on this.  This is -- mostly, it sounds like a government issue since y'all are going forward to trial on this particular issue.  But it would also impact the defense.  I don't know if you have views on how to address this difficult problem.

MS. SPEARS:  Your Honor, it's my understanding -- I mean, obviously we have a pretrial conference with Judge Garcia on Thursday.  But it's my understanding that all parties are ready to proceed on October 21st.  And that's what was going to be talked about on Thursday as well.  So I don't know if we could orally argue in front of you today, Your Honor, and then perhaps maybe waive or shorten the time for, you know, some of those deadlines.  We could --

THE COURT:  Yeah.

MS. SPEARS:  -- shorten --

THE COURT:  All right.  Let me --

MR. BAEZ:  Judge, if I may.

THE COURT:  -- hear from the defense.  Yes, sir.

MR. BAEZ:  If I may, I mean, I love that the government is saying that I was going to -- (inaudible) are in front of Judge -- on Thursday we meet.  And, Your Honor, I was going to say, we have a lot of deadlines that needs to be met.

I don't think we can go to trial.

But, nevertheless, I'm willing to acquiesce if the government is going to stand true by what they have responded before. They say, and I quote, "The United States does not intend to offer any post-arrest statements in their case-in-chief." This is on a document here. And so here we are arguing on these documents, Your Honor.

THE COURT: Okay. Yeah. All right. That's a pretrial submission, I assume?

MR. BAEZ: That is correct, Your Honor.

THE COURT: All right. Well, okay. I do want to hear about that issue. Let's see if we can -- I asked this at the very beginning of this hearing, whether -- what actual statements in this large set of documents the government was going to admit against this defendant. The indication was it was, I think, 3 and 4 of the tapes. They're rather lengthy tapes. Are those things that you're going to admit in your case-in-chief?

MS. SPEARS: Your Honor, that is correct. We're not going to -- at this time we don't -- we don't plan on introducing that in our case-in-chief, potentially in rebuttal, Your Honor, if the defendant were to testify.

THE COURT: Well, this makes a spectacularly large difference to the Court's ruling. *Miranda* will not apply for impeachment or rebuttal evidence. It only -- if he gets up on

the stand and makes a statement, you can -- all those statements come in.  There's not a *Miranda* problem anymore at that -- at that stage.  It would only be a *Miranda* problem if it's offered in the case-in-chief, in the typical circumstance.

The voluntariness issue is something that typically -- I will tell the parties, usually goes to the jury, though the Court, after hearing all the evidence, can, on a *Jackson v. Denno* type ruling, suppress or limit it -- exclude it from the evidence to be presented to the jury.

But that's -- the *Miranda* issue -- I mean, if you're -- if you really aren't going to offer it in your case-in-chief, I don't think it's a *Miranda* issue at all.  And I'd have to hear from the defense on that.

So I just -- if we have a pretrial conference in three days, probably y'all can give me a clear answer as to whether it's in the case-in-chief our not.

MS. SPEARS:  Your Honor, if I just may have a moment with my co-counsel.

THE COURT:  Please.  No, no.  And I want you to consult.  In fact, I'll give y'all a little bit of time to see if y'all -- I'm not -- I'm not trying to force your hand.

MS. SPEARS:  No.  Of course.

THE COURT:  But it gives me a big difference on how I address the motion.

MS. SPEARS:  Yes, Your Honor.  And I appreciate it.

THE COURT: Okay.

MS. SPEARS: I appreciate you giving us the time to discuss.

THE COURT: Yeah. Why don't y'all discuss it. And why don't y'all confer and then confer with defense. See if we know exactly where we are in terms of what statements are coming in and in what context. All right?

MS. SPEARS: Yes, Your Honor.

THE COURT: And I'll take a short recess again. All right. Thank you.

*(Recess at 12:31 p.m. until 12:43 p.m.)*

THE COURT: Please be seated.

All right. Back on the record in SA:22-CR-366.

Ms. Spears, you mentioned that you were going to consult with your colleague to see what -- how to approach the issue of timing --

MS. SPEARS: Yes, Your Honor.

THE COURT: -- with regard to this motion. Yes.

MS. SPEARS: I think we have a resolution, Your Honor.

THE COURT: All right. Very well.

MS. SPEARS: I appreciate the Court giving me time to speak to co-counsel and defense counsel as well.

