IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,          *   NO. SA-21-CR-366-(4)&(7)
                                   *
          Plaintiff,               *
                                   *
v.                                 *   MARCH 4, 2025 and
                                   *
                                   *   MARCH 18, 2025
                                   *
FELIPE ORDUNA-TORRES (4), and      *
                                   *
ARMANDO GONZALES-ORTEGA (7),       *
                                   *
          Defendants.              *   SAN ANTONIO, TEXAS

----------------------------------------------------------------

TRANSCRIPT OF OPENING STATEMENTS and

CLOSING ARGUMENTS

BEFORE THE HONORABLE ORLANDO GARCIA

UNITED STATES DISTRICT JUDGE

----------------------------------------------------------------

Proceedings recorded by mechanical stenography.  Transcript produced by Computer-Aided transcription.

# A P P E A R A N C E S

For the Government:        UNITED STATES ATTORNEY'S OFFICE
                           BY:  MR. ERIC FUCHS and
                                MS. SARAH ELLA SPEARS
                           Assistant U.S. Attorneys
                           601 N.W. Loop 410, Suite 600
                           San Antonio, Texas  78216


For the Defense:           LAW OFFICE OF EDGARDO RAFAEL BAEZ
                           BY:  MR. EDGARDO BAEZ
                           700 N. St. Mary's, Suite 1400
                           San Antonio, Texas  78205


U.S. Court Interpreters:  MS. IRIAS FARIAS
                          MS. ROSARIO FIGUEROA
                          MS. JANIS PALMA
                          MR. STEVE MINES


* * * * * *


# I N D E X

                                                          PAGE

OPENING STATEMENTS (3/4/2025)

  BY AUSA FUCHS........................................... 3

  BY MR. BAEZ............................................ 13


CLOSING ARGUMENTS (3/18/2025)

  BY AUSA FUCHS........................................ 22 / 78

  BY MR. BAEZ........................................... 55

* * * * * *

**MARCH 4, 2025**

**OPENING STATEMENTS**

(9:07:04 A.M., START OF EXCERPT)

THE COURT:  Go ahead, counsel.

OPENING STATEMENTS BY THE GOVERNMENT

AUSA FUCHS:  Quintana Road is a road in Southwest Bexar County, less than a mile -- less than a mile from the I-35 South and 410 interchange.  But along Quintana Road, you wouldn't know those two highways with their regular heavy traffic is so close nearby.  Because on a road, in a word, it's desolate, unmarked, not quite wide enough for two cars to pass, overgrowth as far as the eyes reach on both sides of the road in either direction.  Isolated.  There's barely any traffic along Quintana Road.

You might say it'd be the perfect place to commit a crime, if it involved a whole bunch of people.  Easy assess to the freeways to get away, no one around to see you, to bother you, or to report you.

And on June 27, 2022, just before 6:00 p.m., law enforcement responded to calls of an abandon tractor trailer right along Quintana Road.  In the back of that tracker trailer ended up being a horrific deadly seen.  Bodies upon bodies piled on each other, claw marks on the inside of the trailer walls remanents from people desperately trying to escape, an

overpowering smell, a mix of death and seasoning.  Forty-eight dead on the scene, five more who died after being transported to local hospitals, six of them children.

The autopsies found that they each, essentially, ant cooked in the back of that trailer.  Hyperthermia.  Where the body overheats, the organs fail, and then you seize or pass out before you die.  All from Mexico, Guatemala, and Honduras.  All in the country illegally.  It was immediately clear that this was a disastrous fail of a human smuggling venture.

And in a way this case both starts and ends with Quintana Road on June 27th, and that's how we're going to present the evidence to you in this trial.  But you're going to learn that the result, those 53 deaths, was the product of a sophisticated international human smuggling operation that had been operating for some time.  And you're going to learn a lot of human smuggling operations and how they operate; how despite the journey through Mexico being longer, both in terms of time and mileage, the real risk along that journey is in the United States.  And that's where we're really going to focus with you.  From the U.S./Mexico border on north because that's predominantly where these two defendants were involved.

Now, on Quintana Road that day, the driver of the tractor trailer was found pretty quickly in the overgrowth, about a hundred yards in front of the tractor.  The registration of that tracker was linked to a mechanic in San Antonio, and he

too was arrested that night.  Text messages on the driver's phone connected to his handler, and he was found the next day in North Texas and arrested also.

With time, agents were able to piece together the activities of this organization and discovered just how prolific it had been over the prior eight months.  Because this case isn't just about that one load, though, that's where we end up. Seventeen prior loads of people that this organization had run in the back of trailers.  That's 16 times doing the same thing, repeating the same core processes before that final fatal trip. Cramming people into the back of a trailer like livestock in Laredo; locking them in the back; in the dark; isolated, despite being surrounded; and driving towards San Antonio.

And you were -- you will hear how that worked for this organization.  Because like all legitimate businesses, this organization relied on standard processes, procedures, and progressions.  Like all legitimate businesses, it relied on its members to perform and execute various roles, and every role was crucial to the organization's ultimate success of transporting people.

The bottom of the organization was the load drivers; the people who actually drove the tractor trailers with people secreted in the back of them.  It's the riskiest role.  Right? Because if that tractor trailer is stopped by law enforcement, that's the person who is almost certainly and immediately in

trouble.

Above the load drivers are the coordinators.  And there were a number of coordinators in this organization, and they all performed slightly different roles; taking care of the tracker trailers, recruiting the drivers, shadowing the tractor trailer south to Laredo or north back to San Antonio.  But all those various roles had the same goal; to help the load driver, and the venture succeed.  One of those coordinators was Armando Gonzalez- Ortega.

At the top of the organization were the leaders.  The organizers; the ones who tracked the aliens as they were smuggled across the border to Laredo stash houses, who decided when was time to move those aliens from the stash houses -- be it, do they have 60 of them, do they have 70 of them, do they have 80 of them -- who would orchestrate the use of tractor trailers for that move, and who directed the coordinators to help make it happen.  One of the organizers was Felipe Orduna-Torres.

And so on load days, when the organizers and leaders declared that they had enough people to move them from Laredo to San Antonio, it essentially operated the same way every time.  The same processes, the same procedures, the same progressions.  It all essentially started in a private parking lot in southeast San Antonio, because that's where the tractor trailers were stored.  Right by that red dot [INDICATING].

And I say "parking lot," but it's really just an undeveloped field that somebody rented space in. And when they were ready to go, the organization would have one of its coordinators retrieve a tractor trailer from that lot and drive it across San Antonio to really one of two gas stations, both less than a mile from Quintana Road. There that coordinator would fill the tractor trailer up with gas, and he'd leave it. He'd lead it for the load driver, a load driver who was brought to that gas station by another coordinator for the organization. And that coordinator was responsible for recruiting these drivers, transporting to -- them to and from the tractor trailers, and finding new drivers when they needed new drivers.

After taking control of the tractor trailer, that driver would head down to Laredo. Straight down I-35. And along that trip south, the coordinators would support the trip from the outside -- following, watching, providing guidance. And they relied heavily upon their cell phones to accomplish their most important purpose, and that was letting everybody else in the organization know about the progress of the tractor trailers. And that was important so they could effectively coordinate what was to come.

Because eventually the tractor trailer was in Laredo. And in Laredo, the load driver would be notified of a location to pick up the people the organization was ready to move north to San Antonio. And the locations around Laredo

varied, but they were all essentially the same in some ways; commericial, industrial, somewhere where the presence of a tractor trailer wouldn't raise suspicion.  Because they still had to be discreet when they're loading all these people in the back of a trailer.  Because after all, what they're doing is illegal.  So the organization used smaller box trucks, like U-Haul-type vehicles, to transport the alien from the various stash houses in Laredo to meet the tractor trailer.  And when they wold meet the tractor trailer at these locations, the two vehicle would back up to each other.  That way the aliens could jump straight in from the smaller truck to the larger trailer.

Their cell phones were taken, they were told to be quiet.  Seasoning, which has been put down heavily in trailer to fool Border Patrol canines quickly burned their skin.  Then the doors were closed, they're locked.  And in the dark that tractor trailer would turn around and drive back north to San Antonio.

Just like on that trip south, though, the coordinators were supporting this trip north from the outside.  But this is the riskiest part of the trip.  Because now you've got a trailer with a lot of people hidden in the back and you have you to go past the checkpoint.  So they were constantly updating each other of the tractor trailer's progress on their phones.

Hey, it's been loaded.  Hey, it's approaching the checkpoint.  It made it past the checkpoint.  And where its

location was long IH-35.

Because that was also important, because they'd have a separate coordinator then meet the tractor trailer south of San Antonio along I-35. Not too far south. And it would guide the tracker trailer to its final unloading location. That was often Quintana Road, but not always. But it was always in that same general area near those to gas stations.

This coordination over the phones was also important so that the organization could have passenger cars waiting to meet the tracker trailer when it got there. Passenger cars, so the aliens, when they got out of the trailer, could quickly get into the cars and be disbursed to their next location. That's less time to be seen, less time to be bothered, less time to be reported if it's coordinated effectively.

So the organization did this process about every two weeks over those final eight months. And sometimes the tractor trailer loads were stopped by Border Patrol at the checkpoint. In case -- and actually six times drivers were caught at the checkpoints. Twice with 60 or more aliens in the back of the trailer, twice with more than 70, a load with 98, and a load with 107 people crammed in the back of the trailer. But that didn't stop this organization or these two defendants from keeping on with their business, following their processes, their procedures, their progressions. They would just recruit new drivers and keep on.

Now, when you heard the indictment yesterday, you heard that there's three charges that each of these defendants face. Really just two crimes, though. It's the same set of facts intricately intertwines which supports both of those crimes and all three of those charges.

And the Court's going to give you the full law at the end. It's going to be a document that you can take back with you and follow. But at the core, what we have to prove for Count One is that the defendants agreed with others to transport aliens. And that's on any of those occasions we're talking about. That the conspiracy charge, where the agreement itself to commit that crime is the crime.

And then for Counts Two and Three, the question is: Did either of these defendants help others transport aliens on June 27th, that final fatal blow?

And when I say "help other," that just means, Did they engage in some conduct that was designed to aid or assist the venture?

Now, if you find the defendants guilty of either of those counts, the Court will ask you to make two additional findings. First, did the offense result in the death of at least one person? And second, did the offense place in jeopardy the lives -- or life of at least one person?

An "intent" is not a factor here. You're not going to see that in the jury charge at all. Whether they intended

for them to die, whether they intended to cause them injury. And so I think it's not going to be a difficult decision for you, given what happened here.

Now, you can probably tell just from kind of the length of the trial that we're going to present a lot of evidence. And some of that evidence is going to focus on other members of the organization besides just these two. Because above the load drivers in this organization -- they got a lot of load drivers -- there was really six core individuals driving everything, helping it succeed. And it's important to understand the various roles they played and the interconnectedness amongst those six people to -- to understand the organization as a whole; to understand who they communicated with, and who they didn't communicate with. Because they didn't all talk to each other.

And so that's why it's important for you to hear all the evidence, about all the roles even beyond just these two defendants, so that you can understand how the organization worked and how it accomplished its ultimate goal of moving people.

