IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,        *   NO. SA-21-CR-366-(4)&(7)
                                 *
        Plaintiff,               *
                                 *
v.                               *   MARCH 5, 2025
                                 *
                                 *
FELIPE ORDUNA-TORRES (4), and    *
                                 *
ARMANDO GONZALES-ORTEGA (7),     *
                                 *
        Defendants.              *   SAN ANTONIO, TEXAS

------------------------------------------------------------------

TRANSCRIPT OF JURY TRIAL TESTIMONY OF

GRAYSI SANJAY BACAJOL and

JOSE LUIS VASQUEZ-GUZMAN

BEFORE THE HONORABLE ORLANDO GARCIA

UNITED STATES DISTRICT JUDGE

------------------------------------------------------------------

Proceedings recorded by mechanical stenography.  Transcript produced by Computer-Aided transcription.

**A P P E A R A N C E S**

For the Government:          UNITED STATES ATTORNEY'S OFFICE
                            BY:  MR. ERIC FUCHS and
                                 MS. SARAH ELLA SPEARS
                            Assistant U.S. Attorneys
                            601 N.W. Loop 410, Suite 600
                            San Antonio, Texas  78216


For the Defense:            LAW OFFICE OF EDGARDO RAFAEL BAEZ
                            BY:  MR. EDGARDO BAEZ
                            700 N. St. Mary's, Suite 1400
                            San Antonio, Texas  78205


U.S. Court Interpreters:  MS. ROSARIO FIGUEROA
                          MS. JANIS PALMA
                          MR. STEVE MINES


* * * * * *


**I N D E X**


|  | DIR | CROSS | REDIR | RECROSS |
|---|---|---|---|---|
| BY THE GOVERNMENT: | | | | |
| MS. GRAYSI SANJAY BACAJOL | 4 | 21 | -- | -- |
| MR. JOSE LUIS VASQUEZ-GUZMAN | 41 | 65 | -- | -- |


* * * * * *

(1:08:03 P.M., START OF REQUESTED EXCERPT)

THE COURT:  If you'll call your next witness.

AUSA SPEARS:  Your Honor, the United States calls Graysi Sanjay Bacajol.

**GRAYSI SANJAY BACAJOL,**

having first been duly sworn through the U.S. Court Interpreter, testified to the following:

AUSA SPEARS:  You can go ahead and have a seat.

DIRECT EXAMINATION BY THE GOVERNMENT

BY AUSA SPEARS

Q    Can you please tell us your name.

A    Graysi Esmeralda Sanjay Bacajol.

Q    And, Ms. Sanjay, can you please spell your last name for the court reporter.

A    Yes.

Q    You can go ahead and spell it.

A    G-R-A-Y-S-E --

MR. BAEZ:  I'm sorry, Your Honor.  I believe she said S-I.

THE COURT:  Ask her again to spell it.

THE WITNESS:  G-R-A-Y-S-I.

Q    (By AUSA SPEARS) And that's your first name.  Can you go ahead and spell your last name.

A     S-A-N-J-A-Y.

Q     And where are you from?

A     From Guatemala.

Q     How old are you?

A     Twenty-six.

Q     And did you survive being in the back of the tractor trailer on June 27th of 2022?

A     Yes.

Q     Before we talk about that day, I want to talk to you about the journey that you made to the United States from Guatemala. When did you start to make the arrangements to come to the United States?

A     On June the 5th.

Q     And why did you want to come to the United States?

A     Well, because of the economic need that we have in my country.

Q     And did you reach out to someone, or did someone on your behalf reach out to someone, to make those arrangements happen?

A     Yes.  My boyfriend was here.  He got in touch with a person.

Q     And where was that person from?

A     I don't know.

Q     Did anyone else travel with you from Guatemala?

A     Yes.

Q     Who traveled with you?

A     My brother and another young man.

AUSA SPEARS:  If you could please pull up Exhibit 1162.

Q     (By AUSA SPEARS) What is your brother's name?

A     Oswaldo Leonel Sanjay-Bacajol.  Yes.

Q     And is this him in Government's Exhibit 1162?

A     Yes.

Q     Is he a younger brother or older brother?

A     Older.

Q     How much did you and your brother pay to be transported from Guatemala to the United States?

A     150,000 quetzales.

Q     And was that for you and your brother both, or for you individually?

A     Individually.

Q     Do you know how much that is in U.S. dollars?

A     No.

Q     Okay.  Were you given options on how you could travel into the United States?

A     Yes.

Q     What was the more expensive option?

A     150.

Q     And what did that 150 -- is that quetzales; 150,000 quetzales?

A     Yes.

Q    And what did that 150,000 quetzales, what did that include?

A    It included meals, lodging and transportation.

Q    What kind of transportation would it include?

A    Taxi.

Q    Was there also a cheaper option?

A    Yes.

Q    What was the cheaper option?

A    It was 125,000 quetzales.

Q    And what did that include?

A    Meals, lodging, and transportation.

Q    What kind of transportation was that?

A    It was in -- in boxes, like in trucks.

Q    So, it's more expensive for comfort; is that right?

A    Yes.

Q    And that's what you and your brother paid for?

A    Yes.

Q    Were you required to pay the full amount in Guatemala or did you pay a part of it in Guatemala and then were supposed to pay in the United States?

A    One part in Guatemala, and the rest of that in the United States.

Q    And if you recall, do you remember the day that you began your journey from Guatemala to the United States?

A    Yes.

Q    What day was that?

A     June 6th of 2022.

Q     And your brother, Oswaldo, he left with you as well?

A     Yes.

Q     When you left, were you given a code word?

A     Yes.

Q     Do you recall what that code word was?

A     "Flora."

Q     And when were you supposed to use that code word?

A     When somebody else was coming to pick us up.

Q     Is that how the person would know to pick you up, is when you would use that code word?

A     Yes.

Q     And after leaving Guatemala, and I know you -- I'm sure you visited a lot of other towns, but what was the next major city after leaving the Guatemala border?

A     We were in Puebla and then Monterrey.

Q     And I'm showing you what's been marked as Government's Exhibit Six.  Do you see that on the screen?

A     Yes.

Q     Okay.  So you traveled from the Guatemala border to Monterrey?

A     No.

Q     Where -- did you -- I'm sure -- you visited other Cities; is that right?

A     Yes.

Q    Okay.  Did you eventually end up in Monterrey?

A    Yes.

Q    Where did you stay once you were in Monterrey?

A    At a hotel.

Q    And was your brother with you?

A    Yes.

Q    How long did you stay in Monterrey?

A    One day.

Q    Were you given another *clave* in Monterrey?

A    Yes.

Q    And when were you supposed to use that *clave*?

A    We were told that just in case the police got ahold of us, we could use that code for them to let us go.

Q    Do you remember what the code was?

A    Yes.

Q    What was it?

A    Jorge Español R.

Q    Did anyone ever take pictures of you and your brother while you were at that hotel in Monterrey?

A    Yes.

Q    And what were those pictures used for?

A    To give us some IDs from Mexico.

Q    And were those IDs fake IDs?

A    Yes.

Q    After traveling from Monterrey, where did you and your

brother go next?

A      Nuevo Laredo.

Q      And how long did you stay in Nuevo Laredo?

A      One week.

Q      Where did you stay in Nuevo Laredo?

A      It was like an abandoned house.

Q      Were you given food at that house?

A      Yes.

Q      Was your brother with you at the house?

A      Yes.

Q      Did you also meet a young woman at the house?

A      Yes.

Q      Do you recall her name?

A      Sebastiana.

       AUSA SPEARS:   Can you please pull up Government's Exhibit 1165.

Q      (By AUSA SPEARS)  Is this a photo of Sebastiana?

A      Yes.

Q      And did you and your brother befriend Sebastiana?

A      Yes.

Q      Had you met her before?

       Had you met her before?

A      No.

Q      Do you recall her age?

A      She was 16.

Q    When were you told to leave the house in Nuevo Laredo?

A    I don't remember.

Q    Who told you to leave the house in Nuevo Laredo?

A    The ones who were taking care of us.

Q    And was that time to cross the Rio Grande River?

A    Yes.

Q    How did you get from the house in Nuevo Laredo to the Rio Grande River?

A    We were taken in a car and we were dropped off at some abandoned place.

Q    And was your brother and Sebastiana with you?

A    Only my brother.

Q    Had Sebastiana been separated?

A    Yes.

        AUSA SPEARS:  If you could please pull up Government's Exhibit Six.