THE COURT: Uh-huh.

MS. SPEARS: And so, Your Honor -- and I apologize. When the Court asked me earlier whether or not the intention of

the government was to bring Mr. Orduña-Torres' --

THE COURT:  Statements in, yeah.

MS. SPEARS:  -- statement into trial -- and I apologize for that.  It's not a predicament because -- defense is correct.  We don't plan to bring that statement in our case-in-chief.  However, we don't -- that's -- we're not conceding that *Miranda* was not given properly or that the -- the statement was involuntary.  And so that's why it kind of was an odd, you know --

THE COURT:  Yes.

MS. SPEARS:  -- you know, in responding.

But after having spoken, I think we have an agreement that we -- as mentioned before, we do not plan to bring the statement in our case-in-chief.  It would only be for rebuttal purposes.  So the only issue at hand for the Court, I believe, would be the voluntariness issue.

THE COURT:  All right.  Well, thank you.

Let me press you on that -- the issue of the case-in-chief versus rebuttal, to be specific.  I want to get the record clear.  We're in a tight frame --

MS. SPEARS:  Correct.

THE COURT:  -- time frame here.  I don't want these -- I mean, Judge Garcia sends this stuff to me.  I don't want to send it back to him that's not clean on this issue.

When you say in rebuttal, under the *New York v. Harris*

case, if you have a statement that even is in violation of *Miranda* but the defendant testifies, you can cross-examine him or introduce extrinsic evidence, subject to the rules of evidence.  It's not a violation of *Miranda*.  But that's only if he testifies.

Is it the government's intention that if other evidence is presented by the defense, that you might use his statement even if he doesn't testify?  Because that would have a *Miranda* component.

MS. SPEARS:  Yes, Your Honor.  Thank you.

So that is correct.  We'd only use that interview for purposes if the defendant were to testify.

However, the one caveat is, we do plan to file a motion in limine, prior to trial, prohibiting defense from mentioning the interview and making it look like we're not presenting the interview to the jurors.

THE COURT:  That's a fair point, too.  I mean, yes, if there's some -- that's a limine issue, and you can explain that to the judge.  I understand.  And then he might reconsider to allow you to put in evidence that the interview -- of the interview if the argument is, hey, they're trying to hide it.

MS. SPEARS:  Correct.  Correct.

THE COURT:  Sure.  I understand.

All right.  That answers the first part.

Let me go back to defense counsel.  I think I can get the

whole thing squared away to preserve everyone's rights today and allow the case to go forward. I'm very concerned for the defense's rights on a question of a -- what we have here, as the parties can tell, a factual dispute as to the voluntariness of the confession. We have the agent who testified, look, he was voluntary. We have Mr. Orduña testify, no, I was coerced. That's a classic type situation. I want to be very careful to preserve the rights of the defense and the government, if I can, and allow the case to move forward.

So let me turn to defense counsel at this time. Let's start with the *Miranda* issue. I think I have that squared away, that the statements cannot be introduced for *Miranda* -- because of *Miranda* issues, unless your client testifies. If your client testifies, sir, then there is no *Miranda* issue. Do you agree with that?

MR. BAEZ: That is correct, Your Honor. We are in agreement with that.

THE COURT: Okay. So that would resolve that part.

Now, the involuntariness issue, that raises a *Jackson v. Denno* question. Under *Jackson v. Denno*, you're entitled to two determinations on voluntariness. A typically preliminary determination by the Court, separate and apart from the trial. You also have the right to present voluntariness as an issue to a jury -- an issue to the jury if that statement is brought in.

Typically the *Jackson v. Denno* hearing is done before the

trial so that you know what's going on in the case. But it's something that is absolutely subject to an independent determination post-trial. In fact, that's what happened in *Jackson v. Denno*. I don't know if the parties remember. But they didn't raise it until habeas. And the Supreme Court reversed the New York procedure and says, look, you have to have an independent judge, independent judge, separate from the jury, make a determination as to whether it's voluntary or not.

So it seems to me, if the parties are in agreement, we can preserve this record, have the trial. If the statement is even brought in as rebuttal, over and apart from the *Miranda* rights, you still would have the right to seek new trial because that involuntary -- on the basis of voluntariness if that statement is brought in in rebuttal.