Now, there's no single witness who is going to come in here and tell you the whole story. This case consists of dozens of pieces of evidence pieced together. We're going to start with the evidence in just a little bit this morning with June 27th in that final fatal scene. You're going to hear from

the responding officers, then we're going to move to the initial investigation thereafter; how that ultimately uncovered the broader organization at work, and how that ultimately linked that organization to all those prior tractor trailer loads of people trips that I -- that I mentioned.

You're going to see a lot of evidence from cell phones, as I've already told you how heavily they depended on their cell phones to coordinate all these loads.  Text messages.  WhatsApp.  Those conversations, generally in the Spanish language, they've been translated.  You will see through those conversations that they demonstrate the level of coordination between the various defendants on these days that they were moving people from Laredo to San Antonio.  How those conversations demonstrate they followed these same processes, procedures, and progressions.

And then last you will hear from several members of the organization; co-defendants who have agreed to testify in hopes of receiving lesser sentences.  And that will be your opportunity to learn and hear firsthand about the interworkings of this organization.

When you have heard everything, you will know how this organization operated, you will understand the roles these two defendants played, and how all of that ultimately resulted in the tragic loss of so many lives.  You will be convinced beyond a reasonable doubt, and we ask that you return verdicts

of guilty on all counts charged against each these of these two defendants.

THE COURT:  Thank you, Mr. Fuchs.

Mr. Baez, you're not required to make any opening statement or present any evidence, but do you wish to make an opening statement?

MR. BAEZ:  May it please the Court.

THE COURT:  Yes.

OPENING STATEMENTS BY THE DEFENSE

MR. BAEZ:  Counselors, ladies and gentlemen of the jury.  My name is Dr. E.R. Baez, and I am here representing my two clients, Felipe Orduna and Armando Gonzales.  You might have heard different names yesterday.  In the Hispanic community we have two last names; one from father, one from the mother.  I chose to use the father to comport to the American tradition.

Now, this case is a conspiracy case.  Make no mistake about it.  Most conspiracy cases take about a week to show the evidence.  The government as chosen four weeks.  You're going to see lots, and lots, and lots, and lots of evidence. The problem is there are defenses to conspiracy.  The defense, the evidence will show, that perhaps there's another conspiracy taking place that had nothing to do with my clients.

The problem with Spanish translation is that not all of them are proper.  If I was to tell you right now, "Holy cow," to you and I that may mean an expression of elation, surprise,

even scary.  But if you tell the same story to an Indian person, that is a mammal, that is a deity.  Do you see how languages can be mistranslated?  And you have to be careful because you're going to receive a lot of misinformation.

You see, the government uses these translators that supposedly understand the nuances of languages, the idioms.  Not so.  You have to be very careful.  Our founding fathers entrusted that ability for you guys to review the evidence.  You guys are the triers of facts.  Not the judge.  Not the attorneys.  You guys.

So I'm going to ask you, why does the government need to have so much evidence if it is so clear?  Why does the government have to have the members of the known conspiracy -- you're going to hear from them.  They've stated they're guilty. They're not trying the case.  But there's no actual direct involvement in video conversation, a surveillance, nothing.  All you're going to see is WhatsApp application information.  That's it.  And you're going to see a lot of it, by the way.

So imagine that you have your phone and you're texting somebody -- how many of you get texts from weird people? You have no -- no knowledge of what that is.  I received them all the time.  Wait (CLAPPING).  Wait based on the government's evidence, I must be part of that conspiracy.

This is confusion, ladies and gentlemen.  We have to be careful.  I want you guys to pay attention.  Truly.  Can

they -- can they tell you beyond a reasonable doubt that they know the defendants lack knowledge of this conspiracy? Interestingly, the government cannot produce the head person of the conspiracy. The defendants, on the other hand, are going to give you a name, it's going to show you a face. This individual has not been apprehended. Ask yourself why.

This conspiracy, you heard from the prosecutor, sophisticated human smuggling organization. My clients are not sophisticated. They're simple family members. One of them has been here for over 30 years working in the United States properly. And yet here he's facing the most powerful entity in the world, the United States Government. Make no mistake about it. Anybody can be subjected to the same.

So as I stated, the defense is going to show you our side of the story. Paul Harvey used to say it best, Here's the rest of the story. The government is hot going to want you to hear the fact that the members of the conspiracy were already established way before any of my clients had any knowledge or any communication with some of the members -- they're going to comes here and identify themselves and testify. How's that possible? If the conspiracy existed before, could they have the knowledge of the conspiracy? Is it possible that they have no knowledge of a conspiracy?

That is our theory, and that is what we're hoping that you guys see. You see through all of this facade of

evidence and realize that if they really had the evidence, one week. Let's go. Prove them guilty. Nope. They're here --

AUSA FUCHS: I'm going to object. That's the second time. That's an improper argument on the government length of the trial.

THE COURT: I'll permit him to continue.

Go ahead.

MR. BAEZ: Thank you, Your Honor.

Today my clients face some serious accusations. And the judge gave you the elements of that conspiracy. He -- he did. I wrote it down. He told you about the conspiracy and each count. He gave you the elements. It's up to each and every one of you to make that determination.

The standard, the burden of proof, is not on my clients. "Beyond a reasonable doubt," there's no definition by the Fifth Circuit, but it is up to y'all to determine what that means. The fact that they don't have any fingerprints on any of these trailers, is that a reasonable doubt? Because if they were part of this conspiracy, obviously they would have fingerprints all over this vehicle that they just mentioned. Do they have any?

They have WhatsApp text messages, though. Watch out. Do they have, perhaps, forensic material from my clients at any of the scenes? Nope. They have nothing. No DNA. No saliva. No nothing. Many times when a forensic investigation

is conducted, you collect evidence and you analyze it, and then you say, Yeah, here it is. This person is here. No such thing. They do have a lot of WhatsApp messages, apparently. The Mexican community loves to WhatsApp. Is that a crime?

Ladies and gentlemen of the jury, hold the government accountable. They have to prove to y'all beyond a reasonable doubt that my clients were in fact members of this conspiracy. They had no -- no knowledge of it. They're be living their life with their families, working their jobs. And the WhatsApp application comes, boom, you're a part of this conspiracy.

Question is -- and I ask you to ask yourself this: How long has this conspiracy been going on? And when, if at any time, were my clients introduced to this alleged conspiracy that they were part of?

I'm going to tell you -- I'm not going to answer that for you. Is that reasonable doubt? I'm going to leave it up to y'all. We're going to ask that you find my clients not guilty. And it takes conviction and it takes strength because I know how hard it is -- we want to -- we want to compensate people, we're going to feel sorry for so many people. But the constitution is clear, it is their burden. Not mine. They have to prove it to you.

Again, the government -- I understand. I understand their situation. They have people that are dead. I understand.

Somebody has to be held responsible.  But how about if you hold responsible to the people who not do the investigations that are needed to get these convictions?

It's imperative in this society, ladies and gentlemen.  We have to have competent law enforcement agencies that do proper investigations, other than just WhatsApp and Cellebrite information, to actually do investigations in order to get convictions.

It has been my honor and my privilege to represent these clients.  And I have seen all the evidence.  And I stand here in front of you saying, I don't believe the government will meet that burden.  It's not to up to me, though.  It is up to y'all.

But I'm asking you, if you have questions and you have reasonable doubts, please -- when you go to the back room, do not just acquiesce and go because you want to go home.  No. Fight.  Stand firm for what you believe.  Be strong and courageous, says the Lord.  I'm asking you to do that because we cannot allow the government just to throw a whole bunch of evidence and say, There it is, you figure it out.

No.  Let's get to the bottom of this.  How long has this been happening and who is really responsible for it?

Don't hold it against my client that I'm passionate about representing people.  That's who I am.  The Lord made me that way.  But I'm going to ask you to be strong and have the

same courage back there.  We will not be able to be there, but please understand any of you can be sitting right there, and it will be my honor to represent you as well.

AUSA FUCHS:  Judge, I'm going to -- I'm going to object.  That's an improper argument.  And we're arguing; we're not doing an opening statement.

THE COURT:  I'll sustain that.  Let's move on.

MR. BAEZ:  Some of the issue that might come along during the trial, and I'll close with this.  There might be some questions in relation to the medical examiner's certification at the time of these autopsies were conducted.  There are discrepancies on statements.  Make no mistake about it.  You will see that.

As a defendant -- as a defense attorney, I believe there's -- there's no corroboration evidence.  And I call it "corroboration" because they have another WhatsApp text.  No corroboration.

I believe from the bottom of my heart that the evidence will show that the government really did not do a proper investigation.  That's one of the reasons that my clients are standing here in front of you.  They believe in the system.  Our founding fathers believed strongly that people like you and I can see past the fact that they're the government and they have all this power.

My clients are not sophisticated.  They're

powerless.  They're depending on you guys, people like you and I, to say, You know what, government, you have not proven beyond a reasonable doubt.

I have a lot of doubts, as I stand right here.  And I hope you do too.  By the time that we finish, you should have the same doubts.  You should have those same questions.  And I'm asking you to, please, ask them for yourself.  Have the government meet their burden.

The creator of this conspiracy -- and they're going to show you a chart -- is not here.  He's the one response for these people.  He created this conspiracy way before.  He's not here.

Again, no fingerprints on trailers, vehicles; no fingerprints obtained on anybody at the crime scene.  Nobody.  Just WhatsApp text.

Forensic is an important aspect of investigations.  And perhaps you're going to hear from the office that they tell y'all don't really need that.  Ask yourself why.  Ask yourself why it was not important for the government to do what is right?  Now, simply because they have investigated for this long, we are here to trial.

Ladies and gentlemen of the jury, I'm going to ask you to please just listen to the evidence, review it for yourself.  And if at the end you believe that they have met their burden, by all means.  But if not, if you have that

question that is nagging at you like it's nagging at me right now, I'm asking you to stand firm and fight, because our democracy depends on it.

May God bless each and every one of you, may God bless this Court, and may God bless the United States of America.  Thank you very much.

THE COURT:  Thank you, Mr. Baez.

(9:41:15 A.M. END OF EXCERPT)


* * * * * *

**MARCH 18, 2025**

**CLOSING ARGUMENTS**

(9:34:03 A.M., START OF EXCERPT)

THE COURT:  At this time, Mr. Fuchs, on behalf of the government, you may proceed.

Mr. Fuchs, you'll have a time of not more than 120 minutes.

CLOSING ARGUMENTS BY THE GOVERNMENT

AUSA FUCHS:  When you do the same thing repeatedly over days, weeks, months, you know it's intentional.  And when others are doing other things in connection with what you're doing over the same days, the same weeks, the same months, you know you're working together for a common goal.  And when that goal is hiding and moving illegal immigrants in the back of tractor trailers, you know you're committing a crime.  And that is exactly what Felipe Orduna-Torres and Armando Gonzales-Ortega were doing.

Orduna-Torres as the leader, the one with that crucial cartel connection that let them move people over the border so they could have people to move.

Gonzales-Ortega, his *suegro*, his father-in-law, his trusted coordinator, the one who actually had the ability to go all the way to Laredo to verify that the tractor trailer was loaded, and update the boss; to verify whether that tractor

trailer passed the checkpoint, and update the boss; and to coordinate the tractor trailer's location as it came up I-35 towards San Antonio and let everybody else know so they could perform their roles.  And those two together, with the help of many others, as you've heard, ran a vast human smuggling organization.

We have brought you powerful, comprehensive, and overwhelming evidence, and have absolutely proven each one of these counts that these defendants face beyond a reasonable doubt.