Q    (By AUSA SPEARS) How did you get from the house to the Rio Grande River after that?

A    We walked for about two hours.

Q    Did you have a guide?

A    Yes.  There were four of them.

Q    And how did you get across -- or how did the guides get you across the Rio Grande River?

A    They gave us something like donuts that you could inflate, and with that they took us to cross the river.

Q    Do you know how to swim?

A    No.

Q    Did Oswaldo also cross the river?

A    Yes.

Q    Once and you Oswaldo got across the river, what happened after that?

A    We walked for about three hours to a place where they told us we were going to find a school.

Q    And how did you know where to walk?

A    They gave us a GPS in our phones.

Q    Who gave you the GPS in your phones?

A    The guys who were taking us.

Q    Once you got to that school, where did you guys go from there?

A    There was a car waiting for us there already.

Q    And where did that car take you?

A    They took us along another road, and then there was another car waiting for us there, and we switched cars.

Q    Did you eventually end up at a house?

A    Yes.

Q    And was that house in Laredo in the United States?

A    Yes.

Q    Did Oswaldo also make it to the house?

A    Yes.

Q    Did Sebastiana make it to the house as well?

A    She was already there when we got there.

Q    What were -- what did the house look like?

A    It was an apartment.

Q    Were there other migrants in the apartment?

A    Yes.

Q    Were you given food while you're at the apartment?

INTERPRETER:  I'm sorry, counsel?

Q    (By AUSA SPEARS) Were you given food while you're at the apartment?

A    Yes.

Q    How long did you guys stay at the apartment?

A    Two days.

Q    Did you and your brother take care of Sebastiana at that house?

A    Yes.

Q    Why is that?

A    Because she was scared.

Q    Why was she scared?

MR. BAEZ:  Objection, Your Honor.  Calls for speculation.

THE COURT:  I'll sustain that.  Let's move on.

Q    (By AUSA SPEARS) I want to talk to you about June 27th of 2022.  What happened that morning?

A    That morning we were told that we would be leaving at 5:00 in the morning.

Q    And who told you that?

A    The men who were taking care of us.

Q    And was that at the apartment?

A    Yes.

Q    Did they give you a *clave* to use that morning?

A    It was the same one, Jorge Español R.

Q    Do you know when you're supposed to use that *clave*?

A    Every time we went out to a different place.

Q    Did you guys leave that morning at 5:00 a.m.?

A    No.

Q    When did you end up leaving?

A    We left around 12 noon.

Q    And how many of y'all left the apartment?

A    Seventeen.

Q    And were Sebastiana and your brother with you?

A    Yes.

Q    Were you able to bring food or water with you?

A    They did not allow us to do that.

THE COURT:  In that whole trip?

THE WITNESS:  Yes.

Q    (By AUSA SPEARS) What sort of vehicle picked you up from that apartment?

A    A truck.

Q    Do you recall the color of that truck?

A    It was white.

AUSA SPEARS:  Can you please pull up Government's Exhibit 208-BA at 13:13:20.

Go ahead, pause it.

Q    (By AUSA SPEARS) Can you see the screen in front of you?

A    Yes.

Q    Is that similar to the white truck that picked you up that day?

A    Yes.

Q    Where did that white truck take you?

A    It took us to -- like to a stash house where there were other migrants.

Q    And did other migrants get into the back of that white truck?

A    Yes.

Q    Do you recall how many?

MR. BAEZ:  Judge, I'm going to object to this type of -- line of questioning.  The government is leading the witness.

THE COURT:  I overrule that.  Let's go.

THE WITNESS:  No.

Q    (By AUSA SPEARS) Were there a lot or a few?

A    A lot.

Q    Where did that white box truck take you?

A    It took us to another truck that was parked.

Q    And how was that other truck parked?

A    I don't remember.

Q    What were you told to do when -- or did you ever leave that white box truck?

A    No.

Q    Did you ever get into another truck?

A    Yes.

Q    Tell me about that process of you getting into the other truck.

A    The two boxes were put together and then we went from one to the other, but we didn't see anything.

Q    So the boxes were right next to each other like this (INDICATING)?

A    Yes.

Q    And you weren't able to see anything else?

A    No.

Q    And did everyone in the -- get into that big truck?

A    Yes.

Q    Did you have any water or any drinks on you?

A    No.

Q    Were you able to carry any cell phones on you?

A    Once we were there and we moved on to the other box, they were taken away from us.

Q    Who took them away from you?

A    Some men who had their faces covered.

Q    And what were those men telling you?

A   They said we couldn't bring our phones with us.

Q   Did you stay next to your brother and Sebastiana?

A   Yes.

Q   What was it like in that bigger truck?

A   There was a lot of heat, and there was some meat seasoning.

Q   Did that meat seasoning get on you?

A   Yes.

Q   What did it feel like?

A   It's a lot and it made our eyes sting a lot.

Q   How long was that process of people going from the small truck to the big truck?

A   I don't remember.  It was very fast.

Q   Was it chaotic?

A   Yes.

Q   What did every do -- what did everyone do once they got into the big truck?

A   The people moved towards the front, looking for the air that was inside the truck.

Q   Were the doors closed?

A   Yes.

Q   Were they locked?

A   I don't know.

Q   Were you able to get out?

A   No.

Q   Where were you and your brother and Sebastiana located in

the truck?

A    Where the doors were at.

Q    Towards the back of the truck?

A    Yes.

Q    And were you sitting or standing?

A    We were sitting.

Q    And how were you sitting?

A    With our legs like that, stretched out.

Q    And were you facing the doors of the back of the truck?

A    No.  We were leaning up against the truck's wall.

Q    And was Sebastian and Oswaldo, were they near you?

A    Yes.

Q    Where were they located in that -- where were they located around you?

A    They were to my right.

Q    Who was in the middle -- who was --

A    Sebastiana.

Q    And then Oswaldo, your brother, was just next to Sebastiana?

A    Yes.

Q    And why had you put Sebastiana in the middle?

A    Because she was crying.

Q    What started to happen in the back of that tractor trailer?

A    People started yelling because there was a lot of heat.  It was very hot and they started to, like, run.

Q    And were they able to get out?

A    No.

Q    Did people scream for help?

A    Yes.

Q    Did the tractor trailer ever stop?

A    Yes.

Q    Approximately how many times did the tractor trailer stop?

A    Like four times.

Q    Did he ever open the doors, though?  Were the doors ever opened?

A    No.

Q    Were you able to drink any water while you're in there?

A    There was another girl in there who had brought with her, in hiding, saline solution, and she gave me a little bit of her saline solution.

Q    How were you feeling in that moment?

A    I was starting to feel dizzy and tired.

Q    What were Oswaldo and Sebastiana doing?

A    Sebastiana was crying, so my brother started to pray with her.

Q    Did that help calm her down?

A    Yes.  My brother had a Bible with him and he used that to fan her.

Q    What was everyone else doing in that tractor trailer?

A    They were screaming for help.

Q    Did anyone ever help them?

A    No.

Q    What started to happen to you?  What did you start to feel?

A    I think I fell asleep.  I don't know.  I didn't feel anything.

Q    What was going through your head?

A    That I was going to die.

Q    Do you recall how long that lasted?

A    Like three hours.

Q    Did you witness people die next to you?

A    Yes.

Q    What do you eventually remember during that ride?  Do you remember the tractor trailer ever stopping?

        MR. BAEZ:  Judge, I'm going to object.  Asked and answered.

        THE COURT:  I'll permit the question.

          Go ahead.

        THE WITNESS:  Yes.

Q    (By AUSA SPEARS) What happened once the tractor trailer stopped?

A    We were all screaming out for help, but the only thing that they answered was that we were almost there.

Q    Who said that?

A    It was a voice that could be heard from the outside.

Q    And that voice never opened the door?

A    No.

Q    Were the doors eventually opened?

A    Yes.

Q    What do you recall once the doors were opened?

A    I woke up and I saw -- when they opened the doors, I saw that there where some cars in front.

Q    Did you see people leave the back of that tractor trailer?

A    Yeah, I saw, like, some people getting out of there.

Q    And where did they go?

A    I was unable to see because I had a lot of people on top of me.

Q    What did you do?

A    I don't remember anymore.

Q    Did you wake up in the hospital?

A    Yes.

Q    Did Oswaldo, your brother, survive that journey?

A    Yes.

Q    (By AUSA SPEARS) Your Honor, I pass the witness.

        THE COURT:  Okay.  Counselor?

            Well, do -- you can come up, but let me ask.  This may have already been answered, and so if you'll ask her if she -- if she knows or recalls who opened the door.