So I want to preserve your rights if I can, but without having a lengthy ruling from me or objection period because it would delay things in the case.

You see what my concern is. I'm very interested in hearing your view and the view of the government.

MR. BAEZ: Your Honor, we have spoken with the government. And although there were some misconceptions early, we kind of got to the agreement that, yes, we all want to go to trial.

Now, this caveat is true. I'm going to defer to the wisdom of the Court because in the event that the government tries and

they say, no, we never said it, I'd rather have a ruling prior, than subsequent. That's just me. But, again, I don't want to violate our agreement that we are, in fact, trying to get this case to trial on October --

THE COURT: No. I understand. Yeah. Thank you, sir. Ms. Spears, let me turn to you and Mr. Fuchs. You see, it's a little bit unusual. I will -- I'll be very frank with the prosecution counsel. I'm concerned. I don't think this is -- this is an important case. It's not the kind of case where we would -- I would want to do a novel procedure of any sort.

On the other hand, y'all have got a trial setting with three defendants in a big case. I don't -- I mean, I don't want to do anything that's going to impede the joint view of the parties to go forward. I don't know if you have a view on it one way or another, if you even understand what I'm trying to get at. Thank you.

Let y'all -- I'm happy to let y'all consult if you need to.

*(Discussion off the record)*

MS. SPEARS: Your Honor, just for my understanding --

THE COURT: Let's have a joint understanding, I hope, because I'm flying a little bit, you know, outside the normal routes in this matter.

MS. SPEARS: I understand. And I appreciate the Court working with us.

The Court is indicating that the voluntariness issue would be reserved for essentially post-trial if it was brought up at that time?

THE COURT:  If y'all try to admit the -- any statements made by the defendant in rebuttal, the *Miranda* issue would go away, for the reasons that defense counsel has mentioned.  But the voluntariness issue would still be there and would be subject to reconsideration or consideration at that time, I will mention, both by the jury, who has a right to have -- you have a right -- if they wish -- either party wishes, there's a voluntariness instruction that can be given to the jury, but also by the Court, independently of the jury.

MS. SPEARS:  Given the timing issue, I think that's fine.  However, if we can bring it up to Judge Garcia at our pretrial on Thursday and just indicate to him, look, this is what happened on Monday.  This is sort of the plan.  If he is in agreement with that as well -- just kind of bringing it to his attention on Thursday at our pretrial hearing.

THE COURT:  What I was going to propose is that I issue a very short written order that captures the essence of what happened.  Of course, we're getting the transcript as well.  Giving y'all an opportunity to object and say, look, Judge Bemporad was out of his mind.  We don't agree with this in any way, or whatever.

I don't want to -- again, I'm very concerned about

preserving rights across the board, if possible.

Yes, Mr. Fuchs.  Happy to hear from you, sir.

MR. FUCHS:  Yes, Judge.  I think practically this is going to be a moot issue.  I'm not intending to present it.  I really don't see it coming up in evidence unless the defendant testifies, which then we're not having to worry about all of these issues.

THE COURT:  Well, but the voluntariness issue could still be there, even if he testifies because --

MR. FUCHS:  If he testifies --

THE COURT:  -- you'll say, you testified to this, but you said this.  He said, but that wasn't voluntary.  I didn't mean -- you know, I was forced into saying that or coerced.

That's the one spot where we'd have an issue.

MR. FUCHS:  That's the one wrinkle.  And, you know, it is -- it would be much cleaner to -- if we want to confront him with that is the other thing --

THE COURT:  Correct.

MR. FUCHS:  -- during cross.

THE COURT:  Correct.

MR. FUCHS:  So I need to think through that a little bit on, if that situation presents, if that's something that we would want to confront him with versus just rely on the strength of our evidence and the cross-examination as it speaks to.

THE COURT: Right. The side issue there is this issue that you raise, that you were fearful the defense would say, well, they interviewed the gentleman, and they never presented that evidence. It must have been -- the implication being that it was very favorable for the defendant and that y'all were hiding that evidence in some way.

And I'm not meaning to put words in the defense's mouth or to overstate it. But that why -- the jury would wonder why didn't we get to see that evidence. And y'all are concerned about that and wish to limine out any discussion. If we're going to say that this was involuntary or whatever or dispute about that, let's just limine the whole thing out, was kind of your viewpoint.