Now, the Court's charge is the law that applies in this case.  It should answer any question you have and should serve as your guide.  But one of the things it talks about for several pages is one of your most important roles, and that's your role as deciding the credibility of witnesses.  All witnesses.  And it talks in particular about accomplice witnesses, and instructs you that you should view their testimony with caution and great care.  As you should.  But it also tells you that the testimony of just one of those witnesses can be enough for you to find a defendant guilty.  And so that means that just because you've been involved in a conspiracy, just because you committed crimes that resulted in the deaths of 53 people, doesn't mean you're not credible.  And the testimony from these witnesses in this case was confirmed, corroborated, verified, and cross-corroborated over and over.  And it puts in

context and erases any date -- any doubt that you may have about what you know from the electronic evidence, the WhatsApp conversations, the location data of the phones, the Border Patrol checkpoint crossing records, the more than 400 communications between the seven core players on that final fatal day.

The core evidence in this case doesn't lie.  It was consistent.  And that's how you know each of the witnesses told you the truth and why you'll be confident returning verdicts of guilty.

Now, as I told you during opening statements, each of these defendants face three charges, two crimes, both intricately intertwined.  And they all involve the transportation of aliens within the United States.  And that's one of the technical elements we have to prove; that the people they were actually moving in the back of those tractor trailers were in the United States illegally, without permission.  And we've proved that.  We proved that over and over.  In fact, you know we proved it for 541 names over those six, and then the seventh final load.  We only have to prove one.

And you know that from the records that we put on from USCIS, but you also know it because the parties agreed that that was accurate.  Every single person they moved was here illegally without permission.

And because you have that agreement, your real focus

in your deliberations is whether on these -- or is whether these two defendants were knowingly involved.

And so let's look at the charges.  In the first count, the conspiracy count, that's the all-encompassing account.  It covers the entire timeframe that they're moving people.  In a conspiracy, that crime is the agreement to transport aliens in the United States.  The agreement itself is the crime.  And it's a separate crime because the law takes conspiracies seriously.  As it should.  Because one person alone can do an awful lot of damage, but when you take two people, six people, ten people, they begin to take over and the damage done is multiplied tenfold.  They can be more sophisticated, more coordinated, more protective of those at the top really running things, and it allows different skills to combine to accomplish things one couldn't commit on their own.

And because of that, in conspiracies, the participants become agents of each other under the law. Meaning, everyone is accountable for knowing what other people are doing.  Everyone's accountable for the sum of the whole, and you don't have to be aware of everything yourself. Foreseeability is the key.

And it's also important to know that in conspiracies, participating just one time, playing a minor part or a minor role just one time, is enough.

We've proven in detail to you 17 tractor trailer

loads.  One's enough.  But you know these defendants were involved and agreed to all of them.

Counts Two and Three relate to the transportation of aliens on that final, fatal trip on June 27th.  And it's the same crime over two counts, because Count Two goes to the 53 people that were deceased, and Count Three goes to the 11 that survived.

But these charges don't allege just that these defendants transported them themselves.  You know they didn't do that.  It's that they aided and abetted others to accomplish that.  And that's just a fancy legal term for "helping."

And when you're deciding whether somebody helped others, you can look -- use the context of their past behavior to inform and interpret how they were acting on that particular day.  The same processes, the same procedures, the same progressions, the same assistance, the same goal, the same responsibility.

And the Court's instructions tell you that it doesn't matter how involved they were, because if you help, even in the smallest way, even in the smallest role, you're still accountable.  But you know these two defendants weren't fringe players.  You know they were much more involved.

If you find the defendants guilty of those counts, the Court asks you to then answer two special questions with a "yes" or a "no."  First is whether the offense resulted in the

death of at least one person.  Second, whether the defendants caused serious body -- serious bodily injury to or placed in jeopardy the life of at least one person.  The answer to each of those is "yes."  You have 53 options for the deaths; 11 for the final date for placing the lives in jeopardy, but almost 500 over the course of the conspiracy.

You'll notice that what we do not have to prove is that the defendants intended to kill anyone.  We do not have to prove that they intended to cause harm anyone -- to anyone. That is not an element, that is not the law, that is not in the charge, and that is not your concern.

The easiest way to understand the roles of Orduna-Torres and Gonzales-Ortega is to look at their actions. And not by looking at their actions on just one isolated load day, but looking at them over the course of many days, many weeks, and many months.  And when you view their movements and their actions in the context of others, in the context of the processes, the procedures, and the progressions this organization used, their roles become clear.

And as you know, we walked through 17 different load days during the course of the trial.  Each one of those informs you about these defendants' intentions.  And I'm going to walk through some of them now.  Not all.  I'm going to start with March 4th.  Because you know that morning Juan D'Luna-Bilbao sent photos to Guero, and you know what those photos signify

because he told you.  That means he dropped off an empty tractor trailer at the gas station, it had been picked up to the load -- by a load driver to head south to Laredo to pick up the aliens, he told you that, and then you saw it repeatedly in his communications.

Hours later, Orduna-Torres is sending that map link to Christian Martinez.  Because you know all these map links, all these maps, they were the locations in Laredo.  Martinez, as you know he did so many times, quickly flips it to the load driver that day.  And it's important on this one to note the time on that message, because the driver was waiting outside Laredo.  Waiting for that load-up location.  And he's waiting at that truck stop right outside Laredo that you saw over, and over, and over the load drivers would wait at.  Here he's waiting three hours.

But he wasn't the only one waiting.  Gonzales-Ortega was waiting, too.  You know that from his cell phone's location data.  You know he was in Laredo in the same general area waiting, like he'd wait on other days.  And they were both waiting for hours.  And after this load-up spot was sent to them, they both moved to that exact area shortly thereafter.

And you can see from Gonzales-Ortega's phone records, and we walked through these, that while he's in that area near that exact load-up location, he's updating two phone numbers.  And we know from the records we went through exactly

who those two people were.  One of them was Cowboy, the other one was one of Orduna-Torres' prior phone numbers, before he switched to that 4933 number that we saw in all the communications.

Forty-nine minutes after these calls, that tractor trailer is going through that Charlie 29 checkpoint, headed north to San Antonio.  That's the same tractor trailer that had -- the photos had been sent that morning.  And you know who's following it.  Gonzales-Ortega.  And you know that from his cell phone's location data, too, but you also know it on this day from his vehicle going through just seven minutes later.  The same vehicle that's registered to him, the same one that had that unique gray runner along the bottom.  And you know as he's going through that checkpoint from his records that he's calling both Orduna-Torres and Cowboy as soon as he's going through the checkpoint.

And on that same day, that's the day that Cowboy also sent this contact name and this contact phone number of Don-Gon to Christian Martinez.  And he told you that he never met that person, that was just a number and a name of somebody that coordinated the loads with him, let him know sometimes if the weigh station was open, let him know sometimes where that tractor trailer was as it headed north on I-35.  He never met the person, he never texted the person, they just talked.  But you know who it is.

And all coordination was important.  Those phone calls updating others was important so that the role players could play their various roles.  As the tractor trailer would approach San Antonio, they needed to check the weigh station, find out if it was open.  If it was open, let's lead it around a different way.  They had to coordinate with the guys that were going to meet the tractor trailer and guide it to its final unloading location.

And when they're doing that, they're all getting in that area now, making sure things are working exactly like it's supposed to and coordinating with those drivers who are going to meet the tractor trailer; open the doors, figure out which migrants belong to who based on which *clave* they gave, and get them quickly out of the area and on to the next location.

March 18th.  You know on this date that the coordination actually started two days before, when Guero was trying to see how many aliens they had at their stash houses ready to move.  They needed to make sure there was enough to make the load worthwhile, to make the risk worth it.  Two days later they had enough because the photos were sent that the tractor trailer was heading south.  Guero sends a map to Orduna-Torres, he flips it to Christian Martinez, who sends it to the load driver.  Exactly how you know it worked.  And again, noting the time, that's important because the load driver is waiting at that same truck stop outside Laredo that they'd wait

Case 5:22-cr-00366-OLG   Document 437   Filed 09/16/25   Page 31 of 85   31

at every single time until that spot was sent to them.  Just like on March 4th, just like on days to come.

You know Gonzales-Ortega was waiting, too.  He's down in Laredo right in that same general area.  And after this location was sent, same location as March 4th we just walked through, the load driver and Gonzales-Ortega go there.

Meanwhile, while this is going on, the others are focused on getting the load driver some cover, some plausible deniability to help him get through the checkpoint, Here's a fake bill of lading.  You know Orduna-Torres flips that to the driver's coordinator so he can let the driver know about it. And they coordinated the movements of the tractor trailer to the loading location.  And they're doing that so that the aliens can be brought from the stash houses to that location at the same time, because that's a risky part of this venture.  They want to minimize the -- the time to be seen, the time to be bothered, the time they can be reported.

And 40 minutes later, 40 minutes after they're coordinating when that tractor trailer's going to get to the load-up spot, you know Gonzales-Ortega was updating them on what's going on.  He's updating them giving them Torres' old number, he's updating Cowboy so that everybody can know.

Guero sends a text at the same time, confirming the same thing, and 50 minutes later, the tractor trailer was going through the Border Patrol checkpoint heading north to

San Antonio.  The same tractor trailer that was sent in the photos that morning.  Gonzales-Ortega is following right behind them.  And you know as soon as he's going through, he's updating Orduna-Torres.  And that communication, again, is so important because it lets everything get into place, it lets them guide that tractor trailer to the final unloading location, lets them get the drivers in place so they can open the door, check the *claves*, and quickly transport the migrants away.

March 30th.  This day it really starts the day before when Orduna-Torres is getting directions for the next day's load.  And notice who is directing who here.  And that makes sense from what you heard because Guero is responsible for the tractor trailers and Orduna-Torres is responsible for the drivers.  You heard that from Riley repeatedly.  And so Guero does exactly what he was supposed to do with the message, he forwards it.  He forwards it to the guy who brings tractor trailers to meet the drivers.  And exactly like Orduna-Torres directed, the next morning around 7:00 a.m., everyone's in that exact spot where the tractor trailer is brought.  The photos are sent, the tractor trailers headed south, the bill of lading is shared, it's forwarded to the coordinator, who sends it to the load driver.  And you know where he was.  He's waiting outside Laredo, waiting 11 hours this time for information.

Gonzales-Ortega is waiting, too, nearly just as long down in Laredo.  And after that location is sent, both the load

driver and Gonzales-Ortega go to that exact spot at the same time. While he's there, Gonzales-Ortega updates Orduna-Torres, he updates Cowboy. We see here that Orduna-Torres has now switched to his 4933 phone number, the one that you read all the communications from, the one that he uses for the rest of our time.

And meanwhile, while this is going on, they also need to coordinate the load coming up -- back to San Antonio, and they start doing that. They need to coordinate this and they need all the intel they can get because this is the riskiest part. So they're exchanging this information about which Border Patrol checkpoint line they should go through. And that's critical. Orduna-Torres needs it from Guero. He gets it. But he needs it because he needs to provide it to somebody. He needs to provide it to the driver's coordinator who can give it to the driver. And 12 minutes after this message, the driver's going through that exact lane at that checkpoint. Same tractor trailer as the photos were sent that morning. Gonzales-Ortega following right behind, just like the other trips, except on this trip, March 30th, you know what happens; 107 aliens caught hidden in the back of the trailer.