        THE WITNESS:  No, I wasn't able to see anything.

        THE COURT:  No, no.  My question was:  Does she know who opened the door?

THE WITNESS:  No.

THE COURT:  Okay.  And do you know why the door was opened?

THE WITNESS:  No.

THE COURT:  Okay.  Do you believe that the -- that the driver knew or heard the yelling and the screaming?  Only if you know.

THE WITNESS:  Yes.

THE COURT:  How do you know that?

THE WITNESS:  Because they would answer back whenever we screamed.

THE COURT:  And you believe the driver heard the screaming?

THE WITNESS:  Yes.

THE COURT:  Are you sure of that?

THE WITNESS:  Yes, because they were telling us that we had a very short distance before we got there.

THE COURT:  All right.  Thank you.

Go ahead, counselor.

CROSS-EXAMINATION BY THE DEFENSE

BY MR. BAEZ

Q    You must have gone through a very difficult time during this ordeal.  I'm just going to try to understand from your perspective.  Is that okay?

A    (NO AUDIBLE RESPONSE)

Q    So, you and your brother made it alive through the ordeal?

A    Yes.

Q    Okay.  Do you believe that it was because your brother was praying?

A    Yes.

Q    Now, you state that you paid 150,000 quetzales; is that correct?

A    Yes.

Q    What I don't understand is how did you move from Guatemala to Mexico.

A    They took us over in a taxi.

Q    So, for the first part of the trajectory, they put you in a taxi, which is what you had agreed, to 150,000 quetzales; is that correct?

A    Yes.

Q    Did you ever ask any of the people that you paid whether that was going to be the agreement for the entire trip?

A    Yes.  I asked several times.

Q    And what did they respond to you?

A    For me not to be worried, that everything was going to be fine.

Q    I have to ask you a tough question, but did you ever see any of my clients during your trajectory?

A    No.

Q    When was the very first time during your journey that you

were put in the back of a truck?

A    In Laredo.

Q    So in the United States?

A    Yes.

Q    So, all throughout Mexico, you were in taxis?

A    Yes.

Q    Do you remember how many days it took from the time you left to the time you arrived at your final destination?

A    Like 25 days.

Q    And were you told by the people that were going to transport you that it was going to take you that long?

A    Yes.

Q    And even though it's going to take that long, you -- you and your brother decided to face the risk and go ahead and continue with the -- with the journey; is that correct?

A    Yes.

Q    And that's because you stated that the conditions in your country were dire; is that correct?

A    Yes.

Q    Have you ever thought about coming into the United States legally?

A    Yes.

Q    And what happened?

A    Well, when you're over there, you don't get it because you didn't go to school.

Q    But -- so how -- how is it that your brother was able to obtain 150 quetzales each to do this?

A    We took out a loan.

Q    Do you know the different types of visas available to -- for the U.S.?

A    No.

Q    Have you ever heard of an amnesty program in the United States?

A    No.

Q    So it never crossed your mind to apply for amnesty here in the United States?

A    No.

Q    Has anybody offered you anything in exchange for your testimony?

A    No.

Q    So -- I'm sorry, I'm going to sound insensitive, but how are you here if you're not here legally?

A    I don't understand.

Q    You know what, don't answer that.

         THE COURT:  Let -- let me --

         MR. BAEZ:  Don't answer --

         THE COURT:  -- ask you this.  When you -- what is your last name again?

         THE WITNESS:  Sanjay.

         THE COURT:  Sanjay.  Let me ask you this.  After you

left the hospital, where did you -- let me back up.  How many days were you in the hospital?

THE WITNESS:  One week.

THE COURT:  And after you left the hospital, where did you go?  I don't want to know the street, the address.  Where did you go; to somebody's house, to somebody's -- what?

THE WITNESS:  I went to a hotel where I was receiving help.

THE COURT:  I was what?

INTERPRETER:  A hotel.

THE COURT:  No, and where she --

INTERPRETER:  And "where I was receiving help."

THE COURT:  Okay.  And have you been at that hotel since then, since the hospital?

THE WITNESS:  I was there for about 45 days waiting for my brother.

THE COURT:  And then?  Where did she --

THE WITNESS:  I don't understand.

THE COURT:  -- where did she live after the hotel, without telling me the address or the number.

THE WITNESS:  A house in Tennessee.

THE COURT:  Where?

THE WITNESS:  A house.

THE COURT:  In?

THE WITNESS:  In Tennessee.

THE COURT:  Tennessee the state?

THE WITNESS:  Yes.

THE COURT:  How did you get there?

THE WITNESS:  The people who were helping me out paid for a plane ticket for me.

THE COURT:  And where did you go -- without telling me the city, did you stay at some -- some family's home or where'd you stay while you were in Tennessee?

THE WITNESS:  My boyfriend's house.

THE COURT:  Well, that's good.  That -- that part.

Well, let me ask you.  What have you been doing?  Have you been working since you've been in Tennessee?

THE WITNESS:  Yes.

THE COURT:  Without telling me the name of the employer or anything, what kind of work have you been doing in Tennessee?

THE WITNESS:  I work at a store.

THE COURT:  Okay.  Like a cashier or -- or --

THE WITNESS:  Yes.

THE COURT:  Okay.  And what were you paid?  Per hour or per week, what were you paid?

THE WITNESS:  I get paid 13 an hour.

THE COURT:  Okay.  And -- and during that time, when you were working, where did you live?

THE WITNESS:  With my boyfriend.

THE COURT:  Okay.  Let's see...

All right.  Go ahead, counselor.

Q    (By MR. BAEZ) Let me show you the map again of your journey, Exhibit Number Six.  Can you point out from which point in Guatemala you started your journey.

AUSA SPEARS:  Objection, Your Honor.  Relevance.

THE COURT:  I'm sorry?

AUSA SPEARS:  Relevance.

THE COURT:  I'll let him answer -- I mean, ask.

Go ahead.

THE WITNESS:  I don't remember.

Q    (By MR. BAEZ) How long have you lived in Guatemala?

A    Twenty-two years.

Q    And you don't remember what part of Guatemala you lived?

A    I do remember where I lived, but I don't remember how to locate it.

MR. BAEZ:  Is that what she said?  I think she said, I don't remember where I lived.  That she left --

THE WITNESS:  I do remember where I lived, but I don't remember, like, which border.

MR. BAEZ:  "I left," right?

THE WITNESS:  No.

MR. BAEZ:  "*Salí*."  That's what she said, right?

INTERPRETER:  Oh.  "Which part of the border we went through."  Thank you, counsel.

THE COURT:  Okay.  The question might be:  From what city in Guatemala did she leave -- leave from?

THE WITNESS:  From Huehuetenango.

THE COURT:  How many days did it take from -- from her homeland to the Mexican border?

THE WITNESS:  One day.

THE COURT:  And how did you get there?

THE WITNESS:  In a taxi.

THE COURT:  Okay.  And from the Mexican border to Laredo, or Nuevo Laredo, how long did that take?

THE WITNESS:  Like 15 days.

THE COURT:  And how did you get there?

THE WITNESS:  In a taxi.

THE COURT:  And who paid for that?

THE WITNESS:  Well, we had already paid the lady, and I believe that she was the one who paid.

THE COURT:  Was that lady part of the group that got her to the United States?  If she knows.

THE WITNESS:  No.  She stayed behind in Guatemala.

THE COURT:  All right.  Go ahead.

Q    (By MR. BAEZ) But the judge was asking you through Mexico. Mexico.

MR. BAEZ:  She said she paid for a taxi.  Who paid for it?

THE WITNESS:  The taxi who took us was also working

for them.

Q    I know, but the question is:  Who paid for it?

A    When we left Guatemala, the lady gave us, like, 30,000 pesos.

Q    So at some point, now, you -- you had some money back?

A    Yes.  And when we got on the taxi, we handed it over to the man.

Q    How many times did you -- were you transported by taxi through Mexico?

A    Two times.

Q    So from Guatemala to Puebla, correct?

A    Yes.

Q    From Puebla to Monterrey?

A    Yes.

Q    And then from Monterrey to Nuevo Laredo?

A    Yes.

Q    Isn't that three times?

A    The first time was in a bus.

Q    So, certainly, at this first time you told somebody, Look, I paid for a taxi, not a bus.  Did you?

A    Yes.

Q    And what happened?

A    And we got taken out of the bus and put into a taxi.

Q    And at which juncture did you receive the 30,000 pesos?