MR. FUCHS: Right. And we are going to raise that motion with Judge Garcia. And I suspect it will be granted, and we'll be quick to object should we think it's being violated.

THE COURT: All right. Let me check with -- back to defense counsel one more time. You see what my concern is. Again, I'm very concerned about not resolving this issue in a way that preserves rights. On the other hand, I don't want to delay things if the parties are trying to move forward.

MR. BAEZ: I understand, Your Honor. And I appreciate that.

Just so it will be clear, I believe that the government's

presenting Mr. Mendoza at the case-in-chief.  Inevitably, I will have to ask questions in relation to that particular issue.  And so we open the door, and then the government --

THE COURT:  Yeah.  Well, I mean, are you going to ask him, did you talk to my client, and what did he say?

MR. BAEZ:  I mean -- see, but my hands are tied because now I open the door, and they can try to introduce the evidence.  And then here we are, we haven't ruled on that issue, whether it was -- so there's a lot of things, Your Honor, that can implicate my client's right.  And I don't want to do that.  So --

THE COURT:  Yeah.  No.

MR. BAEZ:  Although I (inaudible) agree with the government.  I believe that we're ready for trial.  But this is a very peculiar issue.  And I filed the motion, by the way, a while back.

THE COURT:  Yeah.

MR. BAEZ:  Just --

THE COURT:  Yeah.  I don't know the date it was specifically referred to me.  But I set it as quickly as I could on my docket.

Yes, Mr. Fuchs.

MR. FUCHS:  Mr. Mendoza will not be a witness at trial.

THE COURT:  Oh.  So he's not going to be -- this

gentleman won't be a witness at trial.

MR. BAEZ:  Then we have no issue, Your Honor.

THE COURT:  Okay.  All right.  So then what I'm going to do is I'll issue a very short order that indicates the motion is denied as moot in part.  It's moot -- the *Miranda* part is moot because you're not offering it in your case-in-chief.

On the voluntariness, denied without prejudice in part to presenting that issue -- if any of the statements come in, even in rebuttal, to presenting that issue both to the jury if the defense wishes and to presenting it by virtue or via a post-trial motion.

I have the transcript.  I'm going to order the transcript prepared.  So if there is that post-trial motion, if Judge Garcia wishes to refer that to me, I will consider it at that time if it's necessary, or, of course, Judge Garcia will have the benefit of having seen the whole trial.  He may want to keep it.  But he'd be -- he should have this transcript as well because, as you mention, Mr. -- Agent Mendoza won't be testifying.  We're going to need to have all this information.

Does that sound like a way that preserves everybody's rights and (inaudible).  I have to start with the defense.  This is your motion, sir.  So I have to be very careful.

MR. BAEZ:  I believe so, Your Honor.

THE COURT:  All right.  Very well.

How about that from the perspective of the defense?

MS. SPEARS:  From the United States, yes, Your Honor.

THE COURT:  Great.  I'm going to do my best to get a very short order that captures the essence of that ruling, which I just made up as we were going along, as we're going through these very complex procedural matters.

If either party has a question or needs clarification on that order, please -- I'm going to get it done today, whatever it takes.  Please reach out to me, you know, tomorrow or the next day so that I can have clarification on the record in an order before y'all appear before Judge Garcia, who's going to obviously be wondering what's going on with this motion.

MR. BAEZ:  Judge, I just have one question --

THE COURT:  Yes.  Let me hear from both sides.

MR. BAEZ:  -- just really quick.

THE COURT:  Yeah.

MR. BAEZ:  In the -- in relation to the *Miranda* (inaudible), are you going to -- are you going to actually specify that the government has --

THE COURT:  Oh, of course.  Absolutely.  That's the only way it would be moot.  I'm going to lay that out.  Yes, sir.

MR. BAEZ:  Thank you, Your Honor.

THE COURT:  Have to.  Absolutely.

Yes, Ms. Smears.

MS. SPEARS:  Nothing further from the United States.

THE COURT:  All right.  Very well.  Thank you.

Complex issue.  It's nice for me to get to do a little law review article -- law review exam on criminal procedure.

And we're in recess at this time.

MR. BAEZ:  Thank you, Your Honor.

* * *

*(12:58 p.m.)*

-oOo-

I, court approved transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Date:   10/3/2024     /s/ Chris Poage
                      Approved Transcriber