Gonzales-Ortega then updates Orduna-Torres and Cowboy, like he did the other times, except this time it's not to say, Hey, it made it through the checkpoint; it's to update that, We got caught. And you know that because immediately

after he has these calls to Orduna-Torres and Cowboy, we see what Orduna-Torres is doing.  He's letting Guero know that they got caught.  He's letting his stash house operators know that they got caught.

Because this load was caught, because we now know the names of the migrants that were in the back of that tractor trailer, that lets us take a little deeper look at the electronic evidence in the days preceding this load, too.  And when we look back at that, as you know and as we walk through, we can see that this load was coordinated in the days before.  Orduna-Torres and Riley talked about it, they shared photos, they shared names.  And when you're sharing names, you're coordinating.  And when you're coordinating the transportation of aliens, that's a conspiracy.

Now, the evidence also tells us that they were working together that day, and it confirms those calls from Gonzales-Ortega to Orduna-Torres about the load being caught, and we can see that from the electronic evidence.  Because they were caught, the other coordinators didn't need to travel south from San Antonio to perform their usual roles.  That is exactly what the cell phone location data shows you.  That was the only day they didn't travel south on a load; the day it was caught, when they were no longer needed.  That's a conspiracy.

April 7th and 8th.  You're probably starting to feel the repetitiveness now.  That's how you know.  The processes,

the procedures, the progression.  So it's the business of moving people.  The photos were sent, the tractor trailer's headed south, Guero sends the location information, Orduna-Torres says he'll pass it on.  And who does he pass it on to?  His trusted associate.

And now you'll recall that for April, for these April loads, we don't have cell site location data from the driver, from Othell Brown, so we can't show you the exact details of the movements on these dates to see if they actually make this location.  But you do know what else was going on.  You do know that Orduna-Torres was coordinating that load for the next day.  And it looks like it's going to happen in the morning.  You know he passes that exact information on, the time information, to Gonzales-Ortega.  And you know that matches other evidence we have for that date because we do know that Gonzales-Ortega went down to Laredo then.  And he didn't just go down and back for a single day trip, he stayed overnight.  Just like the tractor trailer had gone down the day before and stayed overnight.

And so then the next day, apparently after doing that morning load-up that they're talking about, we've got the tractor trailer heading north through the checkpoint just after lunch.  The same tractor trailer from the photos from the day before.  And because it wasn't stopped, you know it made it successfully, it makes it to the unloading location, where the

doors were opened, the *claves* were checked and the migrants were quickly driven away.

The same processes.  The same procedures.  The same progressions.  The same roles.  The same actions.  The same intent.

April 29th.  It starts that day, the photos being sent, the tractor trailer is headed south to Laredo, bill of lading is passed along to Orduna-Torres so he can send it along to the driver.  Remember, we still don't have location data from Othell Brown's phone, but we know that Gonzales-Ortega went down to Laredo also.  We know that checkpoint information was shared.  We know that Orduna-Torres acknowledged it.  And we know that shortly thereafter that tractor trailer is going through the checkpoint at Charlie 29, trying to make it back to San Antonio.

The same tractor trailer from that morning's photos, except this time the driver went through the wrong lane, the load got caught.  Ninety-eight people crammed into the back this time.  You can see their legs spread around each other to ensure they could all fit in.  And just like on March 30th, because we know the names of the people who were caught hidden in the back of that trailer, we can look at the electronic evidence, and we can see how it was coordinated between Orduna-Torres and Riley in the days leading up.  They shared photos.  They shared names.  And when you're sharing names, you're coordinating.  And when you're coordinating the transportation of aliens, that's a

conspiracy.

May 10th and 11th. The photos were sent, the tractor trailer's headed south to Laredo to pick up the next load of aliens. Except this time, you remember, after the load-up location information was shared, it got switched. And you also know that Orduna-Torres already knew that it had gotten switched, and he knew why it had gotten switched. That demonstrates to you that there's more coordination going on than we've been able to capture and show you. Maybe he's coordinating with somebody who's already down there for him, like a trusted associate.

You know the load driver is waiting at the usual spot, except it's a new load driver this time because Othell Brown had gotten caught. Same truck stop, though. Just like Chavez, just like Brown. And you know Gonzales-Ortega was down there, too, waiting in his usual place. And after this location was sent to them, they both immediately go to that exact area. When you're moving in concert like that, that's not a coincidence, that's a conspiracy. And Gonzales-Ortega is updating Orduna-Torres exclusively now.

Forty-seven minutes later, just like the length of time it takes to drive up to the checkpoint, after they're at that load-up spot, the tractor trailer is going through the checkpoint. The same tractor trailer from the photos the day before. You've got Gonzales-Ortega following that tractor

trailer, as usual.  Again, here you know it from his phone's movements, and you also know it from his Jeep.  That's the yellow one, registered to him.  And you can also see him driving it.

And so then he calls Orduna-Torres immediately after he goes through the checkpoint.  And this is, as you know, is so the coordination can start between everybody else that's waiting up in San Antonio.  It allows the role players to get in place so they can meet the tractor trailer, guide it to its final unloading location; where it can meet the drivers, who can open the doors, who can check the *claves*, and transport the migrants quickly away.

May 19th and 20th.  Photos were sent, the tractor trailer's headed south to Laredo, Guero sends the location information with Orduna-Torres.  We know that load driver was waiting at the truck stop just outside of Laredo for that location information.  Gonzales-Ortega, too.  And when they get this location, the driver goes to that location.

And you'll recall from Agent Mullen's testimony that we didn't have any cell phone use from Gonzales-Ortega's cell phone for almost a three-hour gap on this day; we can't show exactly where his phone moved.  But we do know as soon as that load driver started heading north, so did Gonzales-Ortega.  The lane information for the checkpoint was shared, and we see the checkpoint -- and we see the tractor trailer going through that

checkpoint. The same one as the photos sent from the day before that was heading south. It's followed by Gonzales-Ortega. And again, we know that from his phone's location data that you can see here, but you also know it from his yellow Jeep. And again, we can see him trying to hide his face with a mask. As he goes through that checkpoint, he's immediately updating Orduna-Torres so that the coordination can start so the role players can leave San Antonio and go meet that tractor trailer, so they can guide it to its final unloading location, so they can meet the drivers, open the doors, get the *claves*, and quickly transport the migrants away.

May 30th and 31st. Tractor trailer photos were sent. A location information was shared. It was passed along to a trusted associate. The load driver was waiting at that truck stop. This time waiting overnight. Gonzales-Ortega was waiting there, too, overnight. And after this location was sent to them, they both moved like every other date on that -- to that exact area. And Gonzales-Ortega is updating Orduna-Torres.

And notice here that this is all happening around 5:00 in the morning. That's odd hours. That also puts them hitting the checkpoint right around shift change. And you heard what happens at shift change; that means Border Patrol's a little less staffed, they had fewer dogs. That's not a coincidence. That's a result of an experienced organization, one that's done its homework. That's a conspiracy.

Thirty-eight minutes later, the tractor trailer is going through that checkpoint.  It's the same tractor trailer as the photos that were sent the day before.  Gonzales-Ortega is following the tractor trailer and load driver, and he's updating Orduna-Torres.  And with that coordination, the coordinators can get in place so they can meet the tractor trailer, they can guide it to its final unloading location, where they can meet all the drivers, so the doors can be opened, the *claves* can be given, and the migrants can be quickly taken away.

June 15th.  This one was a little different than some of the prior trips because we see the planning beforehand, that it's actually Orduna-Torres sending a picture of the tractor trailer this time to Guero.  But we've got the same primary players involved.  He sends him this photo nine days before.  And then four days before, he sends him an address. You know that that address just happens to be that same truck stop right outside of Laredo where the load drivers always wait at for the location information.  And then of course when it's the day, when they're ready, the photos are sent indicating that the tractor trailer is heading south to pick up the load.  And on this date we see that it's the stash house guys that notify Orduna-Torres that the tractor trailer was loaded and had left. And from our records, this is the only day that they do that. But they have to notify him that day because that is the one day Gonzales-Ortega doesn't go to Laredo when the tractor trailer

does.

Thirty-nine minutes later, the tractor trailer's going through the checkpoint, the same one from the photos that morning. And you know that that day another load was caught by Border Patrol. Seventy-one migrants hidden in the back that time.

I want to take just a minute to remind you why you know these phones belonged to and were used by these defendants and you can be confident in that. Let's start with Orduna-Torres, and because not only did you hear from the three guys up top that that was the phone number he used, Orduna-Torres had each of their phones saved in his phone. And of course they had his number saved in their phones under the names they knew him by. Two of them had old numbers for him, too, like the number that we can see he was being updated by Gonzales-Ortega's phone on some of those earlier loads.

They all I.D.'d him as -- as the one that walked with a limp. You know that was true. And you know the iCloud registered to that phone number was registered to Fey Orduna. And that the paperwork found in Orduna-Torres' bedroom at his house linked to that iCloud account, linked to that same phone number, and also listed Fey Orduna.

You also know from the conversations themselves, though, that the people he's talking to referred to him by name, Felipe here, but you remember others, too. Cheukito, Cheque,

Cholo, Negro.  Various names the people he was talking to called him by.  And you saw that in the records.  They were the names they knew him by.  There was no doubt whose phone this was and who was using it.

The link to Gonzales-Ortega and his phone is simple. When he's arrested, he has the phone on him with that phone number.  He told agents it was his number, told them that he'd had it a long time.  Just to link it up, the phone was also registered to him, in his name.  And of course the other people involved had his number in their phones, saved with how they knew him, unsaved in Martinez's phone because that's just a number he talked with on the phone to coordinate these loads. Bilbao doesn't have his number because he said he doesn't know that guy.  They're on different sides of that organization. They didn't interact.

And then when you looked at these two phone numbers and their contacts with who they're talking to on June 26th and 27th, it's especially telling.  They are contacting the exact people who told you that they were in contact with.  Seventy-six in all for Gonzales-Ortega, and it's similar for Orduna-Torres, except 265 communications for him.  That's consistent with his role as the leader, the organizer.  These contacts are not a coincidence.  It's a conspiracy.

Gonzales-Ortega's trips to Laredo were equally incriminating.  Sixteen trips over four months.  And this is the

timeframe that we had the records of the cell phone's location data. But in that time period, in that four months, every successful tractor trailer load trip to Laredo he went. Two of the three unsuccessful trips, he went. And of course June 27th, he went.

If there were overnight trips for the tractor trailer, there were overnight trips for Gonzales-Ortega, too. Every. Single. Time. That's not a coincidence; that's knowing involvement in a conspiracy.

And of course, it's just going there. It's always traveling in concert with the load drivers on the way down, waiting for the location over extended periods of time like they were, moving to the locations, the load-up spots at the same time that the load drivers did. Three times with Daniel Chavez, four times with Homero Zamarano. And then always following them back up north towards San Antonio. You know that from the Border Patrol checkpoint crossing records, you know it from his phone's location information. And you know each time he's going through that checkpoint, he is updating Orduna-Torres thereafter, letting him know whether the tractor trailer made it through successfully or not.