A    When we had already reached the border between Mexico and

Guatemala.

Q    So, wasn't that the same place from Guatemala to Puebla?

A    Yes.  The lady told us to give the money to the one who was driving the bus.

Q    And did you give them the money?

A    Yes, and then later on he gave us some other money that we handed over to the man in the taxi.

Q    How much money did he give you?

A    I wasn't able to count it.

Q    But if he didn't transport you, he'd have given you the entire 30,000 pesos; don't you think?

A    I don't -- I don't know how they work.

Q    Ma'am, you paid 150,000 quetzales --

A    Yes.

Q    -- and you're here to tell the jury that you don't remember that 30,000 pesos that you paid were given back to you?

AUSA SPEARS:  Objection.  Argumentative.

THE COURT:  No, I'll -- I'll permit the question.

Go ahead.

THE WITNESS:  No, they were not given back.

THE COURT:  Let me ask you this.  When did you learn for the first time when you were in this taxi or this bus that you were going to go into the United States?

THE WITNESS:  When I was in Nuevo Laredo.

THE COURT:  Okay.  And so do you know the lady that

was giving you the money?  Did she tell you you were going to the United States?

THE WITNESS:  Yes.

THE COURT:  Yeah.  Go ahead.

Q    (By MR. BAEZ) Can you see this chart?

MR. BAEZ:  I believe you have it as an exhibit.

THE WITNESS:  Yes.

Q    (By MR. BAEZ) I think the government is going to put it on your screen.

THE COURT:  Let me ask the witness, can you see the chart?  Can you see the -- the faces and the names up there?

THE WITNESS:  No.

MR. BAEZ:  If she cannot -- Your Honor, can she stand up and get closer?

AUSA SPEARS:  Your Honor, it's on the screen in front of her.

THE COURT:  Oh.  Okay.  That's fine.

If you'll pinpoint -- you can see that, right?

THE WITNESS:  Yes.

THE COURT:  Okay, go ahead.

Q    (By MR. BAEZ) Do you see where it says Sabrina Rubio-Espinosa?

A    Yes.

Q    Was that the lady you're talking about?

A    No.

Q    In fact, let me ask you:  Do you recognize any of these individuals in this chart?

A    No.

Q    You don't recognize -- you already answered that.

Do you know what happened to Sebastiana?

A    No.

Q    And is your brother with you at this moment?

A    He didn't come with me, but he's at the house.

Q    So he lives with your boyfriend?

A    Yes.

Q    And so is it safe to say that from this incident you've been living in the United States from that point on?

A    Yes.

Q    Have you received asylum from the United States?

A    Yes.

Q    Was that as a result of you testifying today?

A    Yes.

Q    During the time that you were transported from one truck -- the box truck to the big trailer, did you see any other vehicles around?

A    No.

Q    So, it's fair to say, then, that you have never seen a blue truck during your -- during your journey?

A    No.

Q    You really cannot tell much about this box truck, can you?

A    No.

Q    But yet the government showed it to you and you identified it?

A    Yes.

Q    How's that -- how's that possible?

AUSA SPEARS:  Objection, Your Honor.

THE COURT:  Yes?

AUSA SPEARS:  Characterization and argumentative.

THE COURT:  Well, are we talking about the -- the same vehicle?

AUSA SPEARS:  Yes, Your Honor.  She stated that that box truck looks similar, not that --

THE COURT:  She did what?

AUSA SPEARS:  She -- the witness stated that that box truck looked similar, not --

THE COURT:  Okay.

AUSA SPEARS:  -- that it was the box truck.

THE COURT:  All right.  Go ahead.

Q    (By MR. BAEZ) So how is that possible you identified that as a similar vehicle?

A    Because I did see that truck.

Q    Did you see the driver of that truck?

A    No.

Q    Did you see the driver of the big trailer?

A    No.

Q    So how can you, then, tell the judge that you heard the driver speaking to you?

THE COURT:  I didn't ask that.  My question to her was:  Do you think or do you know if the driver heard the yelling and the screaming?  I believe that's what I asked.

MR. BAEZ:  Correct.  So how would she know it was the driver?

THE COURT:  I don't know.  You could ask her that.

AUSA SPEARS:  Your Honor, that's a mischaracterization.  She never --

THE COURT:  I'm sorry?

AUSA SPEARS:  That is a mischaracterization of the witness' statement.  She never said that she knew the driver.

MR. BAEZ:  Right.  Let me rephrase just to...

Q    (By MR. BAEZ) There's a chart in front of you, and it's this big chart right here (INDICATING).

Do you recognize the driver of the trailer truck in this chart?

A    No.

Q    So you don't know what he sounds like, do you?

AUSA SPEARS:  Objection, Your Honor.

THE COURT:  The objection's based on what?

AUSA SPEARS:  She did not identify the -- the fact that she can't identify the driver doesn't mean that she can't know what a driver -- what the person sounds like.

THE COURT:  I understand that, but he's -- I believe he's asking if she heard the driver.

Is that right, counselor?

MR. BAEZ:  That is correct, Your Honor.

THE COURT:  Ask -- ask it again, counselor.

MR. BAEZ:  I think we've beaten that horse to death, Your Honor.  Let me move on.

THE COURT:  Okay.

Q    (By MR. BAEZ) You stated that there were 17 immigrants in an apartment in the United States; is that correct?

A    No.

Q    Where was this apartment at?

A    The apartment was in the United States, but there were more than 17 people there.

Q    Okay.  I stand corrected.  You had mentioned 17 immigrants at one point.  What was that about?

A    It was only 17 of us that went into the truck.

Q    And how long were you in that apartment?

A    Two days.

Q    Did you pay for that apartment with the pesos that you had received?

A    No.

Q    At any time during your journey, did anybody give you dollars?

A    No.

Q    And so to be clear, when you were transport -- transferred from a box truck to the trailer truck, you never hit the ground, did you?

A    No, I did not.

Q    Were you taller than the big trailer?  Let me rephrase.

Could you -- could the top of your head be seen above the trailer truck?

A    No.

Q    Did your head go over the box truck?

A    No.

Q    So there was no way in the world that anybody could see you transported from one box truck to the trailer, is there?

AUSA SPEARS:  Objection, Your Honor.  Speculation.

THE COURT:  No, I'll -- I'll let him ask the question.

Go ahead.  If she -- if she knows.

THE WITNESS:  No.

Q    (By MR. BAEZ) Do you know who took your cell phones away?

A    No, because the men had their faces covered.

Q    And during your journey from Guatemala to at least Mexico, we know that you had a GPS system in it, correct?

A    No.

Q    I thought I heard you say that somebody gave you a GPS system.

A    It was in Nuevo Laredo.

Q    So in the United States?

A      In Nuevo Laredo, Mexico.

Q      So just for a little bit of the -- the trip?

A      Yes.

Q      So why would they have to give you a GPS if you're only going to travel this little bit of distance?

A      So they could see where we were going.

Q      So each immigrant received a GPS system?

A      I don't know.

Q      Or was it the 17 that were transported from Nuevo Laredo to Laredo?

A      No.

Q      And the judge already asked you if -- if you know who the -- who opened the door, correct?

A      Yes.

Q      Now, I find this interesting, and I apologize if I sound insensitive, but you stated that for three hours you were asleep, correct?

A      I was not asleep for three hours.

Q      Okay.  So how -- how much time were you asleep?

A      I don't remember.  What I said was that we were in the truck for three hours.

MR. BAEZ:  Did she not say, I don't remember what I said?

THE COURT:  Did she say what?

MR. BAEZ:  "I don't remember what I said."

THE COURT:  She said she did not sleep for three hours.

MR. BAEZ:  Your -- Your Honor, she said, "*No recuerdo lo que dije*." That means, "I don't remember what I said."

THE WITNESS:  I said that I don't remember having said for how long I was asleep.  I remember saying that we were for three hours in the truck.

Q    (By MR. BAEZ) Okay.  But at some point in the journey you fell asleep, correct?

A    Yes.

Q    I don't remember if you had mentioned that people, as you were going into the trailer truck, put the seasoning on you.

A    No, the seasoning was already inside the truck.

Q    So I'm going to ask you again.  Do you remember how long did you fall asleep for?

AUSA SPEARS:  Objection, Your Honor.  Asked and answered.

THE COURT:  I'll -- I'll sustain that.

Counselor, what's the relevance of how long she slept?

MR. BAEZ:  She mentioned that she -- she remembers four times stopping of this trailer.

THE COURT:  Okay.  And then?