And of course, Gonzales-Ortega had some extra trips to Laredo, also; trips that weren't tied to any tractor trailer load date. You know the -- what those were for, too, because Riley told you. He was the money guy. They had to get money

down to the stash houses to pay for the stash houses, to pay for food, to pay for supplies, to pay the workers. And Riley told you how he gave both Orduna-Torres and Gonzales-Ortega money for that so Gonzales-Ortega could take it down. And he gave it to him in envelopes, just like this one that was found in Orduna-Torres' residence. What amounts did he say he gave them? He said usually 5- or $6,000 in cash, just like the $6,000 on this envelope. That's credibility.

We also know that Gonzales-Ortega was the money guy from the texts between Orduna-Torres. We see that. Here's the phone number. It's the one from the money, and then he goes to Laredo. Sends him a Laredo phone -- phone number, and then he goes to Laredo. Sends him another phone number, and then he goes to Laredo. And all of this makes sense because he is the only one that can actually go to Laredo and make it back past the checkpoint legally. That's a conspiracy using the various tools of each of its members to succeed in ways that it otherwise couldn't on its own. And of course, when the loads came back, Gonzales-Ortega was always nearby, coordinating, letting others know the progression, helping to make the loads successful.

I want to talk just a minute about the organization of the evidence for when you get back -- we tried to organize it in a way that you could find exhibits as easy as possible. Government's Exhibit One, which we didn't show because it's just

a numbering chart for you to kind of let you know how the exhibits are numbered. They're really grouped by events. But anything that starts with the 1000 series is going to be -- that's going to be all the communications; the WhatsApp messages. It's going to be your electronic evidence from the cast report, from the license plate reader evidence. Because you get everything electronically. Now, if you want a hard copy of the transcripts and notebook, I suspect if you ask the Court and say you want some that he would send some back.

I want to point out a couple particularly helpful exhibits to you. We touched on this one real briefly yesterday. This is Government's Exhibit Four. And this is just that matrix of who's talking to who on what date, with that exact transcript exhibit number identified. And so if you want to see what that conversation was, that's a quick way to find a particular conversation you might be looking for.

Government's Exhibit Five is the list of the transcripts from the seizure dates, the six Border Patrol seizure dates that we presented to you and we read with those Border Patrol agents. It puts those relevant transcripts in chronological order so you can see the evolution of the coordination. Those are listed there.

Government's Exhibits 25 -- 325 and 326 is the location information that was sent between the various people. One, just all of it pulled out of the WhatsApp communications

on -- into a single document; and the second interlaid over that map that you see there.  Showing who sends to who, and who forwards to who.

Government's 1027 and 1027-B is the cast information.  That's that FBI's information that he talked about.  1027-B being the high-level summary charts, showing who's where, when.  And 1029-A, then, is the summary of how many contacts all the various people had with the other people in this conspiracy on June 26th and June 27th.

1053 is the license plate reader records.  That's the summary chart of the license plate reader records listing what day they passed, what license plate it was.  And it also references you to the underlying exhibit of the actual six-page record so you know which one supports that summary chart.

You know one of the things that you're not going to see back there is Government's Exhibit Three-A, the big chart that we used pretty heavily during the course of trial.  That's because it's a demonstrative exhibit.  It was one meant to help you track information as we went through it during the trial.  Because it's demonstrative, it's not allowed to go back with you.  But Government Exhibit Three is a blank version of that, if those dates are helpful to you in any way.

So that takes us to June 27th.  And you know from the evidence we presented that the coordination actually started for that load two weeks earlier, coordinating the movement of

three friends through Mexico.  And they're coordinating that because it had to be reported to the cartel.  And Orduna-Torres confirmed his ability to do so.  He's confirming here exactly what Riley told you he did for the organization.  That's credibility.

You know who those three migrants were.  You heard from Jose Luis Vasquez-Guzman.  You know he survived, but his uncle and his friend didn't.  You know the coordination continued one week out.  More names being sent.  Orduna-Torres worried about having to pay extra at a stash house.  Eight names now from the fatal load.  Seven deceased, our same survivor.

Six days out they were continuing to coordinate, coordinating the three friends again because Riley says he heard that they had gotten captured, had been grabbed.  Well, they had.  You know that from the Border Patrol records.  But Orduna-Torres already knew exactly what had happened.  It was his *bodega*; it was his stash house.  He knew it'd been raided.

Two days out, they're sharing more names.  The final coordination of who was going to be in that June 27th load.  Continuing to share names, continuing to -- attending -- to account who was who, continuing to account for who had paid for what they needed to pay.  Sixteen names now, 14 deceased.  Two survivors.

And you -- you know it wasn't just the sharing of names.  You know that Orduna-Torres was getting direct guidance,

too.  And you know that from his conversations with Gustavo Daniel Santillan Santillan.  Coordinating his movements up through Mexico.  Those same bus movements you heard Jose Luis Vasquez-Guzman describe, the same requirements Riley told you about, about passing the name, passing the bus ticket.  Because Orduna-Torres needed that information to report it to the cartel.  He's the one who did that.  Santillan is asking for more information, asking for his name.  But Orduna-Torres is all business.  His name wasn't important.  He didn't want to provide it because that keeps him with a level of protection.  But his *clave* was important, and that's what he shared.

You know, the Spanish was important, too, on this message because we saw that same language, that same *clave*, that same *"de parte de negra"* on the paperwork, that sweat-soaked paperwork found on the person of another deceased.  The same phone number belonging to Orduna-Torres, the same *"de parte de negra,"* the same *clave*, and you know exactly who all that information was referring to.

Orduna-Torres gives Santillan directions for what to do once he got to Nuevo Laredo.  And you know about the Hotel Calderon; you heard about it from Jose Luis.  That's that same hotel referenced on the other deceased's paper.  And so Orduna-Torres and Santillan finalize the details of his travel.  It's about money.  He wants to know about the refund policy.  And you know where he would leave from on each attempt he had from Hotel

Calderon.  And if he got caught, he would go back to Calderon and leave from that same place again and again.  So the exchange of information continued.  Speed over safety.

Then Orduna-Torres actually used his communications with Santillan to try to organize his load, to figure out how many he had at the stash house, to figure out whether that was enough to make a load worth the risk.  That was ten days out. Clearly seven wasn't enough.  It wasn't worth it.  So they stayed.

And you heard about those conditions; you heard about how the stash houses were overcrowded, how they were locked inside and not free to leave, that there was nowhere to sleep comfortably, there wasn't enough food, that there wasn't enough water.  And you know exactly who was responsible for those conditions.  Both guys who operated their own stash houses.  But that's where they stored their "pieces" until they decided it was time to move them.  And they ultimately decided that June 27th was going to be the day.

You know how that day started.  It started with Orduna-Torres calling Guero, Guero calling him back after they talked the first time, and then Orduna-Torres letting Juan D'Luna-Bilbao know it was time.  Time to go to the yard to pick up the tractor trailer, and he did.  And you know he did that because he told you and his phone's location data confirms it. You know while he's over there that Orduna-Torres sends him this

photo asking about the seals.  Which one should he get?  You know what the seals were for.

You also know that the time that D'Luna-Bilbao was at the yard because as we walk through, Orduna-Torres and Gonzales-Ortega came there right after.  And you know why they did it that day because Orduna-Torres told you that he needed his truck brought to the gas station because he needed to take to -- his daughter to the hospital.  He didn't have time to be taken all the way back across town to pick up his truck thereafter.  These are the guys that brought it.  In fact, they left from the same spot that morning to go get it.  Orduna-Torres' house.

You know D'Luna-Bilbao took that tractor trailer that he was directed to take to the gas station.  He told you while he was there, filling it up with gas, that he got a call from Orduna-Torres letting him know that the driver was there.  You can see that in the phone records.  And then the load driver took over.

And every one who the witnesses told you was there at the gas station that morning, was there.  According to their phone records.  So then they started traveling south.  And you know, just like the other days, who goes south.  It's the load driver, it's Gonzales-Ortega, and it's the load driver's coordinator.  Except only two of them go all the way to Laredo.  And then they both wait.  They wait for that location

information, with the load driver at the truck stop.  You know Gonzales-Ortega's waiting down there somewhere, too, because as soon as that loading location was finally sent by Orduna-Torres to the load driver's coordinator, he flips it to the driver.  Immediately.  That location -- that location originally sent by Orduna-Torres, that Chacon Street location.  That exact GPS coordinates you got to watch in that surveillance video from across the street.  That exact location you saw the blue F-150 case shortly before.  You saw it make the block, and then sit at that stop sign for nearly two minutes.

You heard how the migrants got to that exact same location.  They told you.  And then you got to see that white box truck drive up.  You saw the red tractor trailer arrive shortly thereafter.  You could watch it back up and turn around so it was end to end with the white box truck, just as they described it had happened.  And that was all so they could jump right in, so they can minimize the risk of being seen, of being caught, of being reported.  Guys in their masks taking phones as they jump in, seasoning already in the trailer to greet them.  You know that's true.

The cell phone location data shows you that both the load driver and Gonzales-Ortega were both right there, if you didn't believe it from the videos.  That's not a coincidence.  That's a conspiracy.  That's aiding and abetting.  That's helping the venture succeed.  All the prior times, all the prior

trips, all the prior actions inform you of exactly what they were doing.  And of course Gonzales-Ortega updated Orduna-Torres.  Just like every other time.  Then they head north, right to the Charlie 29 checkpoint.

The tractor trailer gets there about an hour after loading up.  Gonzales-Ortega follows this time a little farther behind than he'd been on other occasions.  But you know when he does get there, you know that he still immediately calls Orduna-Torres after he passed and saw that the tractor trailer hadn't been stopped.  And even though by the checkpoint he was 45 minutes later, by the time he gets to that weigh station, which is an important spot, you know, he had caught up.  Because his role is to update others on the tractor trailer's location on its drive north.  You know the tractor trailer had stopped a couple times.  It helped him catch up.  And you know he successfully let them know where it was, because by that point they were all there coordinating, performing their roles, just like every other day.

You know along that journey that things started to go bad.  It was oppressively hot.  The truck stopped multiple times according to them both.  Jose Luis reported to you that the A/C was restarted and it just blew hot air.  You know that's true.  You know it's true because that same thing was reported on the outside by the load driver, letting his coordinator know what was going on, who was letting Orduna-Torres know.  And you

can see that in the phone records happening, that series of calls -- A to B, B to C.

You also heard from D'Luna Bilbao that Orduna-Torres had called him about that exact same thing. That's corroboration. That's credibility. And you can also see this phone call in the phone records. Meanwhile, you know the screaming and the yelling was getting louder. On the inside of the trailer they were clawing at the sides desperately for air. And their pleas for help were heard on the outside. Christian Martinez told you that. He told you he gets that information from the load driver, and he reported it to Orduna-Torres and to Cowboy. And you can see that happened in the phone records.

Orduna-Torres replied to Christian Martinez that, They're almost here. Christian Martinez told you he relayed that back to the load driver. And you can see this series happening, too, in the phone records. Load driver going up, information going back down. And while Martinez is relaying it back to the load driver, Orduna-Torres, interestingly, is calling Guero, letting him know what's going on.

But you also know that happened exactly the way they told you it happened and exactly the way the phone records told you it happened from the inside. Because the migrants in the track -- trapped in the back received that exact same message after it had been passed back to Zamorano. That is compartmentalized stories colliding. That is consistency, that

is corroboration, that is credibility.  And all of the conspirators, as it approached that final unloading location were nearby at the end, performing their various roles like they had on every other day to help the venture succeed.  But you know what happened.  There was no escape.