MR. BAEZ:  I'll move on, Your Honor.

Q    (By MR. BAEZ) And again, I'm not trying to be insensitive,

but do you -- do you remember your brother's prayer?

A    No, I don't remember.

Q    And so these people took the phones away, but they did not take the Bible away?

A    No, because my brother had hidden it away.

Q    And please remind me again, you -- you stated that the trailer truck stopped approximately four times; is that correct?

A    Yes.

Q    And each time that it -- that the truck stopped, were the people inside yelling and screaming to the driver?

A    Yes.

Q    I'm trying to determine, did you hear one voice or several voices telling you it's going to be okay, or, We're almost there?

A    Only one voice.

Q    And I believe you said that when the door was opened, you woke up?

A    Yes.

Q    And you saw cars?

A    Yes.

Q    But you had people on top of you?

A    No.

Q    Do you remember what type of cars you saw?

A    No, I don't remember.  A whole lot.

Q    Could you have been hallucinating?

A    Yes, it could be.

MR. BAEZ:  No further questions, Your Honor.

THE COURT:  Any redirect?

AUSA SPEARS:  No, Your Honor.

THE COURT:  Okay.

Tell the witness -- now, she's free to go, right?

AUSA SPEARS:  Yes, Your Honor.  She may be excused.

THE COURT:  Okay.  Thank you for being here.  You -- you no longer will be needed in this case.  Will you be returning to Tennessee?

THE WITNESS:  Yes.

THE COURT:  And not that it matters, is your boyfriend a citizen or is he in asylum also?

THE WITNESS:  No, he's -- like, he's undocumented.

THE COURT:  Okay.  All right.

Tell her we know that this was a very painful memory.  Hopefully in time it won't be as painful.

Okay.  And she is excused.

THE WITNESS:  Thank you.

THE COURT:  Okay.  Who's your next witness?

AUSA FUCHS:  Jose Luis Vasquez-Guzman.

THE COURT:  And who is he?

AUSA FUCHS:  Another survivor.

THE COURT:  Another what?

AUSA FUCHS:  Another survivor from the back --

THE COURT:  Oh, okay.  Go ahead.

(PAUSE AS THE WITNESS ENTERS)

**JOSE LUIS VASQUEZ-GUZMAN,**

having first been duly sworn through the U.S. Court Interpreter,

testified to the following:

DIRECT EXAMINATION BY THE GOVERNMENT

BY AUSA FUCHS

Q    Good afternoon.

A    Good afternoon.

Q    If you would just pull that microphone a little towards

you.  Can you state your name, please.

A    Jose Luis Vasquez-Guzman.

Q    And how old are you?

A    Thirty-four years old.

Q    Where are you from originally?

A    Mexico.

Q    What city in Mexico?

A    From the city of Oaxaca.

Q    And did you survive a trip in the back of a tractor trailer

on June 27th of 2022?

A    That's correct.

Q    Tell the jury a little bit about yourself in Mexico before

you came to the United States.

A    Well, in Mexico, before making the trip here, I served for six years in the army.  It was only after leaving the army that I made the trip -- or came to the United States.

Q    And what was your role in the Mexican army?

A    Infantry.

Q    Do you have siblings?

A    Yes.

Q    How many?

A    Two brothers and one sister.

Q    I want to start by talking about how you originally made arrangements to come to the United States.  Approximately how much -- before you left, approximately how far before that did you start making arrangements?

A    About four months.

Q    Can you tell the jury, how do you go about making arrangements?

A    In this case all of the arrangements were made by my cousin, Javier.

Q    And what's his last name?

A    Flores-Lopez.

Q    Did he live in Oaxaca as well?

A    Yes.  Correct.  In the same -- in the same village.

Q    Was anybody else from Oaxaca going to travel with the two of you?

A    Yes, but that person lived in Mexico -- Mexico City.

Q    Who was that person?

A    Marcos Velasco.

Q    Now, when you were originally making arrangements -- or when Javier was making arrangements in Oaxaca, did he hire somebody?

A    I didn't understand.

Q    Well, did you have to -- did you have to pay money for your trip?

A    Yes.

Q    And who do you pay money to -- or who did you pay money to?

A    The money was paid to some people in Tamaulipas.

Q    And how much did you pay?

A    45,000 Mexican pesos.

Q    And what was that money supposed to get you?

A    It was to get across the river.

Q    And was it supposed to get you to a certain city in the United States?

A    Yes, but just across the river.

        AUSA FUCHS:  I want to pull up Government's Exhibit Six, please.

Q    (By AUSA FUCHS) Can use your finger to draw an X on the screen where Oaxaca is in Mexico.  Approximately.

A    (WITNESS COMPLIES)

Q    When you left Oaxaca, did you leave with Javier?

A    That's correct.

Q     And where the two did -- where the two did -- where did the two of you travel first?

A     To the city of Nochixtlan.

Q     How did you get there?

A     In a taxi.

Q     Was this a taxi that you arranged or the smuggler you had paid arranged?

A     No, that was our own doing.

Q     And from there, where did you go?

A     From the city of Nochixtlan, we went to Mexico City.

Q     Was that of your own doing, too?

A     Yes.

Q     The -- the nine of 45,000 Mexican pesos that you paid, where did that part of the journey start?

A     We paid that money in Tamaulipas, but it was not to cover the -- the part of the journey from Nochixtlan to Tamaulipas.

Q     Did it cover the journey after Tamaulipas?

A     Yes.

Q     And then when you got to Mexico City, is that where you met -- met up with Marcos Antonio Velasco?

A     Exactly.

Q     And the rest of the -- the rest of your trip to the United States, did you make it with both Javier and Marcos?

A     Yes, at -- from Mexico City onwards.

Q     I want to show you Government's Exhibit 1123.

And who is that?

A      (CRYING) That person is Javier.

Q      Your -- your cousin?

A      Yes.

Q      Okay.  And Government's Exhibit 1135?

A      Marcos Flores [sic].

AUSA FUCHS:  If you'll go back to Government's Six now, please.

Q      (By AUSA FUCHS) Did both Marcos and Javier ended up dying in the back of that tractor trailer?

A      That's correct.

Q      When y'all left Mexico City, what's the next major city that you went to?

A      Monterrey.

Q      And how did you get from Mexico City to Monterrey?

A      On public transport.

Q      Is that a bus or is that something else?

A      In a -- in a bus, passenger bus.

Q      And then after Monterrey to -- to where?

A      To Tamaulipas.

Q      And after Tamaulipas, where did you go?

A      Well, we arrived at Nuevo Laredo in Tamaulipas.

Q      Okay.  So when -- when you're saying "Tamaulipas," are you meaning -- are you referring to Nuevo Laredo in Tamaulipas?

A      That's right.

Q    Were you given any special code words to use along that part of the journey?

A    Yes.

Q    Okay.  What was that code word?

A    Flaco 050.

Q    And when were you given that?

A    We were given that in Monterrey.

Q    By who?

A    It was through -- it was by means of a phone call to Javier.

Q    And Javier is who had arranged -- who had made the arrangement with the smugglers; is that right?

A    That's correct.

Q    What were you supposed to do with that code word Flaco 050?

A    Well, we were asked to not forget it because once we arrived there in Monterrey, we were told that if we gave that code word we would be safe.

Q    Okay.  Did you give that code word in Monterrey?

A    No.

Q    Was there a time when you needed to give that code word?

A    When we arrived at the bus terminal in Nuevo Laredo.

Q    Tell the jury how that happened.

A    When we got off the bus, we went towards the bathroom and a person followed us into the bathroom and then asked us if we had a code.

Q    And so did you tell him Flaco 050?

A    That's right.

Q    So what happened next?

A    He asked us if we were going to cross the river.  We said we were.

Q    And then what?

A    We were told that we were going to take a taxi to the Calderon Hotel.

Q    Is that a hotel that you picked or you were told where to go?

A    They told us that we had to go there, to that hotel.

          AUSA FUCHS:  I show Government's Exhibit 334.

Q    (By AUSA FUCHS) Is that the Hotel Calderon?

A    Yes.

Q    That was in Nuevo Laredo, Tamaulipas?

A    That's right.

Q    I'm going to show you a couple photos from the inside of that hotel.  Government Exhibit 335, what are we looking at here?

A    The doors to the rooms.

Q    That's the rooms where you stayed?

A    Yes.  They all were very much alike.

Q    And who stayed in the room with you?

A    All three of us stayed there.

Q    Okay.  Were there other people in the room besides the

three of you?

A    I only saw very few people.