You know, your role ultimately as jurors is to let the chips fall where they may.  The Court gives you the law and you determine the facts.  And when the facts meet the law, it's your duty to find the defendants guilty.  And when you look at all the evidence that we presented to you in this case, you know that is exactly what we have done here.  It's overwhelming.

THE COURT:  Thank you, counsel.

We'll resume at noon today.  And when we do, Mr. Baez, you'll have a period of -- of time not to exceed 60 minutes.

MR. BAEZ:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

COURT SECURITY OFFICER:  Rise for the jury.

THE COURT:  Hold on, I need to -- well, I need to excuse the two alternates.  Thank you very much.  We always keep the alternates until the very end in case some emergency of some kind should arise.  But I want to thank you for your service on this panel.  Thank you.

(10:44:42 A.M., JURY OUT, AND OFF THE RECORD)

(12:03:45 P.M., ON THE RECORD)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Okay, they're bringing the jury in.

(BRIEF PAUSE)

THE COURT:  And I've permitted the two alternates to stay until -- until the very end.

(BRIEF PAUSE)

COURT SECURITY OFFICER:  Rise for the jury.

(12:04:58 P.M., JURY IN)

COURT SECURITY OFFICER:  You may be seated.

THE COURT:  Okay, Mr. Baez, you can present the defendants' argument.

                CLOSING ARGUMENTS BY THE DEFENSE

MR. BAEZ:  May it please the Court.

THE COURT:  Yes.

MR. BAEZ:  Counselors.

Ladies and gentlemen of the jury, my clients wanted me to thank each and every one of you for your attentiveness, pay attention, the note taking.  Because as you can imagine, their lives is in the line -- on the line.  When you take on such a big giant as the government, they feel as if they are the little David, the little stink -- sling throwing the rock.  It's very difficult.  In fact, they're the only ones that decided to take on the government.  And they're relying on each and every one of you to say, Wait a minute, government, it's more than meets the eye.

The reason is simple.  Known members of a conspiracy come and testify against them.  Now, the defense will argue that in front of you is a conspiracy.  The defense [sic] would argue, based on the testimony of a conspirator, that this conspiracy started somewhere in 2016.  Maybe before.  Because between these two individuals -- Riley testified that Guero brought him to the United States somewhere around 2016.  That means that the inception of bringing people illegally here did not start with my clients.  In fact, you can say that was several years before these two were at it very successfully.  Of course the government is not going to show you that.  It does not fit their narrative.  You're starting to see how this big giant called Goliath reared his ugly face against them.  But you have this.  You heard this.  Guero brought Riley.

Now, what you don't have, unfortunately, is Guero.  Where is he?  Why is he not here?  Why is he not testifying as to this huge, big conspiracy?  Because it does not fit the government's narrative.  Members of a conspiracy accusing supposed two members of a conspiracy.

Now, the defense will argue here is a conspiracy.  The defense would also argue that these conspirators knew exactly what they were doing.  Defense would argue that it is very difficult for the government to prove intentions of my clients when you didn't receive a single phone conversation via phone.  You didn't see -- hear those transcript -- you -- you

read the transcript, but there's no actual conversations saying this and that. Why?

And we're going to go in a little bit and ask several whys why I believe that the jury will find my clients not guilty. And by the way, it takes courage to do that. It takes courage to represent individuals that the whole world is looking to punish. That's a fact. It takes a little David to have a little rock and throw it between the eyes. And that's what I'm asking each and every one of you to do when you go back there and deliberate. Be the David. Don't let the Goliath of the government confuse you.

All of these text, all of this evidence was created by the government. Make no mistake about it. Several witness testified. No forensics. None. Trailers that probably were stopped, they could have taken fingerprints. None. Why?

You know, when you have a case, albeit, call it circumstantial, that's what you have to do. You have to create thousands, and thousands, and thousands of exhibits in order to show, Look, here it is. That's exactly what you do to dogs, repetition, and repetition, and repetition until that dog exactly says, Oh, yeah.

You guys are not. Trust me.

When you read this transcript -- and I urge you to read it, then you will see that it is impossible for this to have my clients' names on them. They were only added by the

government.  In fact, you heard Officer Tijerina testify twice, and he says, and I quote, You cannot tell anybody that was Felipe Orduna or Armando Gonzalez behind those conversations. Well, why not?  Why don't we have those recordings?  Why don't we have an expert that says, Wait, that is such and such saying this such and such message?

Why?  It doesn't fit the government's narrative.  It doesn't fit Goliath.

And so time and again you have to ask yourself, would you want to be involved in something like this?  And make no mistake about it, each and every one of us are susceptible. The government, mighty powerful, can go after you.  As you heard, they have subpoenas and poles and -- there you have it. But the actual evidence needed, Ah, you don't need that; we've bombarded them with evidence.  Which the government created.

Government's case.  They brought you 28 witnesses. I counted them.  I labeled them.  Twenty-eight.  Why?  More is better.  You know, many times when you have to construct something that appears steady and it appears it has substance and structure, that's what you have to do.  You have to bring thousands, and thousands, and thousands, and thousands of exhibits.  Which, by the way, they created in order to have you believe that they met the burden beyond a reasonable doubt.

There's no definition, not even the Fifth Circuit's, have given you a definition of reasonable doubt.  Well, I tell

you, it appears to me that all this evidence that they have looks and feels as thin as this card. You know why? Because, in fact, when the government could have proven without a doubt that my clients were at the scene, that my clients were at the checkpoint, they brought you pictures of this thing that the government calls -- the pictures being -- by the way, do you notice how those pictures can be moved? Photocopy. They didn't show you a video of either one of my clients crossing a checkpoint. Why? Because it doesn't fit the government's narrative. Why didn't they show you a video of either one of my clients at the gas station? They show you one of Homero Zamarano, they show you one of Bilbao, but not one of my clients. Supposedly, Oh, the phone says that they were here. Where's the videos? It does not fit the government's narrative.

And so, again, I want to ask you to be strong and courageous back there and say, You know what, they have to prove beyond a reasonable doubt. Is that reasonable doubt? You be the judge.

Roberto Quintero and Carlos Mendez, very first two witnesses at the scene, if you recall, I was asking whether they were considered a suspect? No. It doesn't fit the government's narrative. So neither one of them -- neither one of them could identify either one of my clients. People that are supposedly there could not identify my clients.

Now, according to data the government provided, they

were there somewhere in the vicinity.  Really?  But nobody seen them.  No one nobody knows them.  If you're going to have people in this organization that are transported by you, you would have a little bit of knowledge.  You would say, You know what, yeah, that's the person that I contacted, and that's the person that I made the arrangements with.  None.  Why?  It doesn't fit the government's narrative.

Then they -- they brought to you Ricardo Guzman, Thaddeus Kwapich, and Julio De La Garza, SAPD cops.  They were at the scene working and -- but neither one of them -- no -- no -- none of them could identify my clients at the scene or the truck.  You remember that.

Now, here we have HSI agents after HSI agents.  The Judge said, Who's guarding our borders?  Because there was so many of them.  Again, repetition, repetition, repetition.  Because they want you to believe that when you have this repetition it's a conspiracy.  Think about it.  The more evidence you see, it has to be so.  Because that's an ipsy dipsy argument, ladies and gentlemen.  It is so because I say so.  You see, I brought you all this evidence.

But why don't they brought you actual proof, forensically, that they were there?  Have you seen a single phone at this trial?  Not one.  All these communications that happened in between them, not a single phone that you can say, Oh, they checked for fingerprints, they checked the biometrics,

it belongs to this person, it is theirs. No. Why? It doesn't fit their narrative.

HSI Agents Brad Watts and Joseph Tijerina testified twice. And Steven Nutt. Neither one of them can say, You know what, yes, our expert surveillance identified your clients at the gas station, identified your clients by video at the checkpoint. Why not? If Armando Gonzales went so many times through these checkpoints, why don't we have videos? It doesn't fit the government's narrative. That's why.

And again, I'm going to ask you to be strong and courageous. You got to read some of the jury charge. The judge says that if you -- if you don't believe beyond a reasonable doubt, you can find them not guilty. That takes courage because -- unfortunately, the moment you leave, all these media outlets are going to be asking you questions as to why. How could you let this happen? It takes courage.

This is why I said this is a battle between David and Goliath. I urge you to be a David. Don't go with the Philistines and be just a bully because they say so. No. Stand firm.

The government brought you two immigrants that were part of this. They actually were transported. They were survivors. One of them testified that four times -- four times he attempted to cross the United States. Why? Government failure? Why four times? Why are they still here, even though

they were brought supposedly by this illegal organization?  I propose to you that the organizer of this, the cartel member, is Mr. Olvera, known as Guero.  That's why he's not here, ladies and gentlemen of the jury.  He's a cartel member.  He is very powerful and not here.  Evading justice.  Why has the government not gone after them?  Oh, we have Orduna and we have Ortega, that's enough.  That satisfies the people.

Is that justice?  I don't think so.

Now, the two immigrants that were there on the 27th testified here, and neither one of them could identify my clients.  Neither one of them.  They could not identify Felipe Orduna, nor could they identify Armando Ortega.  Why?  Because they're not part of this organization.  This is an organization that was created by the government simply because WhatsApp communications and the iCloud communications were supposedly downloaded.  We know that there's a lot of data, we know there could be mistakes.  But it's so neatly presented to you with names, addresses, and times.  Wow.  They call that evidence.  Of course.  It's created by the most powerful institution in the -- in the world, the United States Government.

But, again, neither one of them could identify my clients.

You have USBP agents.  Many of them.  None of them can say, Yep, we saw them cross this video.  All they can testify is to what they presented them from this license plate

reader.  You catch that?  No videos.  No -- none of them have collections of them.  None of them.  It's impossible.  But then you have this nice little chart -- and you're going to take them back there, you're going to see them.  Those pictures, I propose to you, they can be photocopied.  They can be changed.  They're not going to tell you that.  Of course not.

How you -- do you believe the government is capable of doing this?  Well, they didn't do forensic evidence, they didn't do all kinds of things.  Believe that investigation?  Hmm.

Now, six total agents were unable to identify either one of my defendants via video.  If they made an identification, it was solely on the discretion of the license plate reader.  Now remember, they testified that those readers do make mistakes.  Sometimes they don't catch the license plates.  That's a fact.  But yet these pictures that are blurry, they're supposed to identify defendants or trucks.  Which is weird, because if this government spends all this money on this, why don't they spend money on capturing better videos, better pictures?  Because it does not fit their narrative.  That's why.

Many of these witnesses testified as to the -- the readers and the recollection of this texting.  Well, now, it's kind of questionable that you remember all this data.  I don't remember what I ate yesterday, but these people came and testified that they remember all these conversations and they

read them and it was them, and so -- but none of them could say, Can you identify 100 percent and tell the members of the jury that it was Armando or Felipe?  They can't.  It's impossible. That's why you don't have voice recordings.  That will contradict what they presented.  It does not fit the government's narrative.

The government then brings you three co-conspirators.  You have to believe them.  But one of them, we know that he lied in the past.  He said it multiple times.  I asked him, I said, you lied?  Yeah, he lied.  Now all of a sudden he's telling the truth.  He must have had an encounter with God or something because now he's telling the truth.  But that is -- immediately the prosecutor asked him, Mr. Bilbao, can you recognize the defendant?  He stood up, sat down.  No. Judge, we call for a mistrial.  Nope.