Q    Okay.  I mean, in -- in the room that you slept, were there other people sleeping in the room as well?

A    No, just us three.

Q    Government Exhibit 336, what are we looking at here?

A    The beds in the rooms.

Q    This is what the rooms looked like?

A    Yes.

Q    And how many days did you stay in this Hotel Calderon?

A    I don't remember exactly.

Q    More than one?

A    Yes.

Q    What did you do during the days while you were waiting to cross into the United States?

        MR. BAEZ:  Objection, Your Honor.  Relevance.

        THE COURT:  I'll permit the question.

            Go ahead.

        THE WITNESS:  We were -- we were locked up in there.

Q    (By AUSA FUCHS) How would you describe the rooms?

A    Well, they're rooms that are in poor repair.

Q    Was it clean?  Was it dirty?

A    Dirty.

Q    Government's Exhibit 337, what are we -- what are we seeing here?

A    Those are the room -- the windows in the rooms.

Q    They all look like that, with screens or bars on them?

A    Yes.

Q    And then Government's Exhibit 338, what are these?

A    On the lower level of the floor there's an area where all of the people who are going to journey on gather.

Q    And in that area would there often be bags like this?

A    Yes.  Normally everyone has their own backpack.

Q    How often would people gather to cross from that hotel into the United States?

        MR. BAEZ:  Object, Your Honor.  Calls for speculation.

Q    (By AUSA FUCHS) While you were there.

        THE COURT:  If he knows.

        MR. BAEZ:  He said he was locked up in a room, Your Honor.

        THE COURT:  If he knows.

          Only if he knows.

        THE WITNESS:  During the time that I was there?

        THE COURT:  Yes.

        THE WITNESS:  Every afternoon.

Q    (By AUSA FUCHS) Did you gather there on multiple afternoons?

A    Yes.

Q    Is that because you tried and crossed into the United States several times?

A    That's right.

THE COURT:  Counselor, we're going to take a recess.

AUSA FUCHS:  Yes, sir.

COURT SECURITY OFFICER:  Rise for the jury.

(2:49:01 P.M., JURY OUT)

(2:49:05 P.M., OFF THE RECORD)

(3:04:54 P.M., ON THE RECORD.  MOST PARTIES ARE PRESENT, INCLUDING THE DEFENDANTS.  MR. BAEZ IS OUT, THE JURY IS OUT.)

THE COURT:  The jury's coming in here in a moment.  Do we need to take up anything?

AUSA FUCHS:  No, but we could use a --

COURT SECURITY OFFICER:  Rise for the jury.

AUSA SPEARS:  Mr. Baez isn't here, Your Honor.

THE COURT:  No, I -- I know.  We'll wait until -- until he's in.

(3:05:26 P.M., JURY IN)

(BRIEF PAUSE.  MR. BAEZ IS IN)

THE COURT:  Okay.  We can be seated now.

Okay, counselor, you may resume.

CONTINUED EXAMINATION BY THE GOVERNMENT

BY AUSA FUCHS

Q    Mr. Vasquez-Guzman, we were -- when we left off, we were talking about the multiple times you crossed into the United States.  And I want to first talk about the trips before the final trip where you ended up getting on the tractor

trailer.  Were there --

A    Very well.

Q    -- were there times prior to that where you crossed into the United States and were caught and sent back to Mexico?

A    That's right.

Q    And was that the same for Javier and for Marcos?

A    Yes.

Q    And how many times did that happen?

A    Three times.

Q    Okay.  Can you tell me about the first time.

A    We were able to get across the river and went up, walking along a dry creek bed, Marcos was connected by phone and they told us at the top of the hill there was going to be a park with a field where we were going to wait to be picked up.

Q    And how many were in your group at that time?

A    Just -- just four of us.

Q    And so the three of y'all and one other?

A    That's right.

Q    How did you cross the river?

A    We were given life jackets and we swam across.

Q    Okay.  Do you know how to swim?

A    Not very well.  Very little.

Q    The GPS device that you were talking about that Marcos had --

A    No, he was on the phone with a person who was giving him

instructions.

Q    And those instructions took y'all where?

A    To the little park.

Q    Was the little park close to the river?

A    Yes.

Q    And what happened at that little park?

A    Well, they called out his name and we went running towards some cars.  And when we got there, the trucks and some -- and a truck belonging to some military, some Marines was there.

Q    Okay.  And so then what happened?

A    They called immigration and they kicked us out.

Q    Back to Mexico?

A    That's right.

Q    That same night -- or was it daytime or nighttime?

A    It's over the -- it was over the course of a night, and then at dawn they brought us -- they returned us to Mexico.

Q    Back in Mexico, did you go back to Hotel Calderon?

A    Yes.

Q    Did you end up trying again soon thereafter to get back to the United States?

A    Yes.

Q    Tell us about the second trip.

A    On the second trip we managed to cross the river and to walk a while amongst the trees until some patrol cars caught us and returned us to Mexico.

Q    How many were in your group at that time?

A    Just the three of us.

Q    And were you taken back to Mexico that same day or night?

A    Yes.

Q    And did you go back to the Hotel Calderon?

A    Yes.

Q    And tell us about the third time.

A    That time we crossed the river and the water was very deep. They just gave us -- they just gave us an inflated tire to cross with.  There were four of us on that occasion, and the current was somewhat fast and the water deep, like I said, but we managed to cross.

Q    When you got to the other side, where did you go on that time?

A    We were taken to a house.

Q    And what was that house like?

A    It was a normal house, three bedrooms and one bathroom.  It had a washer and dryer which we could use to wash and dry our clothes if we wanted.

Q    Were there other migrants there as well?

A    Yes, in the -- in the bedrooms there were.  Yes.

Q    Approximately how many?

A    More than 25.

Q    How long were you at that house?

A    About three days.

Q    And then what happened?

A    The Border Patrol showed up and they took us back.

Q    Back to Mexico again?

A    Yes.

Q    And did you go back to Hotel Calderon again?

A    Yes.

Q    These times when you're making it to the United States, then getting caught and sent back, are you having to pay any fees each time you cross into the United States?

A    Only when they got us as far as a house and then we were returned.

Q    Okay.  So if -- if you made it to a house and then were returned, you had to do what?

A    We had to pay a new -- again.

Q    Okay.  And so that last time when you just told us about getting caught at the house and sent back, who did you have to pay that time?

A    The -- the guys that would come and check on us at the hotel came to be paid.

Q    Okay.  How much did you have to pay them?

A    10,000 Mexican pesos.

Q    And that was in addition to the 45,000 Mexican pesos that you had paid originally?

A    Yes.

Q    That 45,000 pesos originally that got you across the border

on the first try?

A    Practically.  Yes.

Q    This additional 10,000-peso fee, what was -- what was that for?

A    I don't know.

Q    Would you have been permitted to cross into the United States by these smugglers without paying that?

A    No.

Q    Those three attempts you just told us about where you got sent back to Mexico, was that all in a short timeframe, maybe a week or ten days, before you ended up coming over the final time?

A    A week and a half.

Q    I want to talk about that -- the last time you came over now.  Okay?

        Did you start by leaving Hotel Calderon?

A    That's right.

Q    How many were in your group?

A    Four of us.

Q    And where did you go?

A    We crossed the river again, and again went up a creek bed to where a bridge was, and that's where we were picked up.

Q    Each time you crossed the river on these four trips, is it at the same spot or at different spots?

A    Different spots, but they weren't very far apart, one from

the other.

Q    All right.  How did you choose where to go across?

A    We didn't choose, they chose for us.

Q    That final trip when you got across and you went and met the car, how did you know where to meet it?

A    There was another person who was traveling with us who had a phone and who was guide -- guiding or telling us where to go.

Q    Was he a migrant also, or did he work with the smugglers?

A    He was the person who was tasked or in charge of getting us across.

Q    The vehicle, where did it take you?

A    The vehicle that picked us up took us to be picked up by yet another vehicle.

Q    Is this all in Laredo?

A    Yes.

Q    And when you're traveling, is this at nighttime or daytime?

A    Nighttime.

Q    The second vehicle, where did it take you?

A    To a house.

Q    Can you describe that house.

A    It was a small house with just one room and a half kitchen.

Q    This was a different house than the one you'd been caught in the trip prior, right?

A    That's right.

Q    Were there other migrants already at the house?

A     Yes.  It was full.

Q     Approximately how many people were there?

A     40, about.

Q     Men and women?

A     Yes, men and women.

Q     Children?

A     Yes.

Q     Were there beds for people to sleep in?