They -- he came back, Oh, yeah, I think it might be him.  Did you remember that?  Now it was, Oh, well, he changed his appearance.  Supposedly, based on his testimony, for two years of seeing him, he had deals with him, how are you going to tell me that you don't remember a person?

Reasonable doubt, that's up to each and every one of you to make a determination.

Bilbao never identified Armando Gonzalez.  Not once. He only identified Felipe Orduna after the fact.  Now.

Christian Martinez, God bless his soul, he

insinuated to y'all that I got paid by the cartel.  You catched that.  And so this witness, I have to treat him as a hostile for his belligerent behavior.  And the only reason that he was belligerent in his behavior is because he must have been under drugs.  He testified that he was on cocaine several times.  That's what happens when people are on drugs or withdrawing or whatever.  There's -- this is what the government is -- tells you, believe him.  This drug addict.

The judge makes very clear that you have to take that very carefully.  But that's what they brought you, a co-conspirator.  Yeah, he's going to point at them.  Well, not so.

Mr. Martinez could not identify Armando Gonzales.  He could only identify, supposedly, Felipe Orduna.  But he called them like nobody else.  Everybody else in the organization will call, supposedly, my client "*Cheukito*."  He called him "*Cholo*."  When I asked him, What is a "*Cholo*," he couldn't even tell me what that was.  *Cholo* does not describe in any way, shape, or form my client.

Now, again, would this -- why would they present this?  Well, sometimes you have to present the good, the bad, and the ugly.  That's part of the ugly because he could not tell me why he is the only person in this organization -- and by the way, you seen that chart, it was there in front of you the whole time.  The only person in the organization that will call him

that.  Why is that?

Now, Riley Covarrubias.  I hope you catched the fact that he owns -- or he owned an F-150.  Oh, they show you a video of that F-150.  You saw -- you could barely see it, the spot -- the F-150.  I wonder if they ever questioned if that was Riley.  Oh, no, we can't go over that.  Well, he says that he has an F-150.  Why don't we have a better video?  All we have is the testimony of a person who's been here the whole time, and he just, Yep, that's -- that's -- I watched it for hours.  Doesn't tell you -- you can't even see the license plate, you cannot see a driver.  But yet because it fits the government narrative, Oh, that is Armando Gonzales.  And they expect you to believe it simply because of the sheer amount of evidence.

I'm going to ask you to have courage and question those.  Really, is it -- was it Riley or was it -- I mean, you cannot tell by the video.  You cannot.  Why?  Because the government didn't do a proper investigation in this case.  That's why.  Because it didn't fit the narrative.  Had it been Riley, they would have lost the ability to pinpoint Armando.

Now, all three of them -- and you have -- you will have their plea agreements -- agree to testify for the government.  All three of them.  And it behooves them to testify for the government, because if they do, they get a reduction.  Now, that's a sweet deal in my view.  You're facing -- and they tell you -- life.  You're facing life, and you're facing life.

I ask you, would you not come in and save yourself?  Of course.
It's human nature.  That's what they did.  I'm here to tell you
they didn't really testify truthfully, they testified to save
their -- their rear ends.  And so you're going to have to be the
judges of their credibility.  This fits their narrative
perfectly because you have people somewhere outside of the
United States, and you have -- what I believe is a nephew, but
he denied it.  But you have somebody that's closely related, and
now you have two people that are all coordinating straight to
you -- and straight to you.  It happens in all communications.

Now again, why don't we have those recorded
conversations so that we can hear them?  It does not fit the
government's narrative.

The medical examiner went back and forth.  I wasn't
trying to disprove the credentials at the time, I just had to
ask.  But what I wanted to know it was -- whether forensic
evidence was obtained.  The answer was "no," only as to the
bodies.  I said, Well, okay; you have the bodies, did you do any
forensic evidence?

Oh, I have to go into the forensics.  I have to
review.

The fact of the matter is, there's none.  Nothing
presented to you.  No DNA.  No fingerprints.  No blood.
Nothing.  Nothing.  *Nada*.  Because if you have DNA that belongs
to either one of my defendants, you were there.  But no, no, no,

no, let's not do that.  Let's just throw them a whole bunch of evidence and make it look like, you know, because of the triangulation of the cell phones and all that; but we're not going to do the actual recordings, we're just going to tell you that that's what the recording says.

You find that odd?  Because I do.  It doesn't fit the government's narrative.

Sean Mullen.  FBI agent.  Trained.  Eloquent.  Like him.  He created that entire exhibit.  He put the colors, he put it -- the -- everything.  And I asked him a simple question, Why would you put the trailer on all of those exhibits when that never even happened?

Oh, well, I'm not trying to say the location.

The legend says that's the location.  I don't know if you remember that.

Oh, well...

That's exactly what they're doing with this repetitious and superfluous evidence because they want you to believe by repetition, as if you guys were dogs, that you're going to convict.  That's not how it works in our jurisprudence. You have to have evidence beyond a reasonable doubt.

What I'm mentioning to you guys, is it reasonable? I can't tell you.  It's up to each and every one of you.  I believe it is.  That's why I'm representing my clients to the best of my abilities.  Ultimately, each and every one of you

have to make a determination.

Now, all the government has given you is their version of the story.  That I know.  And I want you guys to go back there and ask yourself seven "whys."  That's it.  Seven "whys."

Number One, why all the government's exhibits have the defendants' names in them?  Who put them there?  The phone companies didn't do it.  Who put them there?

Number Two, why no phone conversations were played during trial?  Why?  Could they have brought an expert and says, Yeah, I identify that to be the voice of Felipe Orduna, and identify that's him because this is forensically proven that it was him making the call, or Armando Gonzalez for that matter. Why?  Doesn't fit the government's narrative.

Why only transcripts?  Why?  Can you guys not make a listening and say, Yep, that's all I got.  Sounds like somebody giving orders or -- that sounds -- no, they want you to believe they were giving orders.  Little arrows pointing, it must be so. Ipsy dipsy.  It is so because I say so.

That is not how our founding fathers envisaged these type of trials.  And I hope and pray that if any of you or your families are in this situation that you will find somebody who will fight for you.  But mostly that you have a jury like you all; so attentive, listening, not just taking one side versus the other.  But listening, and taking notes, and questioning

why.

Number Four, did you see a driver come in and testify against either one of the defendants? Why? If these drivers are supposed to be part of this conspiracy and they would have said -- identify whoever brought them into the organization. You would have heard from them. We didn't. Why? It doesn't fit the government's narrative.

I already mentioned those other times. No videos of either one of the defendants at the scene, at the gas station, either one of them, or at checkpoints. No videos. Why?

Oh, yeah. No, we collected them times before. We didn't know.

Really? Government, you're really going to make us believe that? It doesn't fit the government's narrative.

Why has the government failed to arrest this individual (INDICATING)? Because it doesn't fit the government's narrative. They're not here for -- they're here for them. That's their narrative. Whatever they can create to fry them, that's what they're going to do.

You're jurors and you're paying attention, you're going to question. I know that. I know that you are going to question. I know that you're going to be back there and you're going to fight. And you're going to stand, each and every one of you. Don't fall for the others ones or be booted down. Stand firm. If you believe they're guilty, then believe it. If

you believe they're not guilty, then believe it.  Fight.  Stand firm.  Be strong and courageous.

Why is it that the government has not produced a single piece of tangible evidence?  Where are those lading pages?  I can't even say it.  If they took pictures and it's all digital, where are they?  Why didn't they question -- I said, You know what, let me see those fingerprints.

Yeah, this was touched by Felipe Orduna, he must have been the creator.

Oh, no, that does not fit the government's narrative.  Oh, we've got -- it's all digital.  Why?

The life of two men are on the line.  And if you're going to convict them, convict them with proper evidence; tangible so you can touch it, so you can see it.

Oh, this is the digital part of it.  Wet and sweaty.  Really?  Where is it?  Why don't we see it?  Was it a fingerprint?  Was it tested for any DNA?  No.  Why?  It doesn't fit the government's narrative.

And I have answers for those seven "whys".  There's one answer.  It doesn't fit the government's narrative.  The government wants to control the narrative.  Plain and simple.  The government created the exhibits.  The government wants you to believe the exhibits.  The government is telling you, because of repetition, there is a conspiracy over, and over, and over, and over.

Again, we call that in scientific terms, the "Pavlov." (IMITATING SHOOTING.) They're going to believe it. (IMITATING SHOOTING.)

Fight. Don't believe it. Ask them to show you tangible evidence, forensic evidence. Yes, we are in the age of forensic evidence. We have it. Biometrics, they could have said, Yes, that phone call was made by this -- this -- no. All you have is this nicely created chart because of this self -- (INAUDIBLE). It doesn't fit the narrative of the government.

No bill of lading. No phones. No physical evidence whatsoever. None. It doesn't fit the government's narrative.

Where is Guero? Where is Cowboy? Many others that were mentioned, where are they? How come they're not facing our system of justice? It doesn't fit the government's narrative.

I hope that by now you're getting the -- the idea. And because they've thrown all this evidence at you, you must -- it must be so. It must know so.

Now, let's go into the jury charge. You don't have to open it, but I'll tell you Page Number One -- and I found that it -- because it's imperative for you guys to recognize that it is your duty to apply the law as the judge explained it to you, regardless of consequences. Regardless of consequences. If you believe, which I'm asking you to do, to find my clients not guilty, that's what you do. Regardless of consequences. Be a David. Don't be a Goliath. Definitely don't be a Philistine.

Be a David.  Stand for what you believe.

Ask the government, you know what, you have to -- you have to prove beyond a reasonable doubt.  You could have brought me those bills of lading, you could have brought me those phones, you could have brought me some fingerprints, you could have brought me forensic evidence, you could have brought -- but you didn't.  All you brought me is digital evidence.  And by God, that could be any of us.  That's the scary part.

The judge then says, The law does not require defendants to prove his innocence or produce any evidence.  We don't have to.  All I have to do is question those witnesses.  Because, again, the government tried to portray to you that they have this huge case and they're going to build a mountain from it.  That's how they do it; sheer amount of evidence.  I wish I had a lot of time to build you a nice little printer [sic].  Because that's what they're trying to do with this evidence.  But if you look through it, you'll see the holes in the case.  I just pointed out seven of them and then "why" questions.  And I hope you do the same as you go back there.  Question.

I know that we're tired.  I know that we want to go home.  But stand up and fight.  Don't just take the easy way out.  Really analyze the evidence.  I can present to you this Bill [INDICATING] all day long.  This is the real deal.  This is what the government have tried to do.  It's a real conspiracy.

It's in front of you.  The fact is, it is not.  Y'all can recognize it.

And so I'm asking you to add those five -- seven "whys" because it is not.  The government does not have all the elements.  And when you go back there and you really, really, really review this, you will see that it's all created by the government.  It must be so because the government says it is so.

Reasonable doubt is up to you.  Nobody can give you the definition.  But it is the government who has the burden, not I.  My clients don't have to prove anything.  It is the government's burden and the government alone.  And I don't believe that the government has met that burden.  Because if I have seven questions, I know you probably have more, those of you that took notes, because there's a lot of questions in this particular case.  Why?