A     No.

Q     What about food?

A     The food was brought in by somebody else, by another person, and it had to be passed from person to person until it got to the kitchen.  But it wasn't very much, and then the same problem with the water; there were only -- it was only a 24-pack of waters like this bottle (INDICATING).

Q     How often was food brought in?

A     They almost didn't, or nearly didn't bring food.

Q     How about water; how often was a new pack of water brought in?

A     They also didn't bring much water.  We had to use the faucet to fill up.

Q     Was there much room to move around?

A     No, we were -- we were too crowded in there.

Q     Were you allowed --

A     Cramped.

Q    -- were you allowed to go outside?

A    No.

Q    How long were you at that house?

A    I don't remember exactly.

Q    Multiple nights?

A    Yes.

Q    While you were there, staying at the house, did -- did more -- were more people -- did other people arrive?

A    That's right.

Q    And then what about leaving; while you were there, did any groups leave while you were still staying there?

A    Yes.  Normally it would be two or three people that would leave.

Q    How did you know when it was going to be your time to leave?

A    There was a woman, a person there, who had a phone and they would tell her when that was going to happen.

Q    Was she another migrant?

A    Yes.

Q    On the day that you were able to leave, when did you learn that you were going to leave?

A    Through a phone call that they made to that woman on the phone she had.

Q    And were y'all told, though -- was -- how many of y'all were going to leave at the same time from that house?

A    All of us.

Q    All -- more than 40 people that were there?

A    Yes.

Q    How did you leave the house?

A    There was a truck that backed up to the house, that came and backed up to the -- to the door of the house and we practically jumped into the back of the -- that truck.

Q    Did people show up with the truck or just the driver?

A    I wasn't able to see, honestly.

Q    Did you leave out the front door, or the back door, or where to get to the truck?

A    The house only had a door on the front.

Q    Can you describe that truck that backed up to -- to pick y'all up.

A    It was a white-colored, a small box truck -- a truck with a small box on the back.  White.

AUSA FUCHS:  I'll pull up Government's Exhibit 208-BA.

If you could just pause it as that truck goes across the top.

Q    (By AUSA FUCHS) Can you see the -- the truck at the top of the screen there in the highlighted area?

A    Yes.

Q    The truck that you're describing that showed up to pick more than 40 of y'all up at the stash house, did it look similar to that?

A    Yes.

Q    How was it inside that truck?

A    Well, we -- we were all bunched in, we were all crowded in there.

Q    We know that you ended up in a -- in a large trailer ready -- later, right?

A    Yes.

Q    Did you have more room in the larger trailer or in this little trailer?

A    There was more room in the larger one.

Q    How long were you in the small truck?  Approximately.

        INTERPRETER:  I'm sorry?

        AUSA FUCHS:  Approximately.

        THE WITNESS:  Eight or ten minutes, approximately.

Q    (By AUSA FUCHS) What's the next thing that happened?

A    That truck backed up against the back end of the trailer and we jumped -- we practically jumped into the trailer.

Q    So you didn't get down to the ground first?

A    No.

Q    Were there other people already in the trailer?

A    I don't remember very well.

Q    When you were getting in the trailer, were you allowed to take personal items?

A    We were told as we were getting into the trailer that we needed to leave behind our telephones and anything that we had

on us if we didn't want to lose it at the checkpoint.

Q    Who's telling you this?

A    The same ones -- the same people who were driving the small truck -- that were coming with the small truck.

Q    So were they inside the trailer with you or outside the trailer?

A    They were the ones that opened the doors to that smaller truck.

Q    And then could you see them as you hopped from the small truck to the large truck?

A    Honestly, no.

Q    Were you given any instructions or rules to follow once you were in the large trailer?

A    That we were to not make any noise.

Q    All right.  Did anything else happen at that time?

A    Before we got into that truck, the larger truck, they threw in a powder or spread a powder in there.

Q    Did it have a smell?

A    Yes.

Q    What did it smell like?

A    Cilantro.

Q    When you got into the trailer, where were you positioned; near the back doors or near kind of the front far end?

A    Towards the back end of the trailer.

Q    Were you sitting down or standing up?

A    Sitting down.

Q    Were you -- did you have room to lean against a wall?

A    No.

Q    What were you doing?

INTERPRETER:  I'm sorry?

Q    (By AUSA FUCHS) What were you doing?  How were you sitting?

A    Well, we were sitting kind of like, sometimes, soldiers sit, with each of us with our legs around the next person -- or our knees around the next person.

Q    Were you by Javier and Marcos?

A    Yes.

Q    About how close to the back doors do you think you were?

A    About seven feet.

Q    Were the doors closed?

A    Yes.

Q    When they closed, how was it inside?

A    Too hot.

Q    Could you see?

A    Very little.

Q    Once the doors were closed, could you get out?

A    No.

Q    Did you feel the trailer start to move?

A    Yes.

Q    As the trailer's moving, at any point could you tell that you were at what you thought was a Border Patrol checkpoint?

A    Yes.

Q    Okay.  Why did you think that?

A    Because the truck came to a stop and you could hear voices on the outside of the trailer, and you could hear them knocking against the tires.

Q    How was everyone behaving inside the trailer when that was going on?

A    Everybody was totally quiet.

Q    Why is that?

A    We had been told to not make any noise.

Q    Did things change after you got past that checkpoint?

A    Yes.

Q    Can you describe that for us.

A    We could hear the voice of a man who was asking for help, asking for water because his wife was dying.

Q    This is inside the trailer?

A    Yes.

Q    What else?

A    Everyone became very desperate because it was too hot and we were all sweating too much.  And people began screaming to get the A/C on, and they were banging on the sides of the walls. And I think the driver heard it -- heard that because he turned the air on, but the air that was coming out was hot.

Q    Tell us about that.  Could you feel air coming out of the A/C or the reefer unit?

A    When the A/C was turned on, we could feel that the heat increased.

Q    Were there any other times that the trailer stopped along the journey?

A    Yes.

Q    Can you tell us about that.

A    The truck stopped -- or came to a stop, and somebody tried to open the door from the outside, but I don't know why it wasn't opened.

Q    And why do you think it was -- tried to be opened from the outside?

A    Because I could hear that they moved a safety bar on the door.

Q    And are you familiar with big trucks like that?

A    Well, I could say that I was familiar with or I would recognize the -- the way the sounds are of opening the safety locks or latches, because while I was in the army I was tasked with reviewing trucks -- or inspecting trucks like that.

Q    And that's the sounds you heard that day?

A    Yes.

Q    When that sound was happening and the -- the trailer was stopped, were people inside still yelling for help?

A    People were desperate.  Yes.  Banging on the doors and all.

Q    And you talked about the heat.  Did you do anything in relation to your shirt as it got hotter?

A    I don't remember.

Q    Do you remember if other people were taking off items of clothing?

A    No.

Q    What's the last thing you remember inside the trailer?

A    There was a group of women that made a circle -- or came together in a circle that were praying.

Q    What happened to you after that?

A    I -- I blacked out.  I lost consciousness and I don't remember anything else.

Q    The next time you woke up, where were you?

A    In a hospital.

        AUSA FUCHS:  I'll pass the witness.

                CROSS-EXAMINATION BY THE DEFENSE

BY MR. BAEZ

Q    So as we stand here today, you're telling the jury that you have attempted to cross into the United States four times?

A    Yes.

Q    And three of those times, the United States deported you back to Mexico; is that correct?

A    Two times that happened.  One time we returned ourselves on our own.

Q    Really?  Why?

A    Because we ended up seeing the Border Patrol trucks, or the immigration trucks.

Q    You couldn't hide?

A    No, we decided to return.

Q    All the way back across the river?

A    Yes.

Q    At any time during the two times that you were deported back, were you charged with a crime?

A    No.

Q    From the hospital, when you woke up, did they deport you back to Mexico?

A    No.

Q    Had you been charged with a crime during this smuggling attempt?

A    No.

Q    Do you know how many codes were given to immigrants throughout this operation?

A    I don't know.

Q    Because you only mentioned one, "*flaco*," but you have attempted it four times.

A    Yes.  Yes.

Q    So only one code all these four times?

A    That's right.

Q    The same code?

A    That's right.

Q    Tell the members of the jury how much money you had the first time you attempted to cross into the United States.

A    I don't remember exactly.

Q    And I believe you said it took you about one to one and a half weeks in these four attempts; is that correct?

A    Yes.

Q    Sir, I'm going to ask you:  How many pesos -- or how many dollars is 45,000 pesos?