The judge said it several times and I'm going to repeat it.  What we say -- we're going to be here in the system.  We've been doing this forever, 20 -- 20-plus years.  That's not binding.  I'm doing an argument.  But I know that all of you have common sense, and common sense would tell you, Man, I -- I think I need to be asking those questions, because, you know, a life of two men are in my hands.

And that's what the -- our founding fathers envisaged, people of our peers will review this evidence and hold the government responsible to prove to each and every one

of you beyond a reasonable doubt.  That's a standard that, man, have to all abide.  And if it means that you find my clients not guilty, that's what it means.  In fact, that's what I'm asking for you guys to do.  Find them not guilty.

Hold the government responsible to do an investigation of this kind, because there are -- 53 people are dead.  Why don't we have culprits here?  Why don't we have people that are more responsible?  Why do we just have people that -- well, they fit the narrative, so we're going to go after them because we have all this data.  But they don't have any forensics.  They don't have any physical evidence.  They don't have any -- anything that would unequivocally place them at this locations.  Unequivocally.

I love this part of the jury charge that says, In making up your mind and reaching your verdict.  Kind of an oxymoron, but...Do not make decisions simply because there were more witnesses on one side.

It's the same thing I said -- that deck of cards that I show you -- all this witnesses, repetitious, repetitious, repetitious.  They want you to believe that it's because there is a conspiracy.  And I'm here to tell you it's because they want you to believe that because there's repetition, therefore, there's a conspiracy that involves my clients.  It does not fit the government's narrative.  That's why they didn't bring you the recordings, that's why they didn't give -- bring you the

phones, that's why they didn't bring you the forensics, that's why they didn't bring you any expert to testify that they recognize my clients. There was no video. I mean, on, and on, and on.

But you make that decision. And after examining all of this you have reasonable doubts to the identity of my -- my clients of the offense charged, you must find the defendants not guilty. It's in the charge. Page Seven. I believe that I have argued for that because they don't have anything contrary to what I'm saying. In this day and age, where forensics is key, we have nothing.

Merely because such a witness has expressed an opinion -- and this is talking about the experts, by the way. They had three of them. And the chart, this -- talks about them. It does not mean, however, that you must accept their opinion. I'm actually asking you guys not to accept their opinions because they're bias. They're non -- you know, they're so bias because they need to fit the government's narrative. That's why we have them.

Now, the judge mentioned that take -- you know, weigh the -- the testimony of people that are part of the conspiracy lightly and take care of it. But the fact is this, that an accomplice that has entered a plea of guilty of the offense does not mean guilt of another person.

Not because Riley accepted his culpability, not

because Bilbao accepted his culpability, not because Martinez accepted his culpability means they have accepted theirs. That's why they're here fighting for their life in front of you. Because I believe that the evidence will say, No, we don't have enough to prove. You don't have beyond a reasonable doubt. There's a lot of questions that we have.

And so, in conclusion, ladies and gentlemen of the jury, I'm going to ask you to do the unimaginable. I'm going to ask you to go with what your gut tells you. My gut tells me these guys -- the government did not prove it beyond a reasonable doubt.

Oh, yeah, you got paid to say that.

Well, this is what I hope and pray that if any of you are ever in this situation, you will find a courageous enough attorney to do it.

Now, some of you have portrayed me as -- whatever. And I'm -- I'm okay with that. But this, ladies and gentlemen of the jury, I'm going to ask you to follow. It is beyond reasonable doubt. Beyond reasonable doubt. You guys will give whatever meaning that is. What I propose to you, if any of these other ones come in, that is a not guilty. That is what the law provides and that is what I'm going to ask each and every one of you to do. Stand firm. Be strong and courageous, says the Lord.

May God bless each and every one of you and each and

every person in this courtroom.

THE COURT: Thank you, counselor.

Mr. Fuchs. You'll have 50 minutes.

REBUTTAL CLOSING ARGUMENTS BY THE GOVERNMENT

AUSA FUCHS: Context is everything. I don't have time to address every characterization of the evidence you just heard. I'm not going to. I can't recap two weeks of trial, can't go through the nearly 800 exhibits you heard. Which we didn't create, by the way. Did we gather them? Of course. Did we put them in a way that was understandable for you? We tried. We didn't make them up.

And so I've got to rely on you to go through the evidence and know what it said. But you do know the core details in this case were the same. The processes, the procedures, the progressions, the same. The roles of each of these defendants on each date there was a tractor trailer load, the same. That's why you know you can trust the evidence, because it consistently corroborated itself over, and over, and over.

And you heard a lot about this organization, not only throughout the trial, but from Mr. Baez just now, and about all the other conspirators that were involved in making it successful. And we told you about a lot of them. We even told you there's more than were just listed on this chart, because it was a vast organization.

But this case, this trial which you're here to decide, is about just these two defendants.  That's what you're charged with deciding.  And that's why we focused the evidence that we presented to you on them.  No fingerprints.  No forensics.  No DNA from the back of the tractor trailer.  Because nobody said they drove.  Nobody said they went in.  Nobody said they unloaded people.  That wasn't these defendants' role.  And, sure, yeah, others were clearly involved, but that is not what you are being asked to decide.

In fact, their roles, their titles don't even really matter.  We did that based on the understanding of the organization to help give you context as to their role.  But you're not going to see anything in the charge about, Hey, if they're a conspirator, you need to find that; if they're an organizer, if they're a leader, you need to find that.

That's not what you have to decide.  That's not your standard.  You just have to find if they were involved.

You did hear from three co-conspirators who testified, and we did reach plea agreements with each of them.  In fact, those plea agreements are all available in the evidence for you to read if you want to.  They're in the 1200 series.  I'll tell you, they all essentially say the same thing; that we made them no promises about what they were going to get in exchange.  But those plea agreements do outline what they were required to do, and what they are risking if they don't adhere

to that.  And that was that they needed to tell the complete truth, the absolute truth.  Not just what they think we might want to hear.  No minimizing.  No exaggerating.  And if they don't -- if they don't tell the complete truth, they could be subject to additional charges, and any benefit that they were actually hoping for from the judge is gone.

And that plea bargaining that we described, that you have, that you heard from the witnesses, the Court's instructions tell you all that that is completely proper.  And that makes sense.  Because of course they're not taking the risk that they are, testifying against the leader, the one with those crucial cartel connections, without the hope of at least something in return.  That's common sense.

And they don't know what they're going to get.  They told you that.  Only the judge decides what that's worth.  Only the judge decides what their punishment is.  But I do think it's important for you to consider that if they were just going to come in here and lie, like Mr. Baez suggested, that you would have heard things a little differently.

Mr. D'Luna-Bilbao certainly wouldn't have hesitated before identifying who he only knew as Cheukito, who he hadn't seen in three years, whose appearance has changed significantly. That would have been better.  And remember, like, when -- when Mr. D'Luna-Bilbao told you that he lied to Guero?  There was some focus on that from Mr. Baez.  You know he was telling you

the truth when he told you that, because you know Christian Martinez was getting the drivers during that timeframe.

If they were just going to lie, Christian Martinez would have told you that he had personally met Don-Gon; that phone number that he communicated with. And he would have come in here and identified him in court. That would have been more valuable. It would have been easier.

If they were just going to lie, Riley would have come in here and told you that these two defendants were the ones actually at the unloading locations, opening the back doors, and unloading migrants. That would have made them look worse.

But they didn't -- they didn't tell you any of those things because they came in and relayed to you exactly what happened. Not our narrative. Reality.

How this organization functioned, how it was set up, how it was compartmentalized. And they told you that consistently. That's credibility.

And when you consider the roles these two defendants had in the organization and the three testifying witnesses had, when you consider who they had access to, who they interacted with, what they were able to tell you makes sense.

I do want to make clear that these three guys, they're not our friends and you don't have to like them. Because making deals with human smugglers, particularly ones who

contributed to the deaths of 53, is grim business.  It's also the only way we can truly hold those accountable who are calling the shots and their most trusted associates when we've got sophisticated organizations like these; compartmentalized organizations where there are layers of protection between the risky load driver positions and the guy with the cartel connection making it all happen, the guy who's tracking aliens as they come across the border and are put in Laredo stash houses, the one who's deciding when he has enough that it's time to move them to San Antonio, who's orchestrating the use of tractor trailers for that -- for that move and who's directing his coordinators to help make it happen.

So of course that's who we called as witnesses.  If this had been a shooting in a teachers' lounge, we would have called teachers.  If it had been a kidnapping in a hospital, we would have called doctors and nurses.  This is a human smuggling case with an organization that worked in the shadows, that employed every tactic it could to avoid being caught, especially for those guys running things that were removed from the scenes.  So of course we called human smugglers as witnesses.  And if you think about it, these guys are who the defendants chose to work with.  They effectively chose them as witnesses.

As you know, this case doesn't just rise and fall on those three witnesses, though.  Because you can't just consider them individually.  That is not the case we brought you.

Because you know you also have the WhatsApp and text communications, and a lot of them. And you see on all those transcripts that many of them were audio message -- audio messages. Mr. Baez just suggested that we could have played all of those and I suppose we could have. They were in Spanish. We could have delayed the trial and played them and then translated them in real time. We didn't. But you also heard, and it's in the Court's charge, that none of the transcripts of any of those conversations were disputed. Everybody listened to them and agreed they said what they said before trial.

You also have the license plate reader records that confirm the movements of the tractor trailer, video surveillance verifying the significance of that Google link on that final fatal day, phone call analysis showing the patterns of communication between the various players. Historical cell site analysis showing the coordinated movements on the days of significance. All of that we outlaid on the tall chart during trial. That's all corroborating evidence. We didn't put anything up there that just a witness says. That was all hard physical evidence.

And then of course you had the consistency amongst the compartmentalized stories. And all of it together confirms to you the processes, the procedures, and the progressions this organization employed. And it confirms to you the roles that each of these two defendants played; how they contributed to the

ultimate goal.

You have to look at the evidence as a whole. Because every date, every trip, every phone call between folks to coordinate the progress of a tractor trailer load confirmed their involvement, confirmed their help, and confirmed their guilt.

Six times you heard how this organization's trailer loads were caught by the Border Patrol. Six confirmations of you knowing exactly what type of cargo they were moving. You have no doubt the purpose of all those names they exchanged on those lists over, and over, and over. They called them "pieces." You know they were people.

And just conservatively, if you take the lowest number of migrants caught in any of the trailers, which was 60, that's still well over a thousand migrants that they moved just in that final eight months. You know it's probably many more than that, just based on the size of some of the loads. And you know the tyes of people they were moving, packing them into the back of trailers. Unrestrained. Potentially soaring temperatures. Questionable air flow. That's risky. It's risky to human life every single time. And eventually that risk caught up and you know the result.

(12:59:27 P.M., END OF EXCERPT)

**(END OF REQUESTED PORTIONS)**

**C E R T I F I C A T E**

U.S. DISTRICT COURT          )

WESTERN DISTRICT OF TEXAS )

SAN ANTONIO DIVISION         )

      I, Vickie-Lee Garza, Certified Shorthand Reporter, do hereby certify that the above-styled proceedings were reported by me, later reduced to typewritten form, and that the foregoing specifically requested pages of the Opening Statements and Closing Arguments are a true and correct transcript of the original notes to the best of my ability.

      Certified to by me this 11th day of August, 2025.

      /s/  VICKIE-LEE GARZA
      TX CSR #9062, Expires 10/31/25
      P.O. Box 831583
      San Antonio, Texas  78283