A    2,200.  2,300.

Q    So 45,000 pesos to start, and 10,000 pesos every time thereafter; that's what you told the jury, correct?

A    I paid that money the one time that they returned us.

Q    So you had -- you had to have had at least 85,000 pesos in order for you to do this endeavor that you're describing to the jury.

A    I don't honestly remember how much I was -- how much money I had on me.

Q    Do you have a lot of money on you all the time?

A    No.

Q    Because this is a substantial amount of money, isn't it?

A    I know that.

Q    And you don't remember?

A    That's right.

Q    Okay.  I believe your words were that it took you four months to make the arrangements for this transfer from Mexico to the United States; is that correct?

A    Approximately, yes.  That's right.

Q    In those four months, were you planning so many failures?

A    No.

Q    Certainly the three prior times that you attempted to cross, you got in the back of a truck, correct?

A    I didn't understand.  I don't understand what you are asking.

Q    How many times out of the four times did you get into the back of a truck, of a trailer?

A    Only the last time.

Q    Now, if I may show you exhibit -- Government's Exhibit Number Six.  Do you remember when the prosecutor asked you to put an X?

A    Yes.

Q    Could you do it again, please.

A    (WITNESS COMPLIES)

Q    What does the X mark?

A    The state from which I -- I come from.

Q    Which is Oaxaca?

A    That's right.

Q    From Oaxaca, how far is it to get to the river?

A    It took us a day and a night, approximately.

Q    Because I believe that you stated that they only charged you an additional charge if you failed to cross the river.  Is that -- was that correct?

A    I'm not sure I understood your question very well.

Q    You know what, when you were deported back to Mexico, where were you deported to?

A    We returned to the Calderon Hotel.

Q    The U.S. returned you to where they think immigrants are being smuggled to the United States?  Did I get that right?

A    No.  They would just bring us to the bridge, and then we had to walk across -- cross the bridge back into Mexico.

Q    So they didn't bring you back to Oaxaca at any point, did they?

A    No.  They did not.

Q    So you only, then -- based on this map, you only then took a trip from Oaxaca to Mexico City, and then to Monterrey one time; is that correct?

A    That's right.

Q    But then there was a little bit of confusion between Monterrey and Tamaulipas, and Nuevo Laredo, Tamaulipas.  Are they two different places?

A    No.

Q    During this entire ordeal, did you ever stayed at an apartment?

A    No.  Only in the hotel.

Q    So you have no knowledge of any apartments during this operation?

A    No.

Q    Certainly, when you were deported back to Mexico, the

United States removed your possessions, didn't they?

A    No.

Q    So they let you have your Mexican pesos?

A    Yes.

Q    And that's how you were able to afford Hotel Calderon?

A    Yes.

Q    How many times you stayed at this hotel?

A    I don't remember exactly.

Q    In the hotel were you able to walk in and out?

A    Yes.

Q    So when the government showed you these windows, you were not in a jail, were you?

A    No.

Q    In fact, let me show you Exhibit 337.

        Is that the typical window in Mexico?

A    I'm not sure I understood.

Q    What do windows look like in Mexico?

        THE COURT:  Do they look like this?

        THE WITNESS:  Yes.

Q    (By MR. BAEZ) So there's nothing special about this Government's Exhibit 337, is it?

A    No.

Q    And again, you could have left that room?

A    Yes.

Q    But you chose not to because you wanted to cross to the

United States illegally; is that correct?

A    Yes.

Q    In fact, the only reason that you could tell that other people were attempting to leave is because you were outside looking at them; is that not correct?

A    Normally in the afternoons when we would go out of the rooms to eat, we would see that there would be people gathering.

MR. BAEZ:  Can I show him Exhibit 338, please.

Q    (By MR. BAEZ) This particular pile of items, was that -- then again, was that when you left finally on the truck or is that somebody else's?

A    Other people's.

Q    And so let me -- I want to understand this.  Who took this picture?

A    I don't know.

Q    Because according to you, the phones were taken.

And so how --

A    That's right.

Q    So how is it that the government has this picture when the phones were taken?

A    I don't know.

Q    Going into this exhibit, and this is the chart, can you see any of these people from where you are?

A    Yes.

Q    In fact, it's in front of your screen right now.

A    Yes.

Q    Do you recognize any of those individuals during your four illegal attempts to enter the United States?

A    No.

Q    In fact, sir, have you ever met any of my clients?

A    No.

Q    From June 27, 2022, how many other times have you attempted to cross the United States illegally?

INTERPRETER:  I'm sorry, counsel.  After June 27th?

MR. BAEZ:  After June --

THE WITNESS:  None.

Q    (By MR. BAEZ) In fact, you haven't left back to Mexico from June 27, 2022; is that correct?

A    That's right.

Q    Did you get some kind of a change of status while you've been here in the United States?

A    My lawyer is working on my visa.

Q    Well, typically you work on a visa from the country of origin, not from the United States; is that correct?

A    I don't know.

Q    The government showed you a video of a little truck driving.  Do you remember that?

A    Yes.

Q    And you stated that it looks like -- kind of like the truck that the -- the box truck that you got into it to get

transported; is that correct?

A    That's right.

Q    Well, you're not telling the jury that that was the specific box truck that you were transported?

A    That's right.

Q    Your testimony, sir, was that you don't remember any people in the trailer once you moved from one box truck to the trailer; is that correct?

A    That's right.

Q    Is that because this is your first time actually in a trailer truck to transport to the United States?

A    That's right.

Q    Now, does cilantro smell sweet?

A    I don't know how to describe it.

Q    You testified that it smelled like cilantro; did you not?

A    That's right.

Q    And does cilantro comes in a green -- I mean, in a black form and a white form?

A    No.

Q    What color is the cilantro?

A    Green in color.

Q    Did you see any cilantro there as you were entering the truck?

A    No.

Q    Did anybody throw the substance on any of you?

A    No.

Q    Isn't it true, sir, that you could not see any -- anybody inside of the truck running?

A    Well, honestly, I could only see the people that were next to me.  We could see very little.

Q    So you didn't see anybody running inside the trailer?

A    No.

Q    And you testified that the trailer stopped four times; is that correct?

A    No.

Q    How many times did the trailer stop?

A    Twice.  Two times.

Q    The air that you felt, you said it was hot.  Where did you feel it from?

A    The air was coming from where the compressor blows out air.

Q    Well, how could you feel that if you were all the way to the front of the trailer?

A    Well, it was unbearable.

Q    Isn't it true, sir, that the air on this type of trailer comes from the bottom?

A    I don't know.  I don't know.

Q    You didn't feel any air, did you?

A    It was just way too hot.  Once they turned the air on, it was too -- too hot.

Q    And did you ever -- did you state that you actually passed

out, you blacked out; is that correct?

A    Yes.

Q    Can you tell the members of the jury for approximately how long?

A    No.

Q    Was it before the first stop?

A    Could you repeat the question.

Q    Sure.  Did you passed out, had the blackout episode before the first time that the truck -- trailer truck stopped?

A    No.  Prior to the first stop at the -- at what I thought was the checkpoint, no.  I was still okay.

Q    But it was so hot that you guys decided to stay quiet at the checkpoint?

A    That's right.

Q    Instead of screaming for help to people that could have helped you?

A    That's right.

Q    You must have had a very strong -- strong desire to be here in the United States illegally.

        AUSA FUCHS:  Objection.  Argumentative.

        THE COURT:  Sustained.

        MR. BAEZ:  I'll -- nothing further, Your Honor.

        THE COURT:  I'm sorry?

        MR. BAEZ:  No more questions.

        THE COURT:  Okay.  Good.

AUSA FUCHS:  May he be excused?

THE COURT:  Yes.  Thank you for being here.  You're excused.

(4:10:27 P.M., END OF REQUESTED EXCERPT)


* * * * * *

**C E R T I F I C A T E**

U.S. DISTRICT COURT          )

WESTERN DISTRICT OF TEXAS )

SAN ANTONIO DIVISION         )

          I, Vickie-Lee Garza, Certified Shorthand Reporter, do hereby certify that the above-styled proceedings were reported by me, later reduced to typewritten form, and that the foregoing pages are a true and correct transcript of the original notes to the best of my ability, as pertains only to the testimony of two requested witnesses held on the date of this transcript.

          Certified to by me this 15th day of August, 2025.


                              /s/  VICKIE-LEE GARZA
                              TX CSR #9062, Expires 10/31/25
                              P.O. Box 831583
                              San Antonio, Texas  78283